UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

               Plaintiff,

       -against-

DEUTSCHE BANK AG; TAUNUS
CORPORATION; DB STRUCTURED
PRODUCTS, INC.; DEUTSCHE BANK
SECURITIES INC.; ACE SECURITIES
CORP.; MORTGAGEIT SECURITIES
CORP.; DOUGLAS K. JOHNSON; EVELYN
ECHEVARRIA; AND JULIANA C.
JOHNSON,

              Defendants.

11 CIV. 6192 (DLC)

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

**June 13, 2012**

**TABLE OF CONTENTS**

**Page**

NATURE OF ACTION ...................................................................................................1

PARTIES .......................................................................................................................8

    *The Plaintiff and the GSEs*...................................................................................8

    *The Defendants* ...................................................................................................9

    *The Non-Party Originators* ...............................................................................11

JURISDICTION AND VENUE ...................................................................................11

FACTUAL ALLEGATIONS ........................................................................................12

I.     THE SECURITIZATIONS........................................................................................12

    A.    Residential Mortgage-Backed Securitizations In General .....................12

    B.    The Securitizations At Issue In This Case ...........................................14

    C.    The Securitization Process ....................................................................15

        1.    DB Products Pools Mortgage Loans in Special Purpose Trusts ...............15

        2.    The Trusts Issue Securities Backed by the Loans.....................................16

II.    THE DEFENDANTS' PARTICIPATION IN THE SECURITIZATION PROCESS ....................................................................................................................21

    A.    The Role of Each of the Defendants .....................................................21

        1.    DB Products.........................................................................................21

        2.    DBS.....................................................................................................22

        3.    ACE.....................................................................................................23

        4.    MIT Securities ....................................................................................23

        5.    Deutsche Bank AG .............................................................................24

        6.    Taunus.................................................................................................24

        7.    The Individual Defendants..................................................................24

B.     Defendants' Failure To Conduct Proper Due Diligence ........................................25

III.    THE REGISTRATION STATEMENTS ........................................................................28

A.     Compliance With Underwriting Guidelines ...................................................28

B.     Statements Regarding Occupancy Status of Borrower .........................................31

C.     Statements Regarding Loan-to-Value Ratios..................................................34

D.     Statements Regarding Credit Ratings ...................................................37

IV.    FALSITY OF STATEMENTS IN THE PROSPECTUS SUPPLEMENTS ....................39

A.     The Statistical Data Provided in the Prospectus Supplements Concerning Owner Occupancy and LTV Ratios Was Materially False or Misleading ...........39

1.     Owner Occupancy Data Was Materially False .........................................40

2.     Loan-to-Value Data Was Materially False ...............................................43

B.     The Originators of the Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines ........................................................48

1.     A Forensic Review of Loan Files Has Revealed Pervasive Failure to Adhere to Underwriting Guidelines.......................................................48

(a)    **Stated Income Was Not Reasonable**...........................................52

(b)    **Evidence of Occupancy Misrepresentations**.............................55

(c)    **Debts Incorrectly Calculated; Debt-To-Income Ratios Exceeded Guidelines** ...................................................57

(d)    **Credit Inquiries That Indicated Misrepresentation of Debt** ................................................................62

2.     Both Government and Private Investigations Have Confirmed That the Originators of the Loans in the Securitizations Systematically Failed to Adhere to Their Underwriting Guidelines .................................66

(a)    **Countrywide** ...............................................................66

(b)    **New Century** ..............................................................68

(c)    **Option One** ...............................................................70

(d)    **Fremont**.................................................................71

        **(e)**     **IndyMac** ........................................................................................73

        **(f)**     **Inflated Appraisals Generally**......................................................75

    3.     The Collapse of the Certificates' Credit Ratings Further Indicates that the Mortgage Loans were not Originated in Adherence to the Stated Underwriting Guidelines...............................................................76

    4.     The Surge in Mortgage Delinquency and Default Further Demonstrates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines .....................................79

**V.**    DEUTSCHE BANK KNEW ITS REPRESENTATIONS WERE FALSE  AND THE GSES JUSTIFIABLY RELIED ON DEUTSCHE BANK'S REPRESENTATIONS ........................................................................................81

    A.    Deutsche Bank Knew, Through Its Own Due Diligence And The Findings Of Its Outside Consultants, That The Representations in the Registration Statements Were False............................................................82

        1.     Deutsche Bank Knew Based On Its Own Diligence That The Loans Were Not Adequately Underwritten ................................82

        2.     Deutsche Bank Also Knew, Based On The Findings Of Its Hired Consultants, That The Mortgage Loans Were Not Adequately Underwritten ..........................................................................84

    B.    Deutsche Bank Knew Based On Its Relationship With The Loan Originators That The Representations In The Registration Statements Were False ..........................................................................................87

        1.     Deutsche Bank's Role as Warehouse Lender Further Ensured that it Knew that the Representations Were False .............................87

        2.     Deutsche Bank Knew That The Representations Were False Through Its Affiliation with MortgageIT ...................................88

    C.    Multiple Investigations Confirm that Deutsche Bank Knew that the Mortgage Loans Did Not Conform to the Stated Underwriting Guidelines..........89

    D.    Multiple Witnesses, Including Former Deutsche Bank Personnel, Have Confirmed that Deutsche Bank Knew that the Mortgage Loans Did Not Conform to Stated Underwriting Guidelines ..........................................91

    E.    The GSEs Justifiably Relied on Deutsche Bank's Representations .....................94

**VI.**    FANNIE MAE'S AND FREDDIE MAC'S PURCHASES OF THE GSE CERTIFICATES AND THE RESULTING DAMAGES ..................................................98

VII.    TOLLING OF FHFA'S SECURITIES CLAIMS BY PREVIOUSLY FILED
        CLASS ACTION COMPLAINTS ...................................................................................101

FIRST CAUSE OF ACTION .............................................................................................102

SECOND CAUSE OF ACTION .........................................................................................107

THIRD CAUSE OF ACTION .............................................................................................111

FOURTH CAUSE OF ACTION .........................................................................................115

FIFTH CAUSE OF ACTION ..............................................................................................119

SIXTH CAUSE OF ACTION .............................................................................................122

SEVENTH CAUSE OF ACTION .......................................................................................125

EIGHTH CAUSE OF ACTION ..........................................................................................129

NINTH CAUSE OF ACTION .............................................................................................131

TENTH CAUSE OF ACTION ............................................................................................133

PRAYER FOR RELIEF ......................................................................................................134

JURY TRIAL DEMANDED ...............................................................................................134

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator of The Federal National Mortgage Association ("Fannie Mae") and The Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Amended Complaint herein against DB Structured Products, Inc. ("DB Products"), Deutsche Bank AG, Deutsche Bank Securities Inc. ("DBS"), Taunus Corporation ("Taunus"), ACE Securities Corp. ("ACE"); MortgageIT Securities Corp. ("MIT Securities") (collectively, "Deutsche Bank"), Douglas K. Johnson, Evelyn Echevarria, and Juliana C. Johnson (the "Individual Defendants") (together with Deutsche Bank, the "Defendants") alleges as follows:

## NATURE OF ACTION

1.    This action arises out of Defendants' actionable conduct in connection with the offer and sale of certain residential mortgage-backed securities ("RMBS") to Fannie Mae and Freddie Mac (collectively, the "Government Sponsored Enterprises" or "GSEs").  These securities were sold pursuant to registration statements, including prospectuses and prospectus supplements that formed part of those registration statements, which contained materially false or misleading statements and omissions.  Defendants falsely stated that the underlying mortgage loans and properties complied with certain underwriting guidelines and standards.  These false statements and misleading omissions significantly overstated the ability of the borrowers to repay their mortgage loans and the value of the collateralized property.  These statements were material to the GSEs, as reasonable investors, and their falsity violates Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and constitutes common law fraud and aiding and abetting fraud.

2.    Between September 28, 2005 and June 29, 2007, Fannie Mae and Freddie Mac purchased over $14.2 billion in residential mortgage-backed securities (the "GSE Certificates")

1

issued in connection with 40 Deutsche Bank-sponsored and/or Deutsche Bank-underwritten securitizations.[1]  The GSE Certificates purchased by Freddie Mac, along with the date and amount of the purchases, are listed in Table 10.  The GSE Certificates purchased by Fannie Mae, along with the date and amount of the purchases, are listed in Table 11.  The 40 securitizations at issue are:

 i. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2005-AG1 ("ACE 2005-AG1");

 ii. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2005-ASAP1("ACE 2005-ASAP1");

 iii. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2005-HE6 ("ACE 2005-HE6");

 iv. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2005-HE7 ("ACE 2005-HE7");

 v. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-ASAP1 ("ACE 2006-ASAP1");

 vi. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-ASAP2 ("ACE 2006-ASAP2");

 vii. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-ASAP3 ("ACE 2006-ASAP3");

 viii. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-ASAP4 ("ACE 2006-ASAP4");

 ix. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-ASAP5 ("ACE 2006-ASAP5");

 x. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-ASAP6 ("ACE 2006-ASAP6");

---

[1] For purposes of this Amended Complaint, the securities issued under the Registration Statements (as defined in footnote 2, below) are referred to as "Certificates," while the particular Certificates that Fannie Mae and Freddie Mac purchased are referred to as the "GSE Certificates."  Holders of Certificates are referred to as "Certificateholders."

   xi.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-CW1 ("ACE 2006-CW1");

   xii.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-FM1 ("ACE 2006-FM1");

  xiii.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-FM2 ("ACE 2006-FM2");

  xiv.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-HE1 ("ACE 2006-HE1");

   xv.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-HE2 ("ACE 2006-HE2");

  xvi.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-HE3 ("ACE 2006-HE3");

 xvii.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-HE4 ("ACE 2006-HE4");

xviii.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-NC1 ("ACE 2006-NC1");

  xix.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-NC2 ("ACE 2006-NC2");

   xx.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-NC3 ("ACE 2006-NC3");

  xxi.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-OP1 ("ACE 2006-OP1");

  xxii.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2006-OP2 ("ACE 2006-OP2");

 xxiii.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2007-ASAP1 ("ACE 2007-ASAP1");

 xxiv.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2007-ASAP2 ("ACE 2007-ASAP2");

  xxv.  ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2007-ASL1 ("ACE 2007-ASL1");

xxvi. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2007-HE1 ("ACE 2007-HE1");

xxvii. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2007-HE2 ("ACE 2007-HE2");

xxviii. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2007-HE3 ("ACE 2007-HE3");

xxix. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2007-HE4 ("ACE 2007-HE4");

xxx. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2007-HE5 ("ACE 2007-HE5");

xxxi. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2007-SL1 ("ACE 2007-SL1");

xxxii. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2007-WM1 ("ACE 2007-WM1");

xxxiii. ACE Securities Corp. Home Equity Loan Trust Asset-Backed Pass-Through Certificates, Series 2007-WM2 ("ACE 2007-WM2");

xxxiv. Deutsche Alt-A Securities Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-OA4 ("DBALT 2007-OA4");

xxxv. IndyMac INDX Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-AR31 ("INDX 2005-AR31");

xxxvi. IndyMac INDX Mortgage Loan Trust Mortgage-Backed Certificates, Series 2006-AR9 ("INDX 2006-AR9");

xxxvii. MortgageIT Securities Corp. Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-1 ("MHL 2007-1");

xxxviii. New Century Home Equity Loan Trust Asset-Backed Notes, Series 2006-2 ("NCHET 2006-2");

xxxix. NovaStar Mortgage Funding Trust Asset-Backed Certificates, Series 2007-1 ("NHEL 2007-1");

xl. Residential Asset Securitization Trust Mortgage-Backed Certificates, Series 2005-A15 ("RAST 2005-A15");

(collectively, the "Securitizations").

4

3.      The Certificates were offered for sale pursuant to one of eight shelf registration statements (the "Shelf Registration Statements") filed with the Securities and Exchange Commission (the "SEC").  Defendant ACE filed three Shelf Registration Statements (the "ACE Shelf Registration Statements," including any amendments thereto), which pertained to 34 of the Securitizations.  The Individual Defendants signed the ACE Shelf Registration Statements and the amendments thereto.  Defendant MIT Securities filed one Shelf Registration Statement, which pertained to the MHL 2007-1 Securitization.  With respect to all of the Securitizations, DBS was the lead underwriter and the underwriter that sold the Certificates to the GSEs.

4.      For each Securitization, a prospectus ("Prospectus") and prospectus supplement ("Prospectus Supplement") were filed with the SEC as part of the Registration Statement[2] for that Securitization.  The GSE Certificates were marketed and sold to Fannie Mae and Freddie Mac pursuant to the Registration Statements, including the Shelf Registration Statements and the corresponding Prospectuses and Prospectus Supplements.

5.      The Registration Statements contained statements about the characteristics and credit quality of the mortgage loans underlying the Securitizations, the creditworthiness of the borrowers of those underlying mortgage loans, and the origination and underwriting practices used to make and approve the loans.  Such statements were material to a reasonable investor's, including the GSEs', decision to invest in mortgage-backed securities by purchasing the Certificates.  Unbeknownst to Fannie Mae and Freddie Mac, these statements were materially false, as significant percentages of the underlying mortgage loans were not originated in

---

[2]   The term "Registration Statement," as used herein, incorporates the Shelf Registration Statement, the Prospectus and the Prospectus Supplement for each referenced Securitization, except where otherwise indicated.

accordance with the represented underwriting standards and origination practices and had materially poorer credit quality than what was represented in the Registration Statements.

6.      For example, an initial forensic review of 2,743 loan files in the loan groups backing the GSE Certificates for the ACE 2007-HE3, MHL 2007-1, ACE 2006-HE2, and NCHET 2006-2 Securitizations has revealed that, for the vast majority of the loans reviewed in those Securitizations, there were numerous breaches of the originator's underwriting guidelines, such as a failure to confirm the reasonableness of the borrower's stated income or correctly to account for the borrower's debt, both key factors bearing on eligibility for a mortgage loan. Adherence to underwriting guidelines, particularly on such key criteria bearing on loan eligibility, is a material consideration to reasonable investors.

7.      The Registration Statements also contained statistical summaries of the groups of mortgage loans in each Securitization, such as the percentage of loans secured by owner-occupied properties and the percentage of the loan group's aggregate principal balance with loan-to-value ratios within specified ranges.  This information was material to reasonable investors.  However, a loan level analysis of a sample of loans for each Securitization — a review that encompassed thousands of mortgages across all of the Securitizations — has revealed that these statistics were false and omitted material facts due to widespread falsification of borrowers' incomes and debts, inflated property values, and misrepresentations of other key characteristics of the mortgage loans.

8.      For example, the percentage of owner-occupied properties is a material risk factor to the purchasers of Certificates, such as Fannie Mae and Freddie Mac, since a borrower who lives in a mortgaged property is generally less likely to stop paying his or her mortgage and more likely to take better care of the property.  The loan level review reveals that the true percentage

of owner-occupied properties for the loans supporting the GSE Certificates was materially lower than what was stated in the Prospectus Supplements.  Likewise, the Prospectus Supplements misrepresented other material factors, including the true value of the mortgaged properties relative to the amount of the underlying loans and the actual ability of the individual mortgage holders to satisfy their debts.

9.     Defendants DBS (which was the lead underwriter and sold the GSE Certificates to the GSEs), ACE (which acted as the depositor in 34 of the Securitizations), MIT Securities (which acted as the depositor for the MHL 2007-1 Securitization), DB Products (as successor-interest to depositor MIT Securities), and the Individual Defendants (who signed the Registration Statements with respect to 34 of the Securitizations) are directly responsible for the misstatements and omissions of material fact contained in the Registration Statements because they prepared, signed, filed and/or used these documents to market and sell the Certificates to Fannie Mae and Freddie Mac.

10.     Defendants Deutsche Bank AG, Taunus and DB Products are each responsible for the misstatements and omissions of material fact contained in the Registration Statements by virtue of their direction and control over Defendants DBS, ACE, and MIT Securities.  Deutsche Bank AG exercised dominion and control over the business operations of DBS, ACE, and MIT Securities.  Taunus exercised dominion and control over the business operations of DBS.  DB Products (the sponsor) directly participated in and exercised dominion and control over the business operations of Defendants ACE and MIT Securities.

11.     Fannie Mae and Freddie Mac purchased over $14.2 billion of the Certificates pursuant to the Registration Statements filed with the SEC.  These documents contained misstatements and omissions of material facts concerning the quality of the underlying mortgage

loans, and the practices used to originate such loans.  As a result of Defendants' misstatements and omissions of material fact, Fannie Mae and Freddie Mac have suffered substantial losses as the value of their holdings has significantly deteriorated.

12.    FHFA, as Conservator of Fannie Mae and Freddie Mac, brings this action against the Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2), 77o, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and for common law fraud and aiding and abetting fraud.

## PARTIES

### The Plaintiff and the GSEs

13.    The Federal Housing Finance Agency is a federal agency located at Constitution Center, 400 7th Street, S.W. in Washington, D.C.  FHFA was created on July 30, 2008 pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 4617), to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  On September 6, 2008, under HERA, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorship and appointed FHFA as conservator.  In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs, including but not limited to, the authority to bring suits on behalf of and/or for the benefit of Fannie Mae and Freddie Mac.  12 U.S.C. § 4617(b)(2).

14.    Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress with a mission to provide liquidity, stability and affordability to the United States housing and mortgage markets.  As part of this mission, Fannie Mae and Freddie Mac invested in residential mortgage-backed securities.  Fannie Mae is located at 3900 Wisconsin Avenue, NW in Washington, D.C.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

8

*The Defendants*

15.     Defendant Deutsche Bank AG is a German corporation with its principal place of business in Frankfurt, Germany.  Deutsche Bank AG is the largest banking institution in Germany.  Deutsche Bank AG's U.S. headquarters are located at 60 Wall Street, New York, NY.  Deutsche Bank AG has ownership and control of DB Products, DBS, ACE, and MIT Securities.

16.     Defendant Taunus was founded in 1999 as the North American subsidiary of Germany's Deutsche Bank AG.  The company is headquartered at 60 Wall Street, New York, NY.  According Deutsche Bank AG's annual report, Taunus is a holding company for most of Deutsche Bank AG's subsidiaries in the United States.  Taunus is the direct parent of DBS.

17.     Defendant DBS is a Delaware corporation and an SEC registered broker-dealer with its principal place of business at 60 Wall Street, New York, NY 10005.  DBS is a wholly owned subsidiary of Deutsche Bank AG.  DBS's banking operations are limited to broker-dealer functions in the issuance and underwriting of residential and commercial mortgage-backed securities.  DBS was the lead underwriter for each of the Securitizations, and was intimately involved in the offerings.  Fannie Mae and Freddie Mac purchased all of the GSE Certificates from DBS in its capacity as underwriter of the Securitizations.

18.     Defendant DB Products is a Delaware corporation with its principal place of business at 60 Wall Street, New York, NY 10005.  DB Products is a wholly owned subsidiary of Deutsche Bank AG.  DB Products was the sponsor for 35 of the Securitizations.

19.     DB Products is also the successor-in-interest to MIT Securities, which was the depositor for the MHL 2007-1 Securitization.  MIT Securities was a wholly-owned subsidiary of MortgageIT Holdings, Inc. ("MIT Holdings"), and was organized for the purpose of serving as a private secondary mortgage market conduit.  On or about January 2, 2007, DB Products filed Articles of Merger with the Maryland Secretary of State, which had the effect of consolidating

9

and merging MIT Holdings (and thus MIT Securities) into DB Products.  Under Maryland

General Corporation Law, § 3-114(f)(1), the effect of a consolidation or merger is that "[t]he

successor is liable for all the debts and obligations of each nonsurviving corporation ….  An

existing claim, action, or proceeding pending against any nonsurviving corporation … may be

prosecuted to judgment as if the consolidation or merger had not taken place, or, on motion of

the successor of any party, the successor may be substituted as a party and the judgment against

the nonsurviving corporation."

20.     Defendant ACE is a special purpose Delaware corporation with its principal place

of business in Charlotte, North Carolina.  ACE is a subsidiary of Deutsche Bank AG.  ACE was

formed to facilitate the sale of residential mortgage loans through securitization programs.  ACE

was the depositor for 34 of the Securitizations.  ACE, as depositor, was also responsible for

registering the Certificates with the SEC and preparing and filing reports required under the

Securities Exchange Act of 1934.

21.     Defendant MIT Securities is a Delaware corporation with its principal place of

business in New York, New York.  MIT Securities was organized for the purpose of serving as a

private secondary mortgage market conduit.  As discussed above in paragraph 19, DB Products

is the successor in interest to MIT Securities.  MIT Securities acted as the depositor for the MHL

2007-1 Securitization and as depositor, was responsible for registering the Certificates with the

SEC and preparing and filing reports required under the Securities Exchange Act of 1934.

22.     Defendant Douglas Johnson was the President and a Director of ACE, and the

President of its parent, Altamont.  Mr. Johnson signed three of the Shelf Registration Statements

and the amendments thereto.

23.     Defendant Evelyn Echevarria was the Secretary and a Director of ACE, and a Vice President of its parent, Altamont.  Ms. Echevarria signed three of the Shelf Registration Statements and the amendments thereto.

24.     Defendant Juliana Johnson was the Treasurer and a Director of ACE, and a Vice President of its parent, Altamont.  Ms. Johnson signed three of the Shelf Registration Statements and the amendments thereto.

### The Non-Party Originators

25.     The loans underlying 30 of the Securitizations were acquired by the sponsor from non-party mortgage originators.[3]  The non-party originators responsible for the loans underlying the Certificates included Countrywide Home Loans, Inc. ("Countrywide"), Fremont Investment & Loan ("Fremont"), IndyMac Bank, F.S.B. ("IndyMac"), New Century Mortgage Corp. ("New Century"), and Option One Mortgage Corporation ("Option One").

## JURISDICTION AND VENUE

26.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1345, which gives federal courts original jurisdiction over claims brought by FHFA in its capacity as conservator of Fannie Mae and Freddie Mac.

27.     Jurisdiction of this Court is also founded upon 28 U.S.C. § 1331 because the Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), 77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

---

[3]   Defendant DB Products was the sponsor for 35 of the 40 Securitizations.  The remaining five Securitizations were sponsored by non-parties.  In particular, IndyMac Bank, F.S.B., sponsored three of the Securitizations; NovaStar Mortgage Inc., sponsored one of the Securitizations; and New Century Mortgage Corporation sponsored one of the Securitizations.

28.     This Court has jurisdiction over the statutory claims of violations of Sections

13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code and Sections 31-5606.05(a)(1)(B) and 31-

5606.05(c) of the District of Columbia Code, pursuant to this Court's supplemental jurisdiction

under 28 U.S.C. § 1367(a).  This Court also has jurisdiction over the common law claims of

fraud and aiding and abetting fraud, pursuant to this Court's supplemental jurisdiction under 28

U.S.C. § 1367(a).

29.     Venue is proper in this district pursuant to Section 22 of the Securities Act of

1933, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged

herein, including the preparation and dissemination of the Registration Statements, occurred in

substantial part in New York County.  Additionally, the GSE Certificates were actively marketed

and sold from New York State and several of the Defendants have their principal place of

business in New York County.  Defendants are also subject to personal jurisdiction in this

District.

## FACTUAL ALLEGATIONS

### I.     THE SECURITIZATIONS

#### A.     Residential Mortgage-Backed Securitizations In General

30.     Asset-backed securitization distributes risk by pooling cash-producing financial

assets and issuing securities backed by those pools of assets.  In residential mortgage-backed

securitizations, the cash-producing financial assets are residential mortgage loans.

31.     The most common form of securitization of mortgage loans involves a sponsor—

the entity that acquires or originates the mortgage loans and initiates the securitization—and the

creation of a trust, to which the sponsor directly or indirectly transfers a portfolio of mortgage

loans.  The trust is established pursuant to a Pooling and Servicing Agreement entered into by,

among others, the depositor for that securitization.  In many instances, the transfer of assets to a

12

trust "is a two-step process:  the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor … and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions."  Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

32.     Residential mortgage-backed securities are backed by the underlying mortgage loans.  Some residential mortgage-backed securitizations are created from more than one cohort of loans called collateral groups, in which case the trust issues securities backed by different groups.  For example, a securitization may involve two groups of mortgages, with some securities backed primarily by the first group, and others primarily by the second group.  Purchasers of the securities acquire an ownership interest in the assets of the trust, which in turn owns the loans.  Within this framework, the purchasers of the securities acquire rights to the cash-flows from the designated mortgage group, such as homeowners' payments of principal and interest on the mortgage loans held by the related trust.

33.     Residential mortgage-backed securities are issued pursuant to registration statements filed with the SEC.  These registration statements include prospectuses, which explain the general structure of the investment, and prospectus supplements, which contain detailed descriptions of the mortgage groups underlying the certificates.  Certificates are issued by the trust pursuant to the registration statement, the prospectus and the prospectus supplement.  Underwriters sell the certificates to investors.

34.     A mortgage servicer is necessary to manage the collection of proceeds from the mortgage loans.  The servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee.  The

servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance.  The servicer is required to report key information about the loans to the trustee.  The trustee (or trust administrator) administers the trust's funds and delivers payments due each month on the certificates to the investors.

**B.    The Securitizations At Issue In This Case**

35.    This case involves the 40 Securitizations listed in paragraph 2 above, 35 of which were sponsored by DB Products and all of which were underwritten by DBS.  For each of the 40 Securitizations, Table 1 identifies: (1) the sponsor; (2) the depositor; (3) the lead underwriter; (4) the principal amount issued for the tranches[4] purchased by the GSEs; (5) the date of issuance; and (6) the loan group or groups backing the GSE Certificates for that Securitization (referred to as the "Supporting Loan Groups").

**Table 1**

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Group(s) |
|---|---|---|---|---|---|---|---|
| ACE 2005-AG1 | A1A | DB Products | ACE | DBS | 181,194,000 | 10/28/2005 | IA |
| ACE 2005-ASAP1 | A1 | DB Products | ACE | DBS | 199,395,000 | 10/31/2005 | I |
| ACE 2005-HE6 | A1 | DB Products | ACE | DBS | 531,329,000 | 9/28/2005 | I |
| ACE 2005-HE7 | A1A | DB Products | ACE | DBS | 572,103,000 | 11/28/2005 | IA |
| ACE 2006-ASAP1 | A1 | DB Products | ACE | DBS | 200,510,000 | 1/30/2006 | I |
| ACE 2006-ASAP2 | A1 | DB Products | ACE | DBS | 219,739,000 | 3/30/2006 | I |
| ACE 2006-ASAP3 | A1 | DB Products | ACE | DBS | 351,056,000 | 5/30/2006 | I |
| ACE 2006-ASAP4 | A1 | DB Products | ACE | DBS | 285,643,000 | 7/31/2006 | I |
| ACE 2006-ASAP5 | A1A | DB Products | ACE | DBS | 204,109,000 | 9/28/2006 | IA |
| | A1B | DB Products | ACE | DBS | 124,883,000 | 9/28/2006 | IB |
| ACE 2006-ASAP6 | A1A | DB Products | ACE | DBS | 166,575,000 | 11/29/2006 | IA |
| | A1B | DB Products | ACE | DBS | 96,477,000 | 11/29/2006 | IB |
| ACE 2006-CW1 | A1 | DB Products | ACE | DBS | 348,483,000 | 7/25/2006 | I |
| ACE 2006-FM1 | A1 | DB Products | ACE | DBS | 379,752,000 | 8/25/2006 | I |
| ACE 2006-FM2 | A1 | DB Products | ACE | DBS | 331,351,000 | 10/30/2006 | I |
| ACE 2006-HE1 | A1A | DB Products | ACE | DBS | 757,819,000 | 2/28/2006 | IA |
| | A1B1 | DB Products | ACE | DBS | 417,082,000 | 2/28/2006 | IB |
| | A1B2 | DB Products | ACE | DBS | 104,270,000 | 2/28/2006 | IB |
| ACE 2006-HE2 | A1 | DB Products | ACE | DBS | 417,932,000 | 4/28/2006 | I |
| ACE 2006-HE3 | A1 | DB Products | ACE | DBS | 585,651,000 | 6/27/2006 | I |

---

[4]    A tranche is one of a series of certificates or interests created and issued as part of the same transaction.

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Group(s) |
|---|---|---|---|---|---|---|---|
| ACE 2006-HE4 | A1 | DB Products | ACE | DBS | 224,129,000 | 9/28/2006 | I |
| ACE 2006-NC1 | A1 | DB Products | ACE | DBS | 596,262,000 | 1/30/2006 | I |
| ACE 2006-NC2 | A1 | DB Products | ACE | DBS | 310,440,000 | 9/15/2006 | I |
| ACE 2006-NC3 | A1A | DB Products | ACE | DBS | 411,186,000 | 11/30/2006 | IA |
| | A1B | DB Products | ACE | DBS | 310,606,000 | 11/30/2006 | IB |
| ACE 2006-OP1 | A1A | DB Products | ACE | DBS | 356,901,000 | 5/25/2006 | IA |
| | A1B | DB Products | ACE | DBS | 180,507,000 | 5/25/2006 | IB |
| ACE 2006-OP2 | A1 | DB Products | ACE | DBS | 355,789,000 | 10/30/2006 | I |
| ACE 2007-ASAP1 | A1 | DB Products | ACE | DBS | 284,631,000 | 3/15/2007 | I |
| ACE 2007-ASAP2 | A1 | DB Products | ACE | DBS | 196,819,000 | 5/30/2007 | I |
| ACE 2007-ASL1 | A1 | DB Products | ACE | DBS | 28,625,000 | 2/15/2007 | I |
| ACE 2007-HE1 | A1 | DB Products | ACE | DBS | 299,722,000 | 1/30/2007 | I |
| ACE 2007-HE2 | A1 | DB Products | ACE | DBS | 283,073,000 | 3/8/2007 | I |
| ACE 2007-HE3 | A1 | DB Products | ACE | DBS | 222,412,000 | 3/22/2007 | I |
| ACE 2007-HE4 | A1 | DB Products | ACE | DBS | 320,222,000 | 4/30/2007 | I |
| ACE 2007-HE5 | A1 | DB Products | ACE | DBS | 156,231,000 | 6/29/2007 | I |
| ACE 2007-SL1 | A1 | DB Products | ACE | DBS | 48,608,000 | 3/2/2007 | I |
| ACE 2007-WM1 | A1 | DB Products | ACE | DBS | 219,104,000 | 1/29/2007 | I |
| ACE 2007-WM2 | A1 | DB Products | ACE | DBS | 203,823,000 | 3/30/2007 | I |
| DBALT 2007-OA4 | IIA1 | DB Products | ACE | DBS | 151,671,000 | 6/29/2007 | II |
| | IIIA1 | DB Products | ACE | DBS | 149,369,000 | 6/29/2007 | III |
| INDX 2005-AR31 | 2A1 | IndyMac | IndyMac | DBS | 247,033,000 | 11/29/2005 | II |
| INDX 2006-AR9 | 2A1 | IndyMac | IndyMac | DBS | 188,330,000 | 4/27/2006 | II |
| MHL 2007-1 | 1A1 | DB Products | MIT Securities | DBS | 440,151,000 | 5/31/2007 | I |
| NCHET 2006-2 | A1 | New Century | New Century Securities | DBS | 435,122,000 | 6/29/2006 | I |
| NHEL 2007-1 | A1A | NovaStar | NovaStar Funding | DBS | 803,560,000 | 2/28/2007 | I |
| RAST 2005-A15 | 3A1 | IndyMac | IndyMac | DBS | 170,981,200 | 12/29/2005 | III |
| | 4A1 | IndyMac | IndyMac | DBS | 209,067,600 | 12/29/2005 | IV |

### C.  The Securitization Process

####   1.      DB Products Pools Mortgage Loans in Special Purpose Trusts

36.      As the sponsor for 35 of the 40 Securitizations, Defendant DB Products purchased

the mortgage loans underlying the Certificates for those 35 Securitizations after the loans were

originated, either directly from the originators or through affiliates of the originators.[5]

37.      DB Products then sold the mortgage loans for 34 of the Securitizations that it

sponsored to Defendant ACE.  With respect to the MHL 2007-1 Securitization, DB Products

---

[5]   Non-party IndyMac sponsored the INDX 2005-AR31, INDX 2006-AR9, and RAST 2005-AR15 Securitizations, and purchased the mortgage loans underlying those Certificates. Non-party NovaStar sponsored the NHEL 2007-1 Securitization, and purchased the underlying mortgage loans.  Non-party New Century sponsored the NCHET 2006-2 Securitization, and purchased the mortgage loans underlying that Securitization.  The sponsor for each Securitization is included in Table 1.

transferred the mortgage loans to MIT Securities, an entity that it subsequently purchased and with respect to which it is liable as successor-in-interest, as discussed at paragraph 19, *supra*. With respect to the remaining five Securitizations, non-party sponsors sold the mortgage loans to non-party depositors, as reflected in Table 1; Defendant DBS was the lead and selling underwriter for all of those Securitizations.

38.     ACE was a wholly-owned, limited-purpose subsidiary of Deutsche Bank AG. ACE's sole purpose was to act as a conduit through which loans acquired by DB Products could be securitized and sold to investors.  As depositor for 34 of the Securitizations, ACE transferred the relevant mortgage loans to the trusts.

39.     MIT Securities, for which DB Products now stands as successor-in-interest, had, as its sole purpose, acting as a conduit through which loans acquired by DB Products could be securitized and sold to investors.  As depositor for one of the Securitizations (MHL 2007-1), MIT Securities transferred the relevant mortgage loans to the trust.

40.     As part of each of the Securitizations, the trustee, on behalf of the Certificateholders, executed a Pooling and Servicing Agreement ("PSA") with the relevant depositor and the parties responsible for monitoring and servicing the mortgage loans in that Securitization.  The trust, administered by the trustee, held the mortgage loans pursuant to the related PSA and issued Certificates, including the GSE Certificates, backed by such loans.  The GSEs purchased the GSE Certificates, through which they obtained an ownership interest in the assets of the trust, including the mortgage loans.

### 2.     The Trusts Issue Securities Backed by the Loans

41.     Once the mortgage loans were transferred to the trusts in accordance with the PSAs, each trust issued Certificates backed by the underlying mortgage loans.  The Certificates were then sold to investors like Fannie Mae and Freddie Mac, which thereby acquired an

16

ownership interest in the assets of the corresponding trust.  Each Certificate entitles its holder to a specified portion of the cashflows from the underlying mortgages in the Supporting Loan Group.  The level of risk inherent in the Certificates was a function of the capital structure of the related transaction and the credit quality of the underlying mortgages.

42.     The Certificates were issued pursuant to one of eight Shelf Registration Statements filed with the SEC on a Form S-3.  The Shelf Registration Statements were amended by one or more Forms S-3/As filed with the SEC.  Each Individual Defendant signed the three ACE Shelf Registration Statements, including any amendments thereto.  The SEC filing number, registrants, signatories and filing dates for all eight Shelf Registration Statements and amendments thereto, as well as the Certificates covered by each Shelf Registration Statement, are set forth in Table 2 below.

**Table 2**

| SEC File No. | Date Registration Statement Filed | Date(s) Amended Registration Statement Filed | Registrants | Covered Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-123741 | 4/1/2005 | 4/19/2005 | ACE | ACE 2005-AG1<br>ACE 2005-ASAP1<br>ACE 2005-HE6<br>ACE 2005-HE7<br>ACE 2006-ASAP1<br>ACE 2006-ASAP2<br>ACE 2006-HE1<br>ACE 2006-NC1 | Douglas K. Johnson;<br>Evelyn Echevarria;<br>Juliana C. Johnson | Douglas K. Johnson;<br>Evelyn Echevarria;<br>Juliana C. Johnson |

17

| SEC File No. | Date Registration Statement Filed | Date(s) Amended Registration Statement Filed | Registrants | Covered Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-131727 | 2/10/2006 | 3/28/2006; 4/10/2006; 4/18/2006 | ACE | ACE 2006-ASAP3 ACE 2006-ASAP4 ACE 2006-ASAP5 ACE 2006-ASAP6 ACE 2006-CW1 ACE 2006-FM1 ACE 2006-FM2 ACE 2006-HE2 ACE 2006-HE3 ACE 2006-HE4 ACE 2006-NC2 ACE 2006-NC3 ACE 2006-OP1 ACE 2006-OP2 ACE 2007-ASL1 ACE 2007-ASAP1 ACE 2007-HE1 ACE 2007-HE2 ACE 2007-HE3 ACE 2007-HE4 ACE 2007-SL1 ACE 2007-WM1 ACE 2007-WM2 | Douglas K. Johnson; Evelyn Echevarria; Juliana C. Johnson | Douglas K. Johnson; Evelyn Echevarria; Juliana C. Johnson |
| 333-141008 | 3/1/2007 | 4/2/2007 | ACE | ACE 2007-ASAP2 ACE 2007-HE5 DBALT 2007-OA4 | Douglas K. Johnson; Evelyn Echevarria; Juliana C. Johnson | Douglas K. Johnson; Evelyn Echevarria; Juliana C. Johnson |
| 333-127556 | 8/15/2005 | Not applicable | IndyMac | INDX 2005-AR31 RAST 2005-A15 | John Olinski; S. Blair Abernathy; Lynette Antosh; Samir Grover | Not applicable |
| 333-132042 | 2/24/2006 | 3/29/2006; 4/13/2006; 6/5/2007 | IndyMac | INDX 2006-AR9 | John Olinski; S. Blair Abernathy; Raphael Bostic; Samir Grover; Victor H. Woodworth | John Olinski; S. Blair Abernathy; Raphael Bostic; Simon Heyrick; Victor H. Woodworth |
| 333-131288 | 1/26/2006 | 3/27/2006; 5/25/2006; 7/21/2006; 8/15/2006 | MIT Securities | MHL 2007-1 | Doug W. Naidus; Donald Epstein | Doug W. Naidus; Donald Epstein |
| 333-131231 | 1/23/2006 | 3/7/2006; 3/24/2006; 4/6/2006; 4/12/2006 | New Century Securities | NCHET 2006-2 | Brad A. Morrice; Patrick J. Flanagan; Patti Dodge | Brad A. Morrice; Kevin Cloyd; Patti Dodge |
| 333-134461 | 5/25/2006 | 6/16/2006 | Novastar Funding | NHEL 2007-1 | Scott F. Hartman; Greg Metz; W. Lance Anderson; Mark Herpich | Scott F. Hartman; Greg Metz; W. Lance Anderson; Mark Herpich |

43.     The Prospectus Supplement for each Securitization describes the underwriting guidelines that purportedly were used in connection with the origination of the underlying mortgage loans.  In addition, the Prospectus Supplements purport to provide accurate statistics regarding the mortgage loans in each group, including the ranges of and weighted average FICO credit scores of the borrowers, the ranges of and weighted average loan-to-value ratios of the loans, the ranges of and weighted average outstanding principal balances of the loans, the debt-to-income ratios, the geographic distribution of the loans, the extent to which the loans were for purchase or refinance purposes; information concerning whether the loans were secured by a property to be used as a primary residence, second home, or investment property; and information concerning whether the loans were delinquent.

44.     The Prospectus Supplements associated with each Securitization were filed with the SEC as part of the Registration Statements.  The Form 8-Ks attaching the PSAs for each Securitization were also filed with the SEC.  The dates on which the Prospectus Supplement and Form 8-K were filed for each Securitization, as well as the filing number of the Shelf Registration Statement related to each, are set forth in Table 3 below.

**Table 3**

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA Filed | Filing No. of Related Registration Statement |
|---|---|---|---|
| ACE 2005-AG1 | 10/26/2005 | 11/17/2005 | 333-123741 |
| ACE 2005-ASAP1 | 11/1/2005 | 11/15/2005 | 333-123741 |
| ACE 2005-HE6 | 9/30/2005 | 10/18/2005 | 333-123741 |
| ACE 2005-HE7 | 11/28/2005 | 1/4/2006 | 333-123741 |
| ACE 2006-ASAP1 | 1/30/2006 | 3/7/2006 | 333-123741 |
| ACE 2006-ASAP2 | 3/22/2006 | 4/27/2006 | 333-123741 |
| ACE 2006-ASAP3 | 5/26/2006 | 6/16/2006 | 333-131727 |
| ACE 2006-ASAP4 | 7/28/2006 | 8/4/2006 | 333-131727 |
| ACE 2006-ASAP5 | 10/13/2006 | 10/25/2006 | 333-131727 |
| ACE 2006-ASAP6 | 11/30/2006 | 1/10/2007 | 333-131727 |
| ACE 2006-CW1 | 7/20/2006 | 11/13/2006 | 333-131727 |
| ACE 2006-FM1 | 8/21/2006 | 11/3/2006 | 333-131727 |
| ACE 2006-FM2 | 10/30/2006 | 11/20/2006 | 333-131727 |
| ACE 2006-HE1 | 2/28/2006 | 5/5/2006 | 333-123741 |
| ACE 2006-HE2 | 4/27/2006 | 5/10/2006 | 333-131727 |

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA Filed | Filing No. of Related Registration Statement |
|---|---|---|---|
| ACE 2006-HE3 | 6/22/2006 | 7/17/2006 | 333-131727 |
| ACE 2006-HE4 | 9/27/2006 | 10/19/2006 | 333-131727 |
| ACE 2006-NC1 | 1/30/2006 | 3/7/2006 | 333-123741 |
| ACE 2006-NC2 | 9/15/2006 | 10/27/2006 | 333-131727 |
| ACE 2006-NC3 | 11/24/2006 | 12/19/2006 | 333-131727 |
| ACE 2006-OP1 | 5/19/2006 | 6/16/2006 | 333-131727 |
| ACE 2006-OP2 | 10/24/2006 | 11/16/2006 | 333-131727 |
| ACE 2007-ASAP1 | 3/19/2007 | 4/10/2007 | 333-131727 |
| ACE 2007-ASAP2 | 5/25/2007 | 6/25/2007 | 333-141008 |
| ACE 2007-ASL1 | 2/15/2007 | 3/19/2007 | 333-131727 |
| ACE 2007-HE1 | 1/31/2007 | 3/23/2007 | 333-131727 |
| ACE 2007-HE2 | 3/12/2007 | 4/10/2007 | 333-131727 |
| ACE 2007-HE3 | 3/23/2007 | 4/12/2007 | 333-131727 |
| ACE 2007-HE4 | 4/30/2007 | 6/14/2007 | 333-131727 |
| ACE 2007-HE5 | 6/26/2007 | 8/21/2007 | 333-141008 |
| ACE 2007-SL1 | 3/2/2007 | 3/22/2007 | 333-131727 |
| ACE 2007-WM1 | 1/30/2007 | 4/16/2007 | 333-131727 |
| ACE 2007-WM2 | 4/2/2007 | 4/13/2007 | 333-131727 |
| DBALT 2007-OA4 | 7/3/2007 | 7/16/2007 | 333-141008 |
| INDX 2005-AR31 | 11/30/2005 | 1/30/2006 | 333-127556 |
| INDX 2006-AR9 | 5/2/2006 | 5/12/2006 | 333-132042 |
| MHL 2007-1 | 6/1/2007 | 8/1/2007 | 333-131288 |
| NCHET 2006-2 | 6/27/2006 | 7/14/2006 | 333-131231 |
| NHEL 2007-1 | 2/28/2007 | 4/9/2007 | 333-134461 |
| RAST 2005-A15 | 12/30/2005 | 1/30/2006 | 333-127556 |

45.     The Certificates were issued pursuant to the PSAs, and Defendants DBS, ACE,

and MIT Securities offered and sold the GSE Certificates to Fannie Mae and Freddie Mac

pursuant to the Registration Statements, which, as noted previously, included the Prospectuses

and Prospectus Supplements.

46.     Defendants DBS, ACE, and MIT Securities targeted Fannie Mae in Washington,

D.C. and Freddie Mac in Virginia.  Defendants DBS, ACE, and MIT Securities sent offering

materials, including the Prospectuses and Prospectus Supplements, to Fannie Mae in

Washington, D.C. and Freddie Mac in Virginia.  Defendants DBS, ACE, and MIT Securities

knew that Fannie Mae was located in the District of Columbia and that Freddie Mac was located

in Virginia.

II.      **THE DEFENDANTS' PARTICIPATION IN THE SECURITIZATION PROCESS**

A.      **The Role of Each of the Defendants**

47.      Each of the Defendants, including the Individual Defendants, had a role in the securitization process and the marketing for most or all of the Certificates, which included purchasing the mortgage loans from the originators, arranging the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, structuring and issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

48.      With respect to each Securitization, the depositor, underwriters, and Individual Defendants who signed the Registration Statement, as well as the Defendants who exercised control over their activities, are liable, jointly and severally, as participants in the registration, issuance and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statement, and omitting material facts required to be stated therein or necessary to make the statements contained therein not misleading.

1.      **DB Products**

49.      DB Products was purchased by Deutsche Bank in 1993 and began securitizing residential mortgage loans in 2004.  DB Products is a leading sponsor of mortgage-backed securities.  As stated in the Prospectus Supplement for the ACE 2007-WM2 Securitization, during the 2004, 2005 and 2006 fiscal years, DB Products securitized approximately $7.7 billion, $18.4 billion, and $23.9 billion of residential mortgage loans, respectively.

50.      Defendant DB Products was the sponsor for 35 of the Securitizations.  In that capacity, DB Products initiated the Securitizations, purchased the mortgage loans to be

securitized, and determined the structure of the Securitizations.  DB Products also selected the

depositor that would be used to transfer the mortgage loans from DB Products to the trusts, and

selected the underwriter for the Securitizations.  In its role as sponsor, DB Products knew and

intended that the mortgage loans it purchased would be sold in connection with the securitization

process, and that certificates representing such loans would be issued by the relevant trusts.

    51.    Defendant DB Products also conveyed the mortgage loans to ACE for 34 of the

35 Securitizations that DB Products sponsored, and to MIT Securities for the Securitization that

it sponsored.  DB Products conveyed the loans to these entities, to serve as depositors for the

Securitizations, pursuant to Mortgage Loan Purchase Agreements.  In these agreements, DB

Products made certain representations and warranties to the depositors regarding the group of

loans collateralizing the Certificates.  These representations and warranties were assigned by the

depositors, including ACE with respect to 34 of the Securitizations, to the trustees for the benefit

of the Certificateholders.

    **2.    DBS**

    52.    Defendant DBS is an investment bank, and was, at all relevant times, a registered

broker/dealer and one of the leading underwriters of mortgage and other asset-backed securities

in the United States.

    53.    Defendant DBS was the lead underwriter for each of the Securitizations.  In that

role, DBS was responsible for underwriting and managing the offer and sale of the Certificates to

Fannie Mae and Freddie Mac and other investors.  DBS was also obligated to conduct

meaningful due diligence to ensure that the Registration Statements did not contain any material

misstatements or omissions, including as to the manner in which the underlying mortgage loans

were originated and underwritten.

### 3.   ACE

54.   Defendant ACE is a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

55.   Defendant ACE was the depositor for 34 of the 40 Securitizations.  In its capacity as depositor, ACE purchased the mortgage loans from DB Products (as sponsor) pursuant to the Mortgage Loan Purchase Agreements.  ACE then sold, transferred, or otherwise conveyed the securitized loans to the trusts.  ACE, together with the other Defendants, was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale.  The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 4.   MIT Securities

56.   Defendant MIT Securities acted as the depositor for the MHL 2007-1 Securitization.  In its capacity as depositor, MIT Securities purchased the mortgage loans from DB Products pursuant to a Mortgage Loan Purchase Agreement.  MIT Securities then sold, transferred, or otherwise conveyed the securitized loans to the trusts.  MIT Securities was also responsible for preparing and filing the Registration Statement pursuant to which the Certificates for that Securitization were offered for sale.  The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 5. Deutsche Bank AG

57.     Defendant Deutsche Bank AG is the ultimate parent of DBS, DB Products, and ACE.  Deutsche Bank AG employed its subsidiaries, DBS, DB Products and ACE, in key steps of the securitization process.  Unlike typical arms' length transactions, the Securitizations here involved various Deutsche Bank AG subsidiaries and affiliates at virtually every step in the chain.  With few exceptions, the sponsor was DB Products, the depositor was ACE and the lead underwriter was DBS.  Deutsche Bank AG profited substantially from this vertically integrated approach to mortgage-backed securitization.

### 6. Taunus

58.     Defendant Taunus is Deutsche Bank AG's principal holding company in the United States and the direct parent of DBS.  It is a wholly owned subsidiary of Deutsche Bank AG.  As the sole corporate parent of DBS, Taunus had the practical ability to direct and control the actions of DBS related to the Securitizations, and in fact exercised such direction and control over the activities of DBS related to the issuance and sale of the Certificates.

### 7. The Individual Defendants

59.     Defendant Douglas Johnson was the President and a Director of ACE, and the President of its parent, Altamont.  Mr. Johnson signed the ACE Shelf Registration Statements and amendments thereto.

60.     Defendant Evelyn Echevarria was the Secretary and a Director of ACE, and a Vice President of its parent, Altamont.  Ms. Echevarria signed the ACE Shelf Registration Statements and the amendments thereto.

61.     Defendant Juliana Johnson was the Treasurer and a Director of ACE, and a Vice President of its parent, Altamont.  Ms. Johnson signed the ACE Shelf Registration Statements and the amendments thereto.

**B.      Defendants' Failure To Conduct Proper Due Diligence**

62.      Defendants failed to conduct adequate and sufficient due diligence to ensure that the mortgage loans underlying the Securitizations complied with the representations in the Registration Statements.

63.      During the time period in which the Certificates were issued—approximately 2005 through 2007—Deutsche Bank's involvement in the mortgage-backed securitization market was rapidly expanding.  In an effort to increase revenue and profits, Deutsche Bank vastly expanded the volume of mortgage-backed securities it issued as compared to prior years. In 2004, DB Products purchased and securitized approximately $7.7 billion in residential mortgage loans, using both prime and subprime loans; in 2005, DB Products securitized more than $18.4 billion in residential mortgage loans; and in the first three quarters of 2006 DB Products had already securitized over $23.9 billion in residential mortgage loans.  *See* ACE 2007-WM2 Prospectus Supplement, filed Jan. 30, 2007.

64.      At the same time, DBS was becoming one of the largest underwriters of subprime residential mortgage-backed securities.  According to an August 10, 2010 report by Compass Point Research & Trading LLC, citing the Bloomberg Asset Backed Alert, DBS ranks as the 12th largest underwriter of subprime residential mortgage-backed securities from 2005 through 2007, with a 3.7 percent market share.  DBS underwrote over $20 billion of subprime residential mortgage-backed securities during this time period:  approximately $5.5 billion in 2005, $4.3 billion in 2006, and $10.1 billion in 2007.

65.      Deutsche Bank's participation in the securitization of residential mortgage loans proved extremely lucrative.  According to Deutsche Bank AG's 2006 Annual Report, the company's "sustained expansion into residential mortgage-backed securities in the U.S." generated "record revenues."

25

66.     Defendants had enormous financial incentives to complete as many offerings as quickly as possible without regard to ensuring the accuracy or completeness of the Registration Statements, or conducting adequate and reasonable due diligence.  For example, ACE, as depositor, was paid a percentage of the total dollar amount of the offerings upon completion of the Securitizations, and DBS, as the underwriter, was paid a commission based on the amount it received from the sale of the Certificates to the public.

67.     The push to securitize large volumes of mortgage loans contributed to the absence of controls needed to prevent the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.  In particular, Defendants failed to conduct adequate diligence or to otherwise ensure the accuracy of the statements in the Registration Statements pertaining to the Securitizations.

68.     The Financial Crisis Inquiry Commission ("FCIC")[6] specifically found in its report issued January 2011 (the "FCIC Report") that due diligence practices across many mortgage corporations, including Deutsche Bank and its subsidiary DB Products, were insufficient:

> Some mortgage securitizers did their own due diligence, but seemed to devote only limited resources to it …. **Deutsche Bank** and JP Morgan [] also had only small due diligence teams.

FCIC Report at 278 (emphasis added).

69.     The failure to perform proper due diligence led to sponsors, depositors and underwriters, including Defendants, sponsoring, marketing, and selling poor-quality securities. As stated in the April 13, 2011 report of the Senate Permanent Subcommittee on Investigations

---

[6]   The Financial Crisis Inquiry Commission was created by the Fraud Enforcement and Recovery Act of 2009, and was established to examine the causes, domestic and global, of the current financial and economic crisis in the United States.

entitled "Wall Street and the Financial Crisis: Anatomy of a Financial Collapse" (the "Levin-Coburn Report"):  "Both Goldman Sachs and Deutsche Bank underwrote securities using loans from subprime lenders known for issuing high risk, poor quality mortgages, and sold risky securities to investors across the United States and around the world."  The Levin-Coburn Report made clear, moreover, that these underwriters sold securitizations collateralized by these high-risk mortgages without fully disclosing the risks.  *Id.*

70.    The Levin-Coburn Report likewise revealed that ACE, the depositor for all but six of the Securitizations, did not follow its underwriting guidelines.  For instance, in an email cited in the report, Deutsche Bank employee Greg Lippman discussed several mortgage-backed securitizations and stated that ACE "is generally horrible."  *See* Levin-Coburn Report at 339.

71.    DBS also retained third-party due diligence providers such as Clayton Holdings, Inc. ("Clayton") to analyze the loans it was considering placing in its securitizations, but waived a significant number of loans into the securitizations that these firms had recommended for exclusion, and did so without taking adequate steps to ensure that these loans had in fact been underwritten in accordance with applicable guidelines or had compensating factors that excused the loans' non-compliance with those guidelines.  On January 27, 2008, Clayton revealed that it had entered into an agreement with the New York Attorney General (the "NYAG") to provide documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  According to *The New York Times*, as reported on January 27, 2008, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

Jenny Anderson & Vikas Bajaj, *Loan Reviewer Aiding Inquiry into Big Banks*, N.Y. Times, Jan. 27, 2008.

72.    Deutsche Bank was negligent in allowing into the Securitizations a substantial number of mortgage loans that, as reported to Deutsche Bank by third-party due diligence firms, did not conform to the underwriting standards stated in the Registration Statements, including the Prospectuses and Prospectus Supplements.  Even upon learning from the third-party due diligence firms that there were high percentages of defective or at least questionable loans in the sample of loans reviewed by the third-party due diligence firms, Deutsche Bank failed to exclude a material number of these loans from the Securitizations.  It also failed to take any additional steps to verify that the population of loans in the Securitizations did not include a similar percentage of defective and/or questionable loans.

73.    Clayton's trending reports revealed that in the period from the first quarter of 2006 to the second quarter of 2007, 34.9 percent of the mortgage loans Deutsche Bank submitted to Clayton for review in residential mortgage-backed securities groups were rejected by Clayton as falling outside applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 50 percent of the loans were subsequently waived in by Deutsche Bank without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.  *See* Clayton Trending Reports, *available at* http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisis-sacramento#documents.

### III.    THE REGISTRATION STATEMENTS

### A.    Compliance With Underwriting Guidelines

74.    The Prospectus and Prospectus Supplement for each Securitization describe the mortgage loan underwriting guidelines pursuant to which the mortgage loans underlying the

related Securitizations were to have been originated.  These guidelines were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy of the mortgaged property as security for the loan.  As explained below, a reasonable investor would not have understood, in light of the representations regarding supposed adherence to underwriting guidelines, that there were pervasive and systematic breaches of those guidelines with respect to the securitized loans.

75.     The statements about compliance with underwriting guidelines made in the Prospectus and Prospectus Supplements, which, as discussed, formed part of the Registration Statement for each Securitization, were material to a reasonable investor's, including the GSEs', decision to purchase and invest in the Certificates because the failure to originate a mortgage loan in accordance with the applicable guidelines creates a higher risk of delinquency and default by the borrower, as well as a risk that losses upon liquidation will be higher, thus resulting in greater economic risk to an investor.

76.     The Prospectus Supplements for the Securitizations contained several key statements with respect to the underwriting standards of the entities that originated the loans in the Securitizations.  For example, the Prospectus Supplement for the ACE 2006-OP1 Securitization, for which DB Products was the sponsor, ACE was the depositor and DBS was the underwriter, stated that: "the [m]ortgage [l]oans will have been originated generally in accordance with the Option One Guidelines (the 'Option One Underwriting Guidelines')," and that the underwriting standards were "intended to assess the ability and willingness of the mortgagor to repay the debt and to evaluate the adequacy of the property as collateral for the mortgage loan."

77.     The Prospectus Supplement for the ACE 2006-OP1 Securitization stated that, "[o]n a case by case basis," loans that did not meet Option One's underwriting guidelines, as described in the Prospectus Supplement, may nonetheless have been included in the Securitization, but only where "compensating factors" existed.

78.     With respect to the information evaluated by the originator, the Prospectus Supplement stated that "[e]ach mortgage loan applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.  The Option One Underwriting Guidelines require a credit report and, if available, a credit score on each applicant from a credit-reporting agency."

79.     The Prospectus Supplement further stated that: "The Option One Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and require Option One's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal supports the loan balance."

80.     With respect to appraisals, the Prospectus Supplement stated that: "Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers.  Such appraisers inspect and appraise the subject property and verify that such property is in acceptable condition.  Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac."

81.     The Prospectus and Prospectus Supplement for each of the Securitizations had similar representations to those quoted above.  The relevant representations in the Prospectus and Prospectus Supplement pertaining to originating entity underwriting standards for each Securitization are reflected in Appendix A to this Amended Complaint.  As discussed below at paragraphs 112 through 163, in fact, the originators of the mortgage loans in the Supporting Loan Group for the Securitizations did not adhere to their stated underwriting guidelines, thus rendering the description of those guidelines in the Prospectuses and Prospectus Supplements false and misleading.

82.     Further, for the vast majority of the Securitizations, the Prospectuses and Prospectus Supplements included additional representations and warranties concerning the mortgage loans backing the Securitizations that were made by the originator to the seller in the PSA.  Such representations and warranties, which are described more fully for each Securitization in Appendix A, included that the mortgage loans were underwritten in accordance with the originators' underwriting guidelines in effect at the time of origination, subject to only limited exceptions.

83.     The inclusion of these representations in the Prospectuses and Prospectus Supplements had the purpose and effect of providing additional assurances to investors regarding the quality of the mortgage collateral underlying the Securitizations and the compliance of that collateral with the underwriting guidelines described in the Prospectuses and Prospectus Supplements.  These representations were material to a reasonable investor's decision to purchase the Certificates.

**B.     Statements Regarding Occupancy Status of Borrower**

84.     The Prospectus Supplements contained collateral group-level information about the occupancy status of the borrowers of the loans in the Securitizations.  Occupancy status

refers to whether the property securing a mortgage is to be the primary residence of the borrower, a second home, or an investment property.  The Prospectus Supplements for each of the Securitizations presented this information in tabular form, usually in a table entitled "Occupancy Status of the Mortgage Loans."  This table divided all the loans in the collateral group by occupancy status, *e.g.*, into the following categories:  (i) "Primary," or "Owner Occupied"; (ii) "Second Home," or "Secondary"; and (iii) "Investment" or "Non-Owner."  For each category, the table stated the number of loans in that category.  Occupancy statistics for the Supporting Loan Groups for each Securitization were reported in the Prospectus Supplements as follows:[7]

Table 4

| Transaction | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investment (%) |
|---|---|---|---|---|
| ACE 2005-AG1 | Group IA | 97.16 | 2.84 | 0.00 |
| ACE 2005-ASAP1 | Group I | 96.78 | 0.73 | 2.49 |
| ACE 2005-HE6 | Group I | 88.08 | 1.06 | 10.86 |
| ACE 2005-HE7 | Group IA | 92.84 | 3.50 | 3.66 |
| ACE 2006-ASAP1 | Group I | 97.04 | 0.50 | 2.46 |
| ACE 2006-ASAP2 | Group I | 96.17 | 1.06 | 2.78 |
| ACE 2006-ASAP3 | Group I | 97.29 | 0.35 | 2.36 |
| ACE 2006-ASAP4 | Group I | 97.41 | 0.40 | 2.20 |
| ACE 2006-ASAP5 | Group IA | 96.31 | 1.14 | 2.55 |
| | Group IB | 99.26 | 0.08 | 0.65 |
| ACE 2006-ASAP6 | Group IA | 96.54 | 0.58 | 2.88 |
| | Group IB | 96.81 | 0.82 | 2.36 |
| ACE 2006-CW1 | Group I | 95.16 | 0.90 | 3.93 |
| ACE 2006-FM1 | Group I | 90.37 | 0.89 | 8.75 |
| ACE 2006-FM2 | Group I | 90.35 | 1.02 | 8.64 |
| ACE 2006-HE1 | Group IA | 89.25 | 1.09 | 9.66 |
| | Group IB | 94.41 | 0.57 | 5.02 |
| ACE 2006-HE2 | Group I | 90.60 | 0.92 | 8.47 |
| ACE 2006-HE3 | Group I | 93.37 | 0.62 | 6.01 |
| ACE 2006-HE4 | Group I | 91.15 | 0.75 | 8.10 |
| ACE 2006-NC1 | Group I | 83.55 | 4.05 | 12.40 |

---

[7]   Each Prospectus Supplement provides the total number of loans and the number of loans in the following categories:  owner occupied, investor, and second home.  These numbers have been converted to percentages.

| Transaction | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investment (%) |
|---|---|---|---|---|
| ACE 2006-NC2 | Group I | 93.30 | 0.81 | 5.88 |
| ACE 2006-NC3 | Group IA | 82.52 | 4.51 | 12.97 |
| | Group IB | 94.32 | 0.76 | 4.92 |
| ACE 2006-OP1 | Group IA | 88.00 | 1.65 | 10.35 |
| | Group IB | 92.54 | 0.48 | 6.98 |
| ACE 2006-OP2 | Group I | 90.64 | 0.54 | 8.82 |
| ACE 2007-ASAP1 | Group I | 96.13 | 0.69 | 3.19 |
| ACE 2007-ASAP2 | Group I | 94.78 | 0.82 | 4.39 |
| ACE 2007-ASL1 | Group I | 100.00 | 0.00 | 0.00 |
| ACE 2007-HE1 | Group I | 91.91 | 1.25 | 6.84 |
| ACE 2007-HE2 | Group I | 88.68 | 0.46 | 10.86 |
| ACE 2007-HE3 | Group I | 92.56 | 1.16 | 6.28 |
| ACE 2007-HE4 | Group I | 90.09 | 1.59 | 8.33 |
| ACE 2007-HE5 | Group I | 87.14 | 1.30 | 11.56 |
| ACE 2007-SL1 | Group I | 100.00 | 0.00 | 0.00 |
| ACE 2007-WM1 | Group I | 94.02 | 3.66 | 2.32 |
| ACE 2007-WM2 | Group I | 95.49 | 3.72 | 0.78 |
| DBALT 2007-OA4 | Group II | 64.02 | 6.39 | 29.60 |
| | Group III | 64.12 | 10.11 | 25.77 |
| INDX 2005-AR31 | Group II | 82.76 | 4.49 | 12.76 |
| INDX 2006-AR9 | Group II | 82.56 | 2.69 | 14.74 |
| MHL 2007-1 | Group I | 61.96 | 2.83 | 35.21 |
| NCHET 2006-2 | Group I | 85.02 | 2.58 | 12.40 |
| NHEL 2007-1 | Group I | 86.87 | 2.76 | 10.37 |
| RAST 2005-A15 | Group III | 84.51 | 3.70 | 11.79 |
| | Group IV | 66.67 | 4.76 | 28.57 |

85.     As Table 4 makes clear, the Prospectus Supplements for each Securitization reported that an overwhelming majority of the mortgage loans in the Supporting Loan Groups were owner occupied, while a small percentage were reported to be non-owner occupied (*i.e.*, a second home or investment property).

86.     The statements about occupancy status were material to a reasonable investor's decision to invest in the Certificates.  Information about occupancy status is an important factor in determining the credit risk associated with a mortgage loan and, therefore, the securities that it collateralizes.  Because borrowers who reside in mortgaged properties are less likely to default than borrowers who purchase homes as second homes or investments and live elsewhere, and are

33

more likely to care for their primary residence, the percentage of loans in the collateral group of a securitization that are secured by mortgage loans on owner-occupied residences is an important measure of the risk of the certificates sold in that securitization.

87.     Other things being equal, the higher the percentage of loans not secured by owner-occupied residences, the greater the risk of loss to the certificateholders.  Even small differences in the percentages of primary/owner-occupied, second home/secondary, and investment properties in the collateral group of a securitization can have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.  As discussed below in paragraphs 99 through 104, the Registration Statement for each Securitization materially overstated the percentage of loans in the Supporting Loan Groups that were owner occupied, thereby misrepresenting the degree of risk of the GSE Certificates.

## C.     Statements Regarding Loan-to-Value Ratios

88.     The loan-to-value ratio of a mortgage loan, or LTV ratio, is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

89.     The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property.  In a refinancing or home-equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced loan.  Accordingly, an accurate appraisal is essential to an accurate LTV ratio.  In particular, an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan.

90.     The Prospectus Supplements for each Securitization also contained group-level information about the LTV ratio for the underlying group of loans as a whole.  The percentage of loans with an LTV ratio at or less than 80 percent and the percentage of loans with an LTV ratio

34

greater than 100 percent as reported in the Prospectus Supplements for the Supporting Loan

Groups are reflected in Table 5 below.[8]

**Table 5**

| Transaction | Supporting Loan Group | Percentage of Loans, by Aggregate Principal Balance, with LTV Less than or Equal to 80% | Percentage of Loans, by Aggregate Principal Balance, with LTV Greater than 100% |
|---|---|---|---|
| ACE 2005-AG1 | Group IA | 53.56 | 0.00 |
| ACE 2005-ASAP1 | Group I | 81.79 | 0.00 |
| ACE 2005-HE6 | Group I | 58.98 | 0.00 |
| ACE 2005-HE7 | Group IA | 63.19 | 0.00 |
| ACE 2006-ASAP1 | Group I | 83.88 | 0.00 |
| ACE 2006-ASAP2 | Group I | 82.93 | 0.00 |
| ACE 2006-ASAP3 | Group I | 82.81 | 0.00 |
| ACE 2006-ASAP4 | Group I | 79.68 | 0.00 |
| ACE 2006-ASAP5 | Group IA | 75.16 | 0.00 |
|  | Group IB | 73.79 | 0.00 |
| ACE 2006-ASAP6 | Group IA | 63.98 | 0.00 |
|  | Group IB | 58.72 | 0.00 |
| ACE 2006-CW1 | Group I | 63.34 | 0.00 |
| ACE 2006-FM1 | Group I | 65.70 | 0.00 |
| ACE 2006-FM2 | Group I | 66.39 | 0.00 |
| ACE 2006-HE1 | Group IA | 64.38 | 0.00 |
|  | Group IB | 69.52 | 0.00 |
| ACE 2006-HE2 | Group I | 63.48 | 0.00 |
| ACE 2006-HE3 | Group I | 68.18 | 0.00 |
| ACE 2006-HE4 | Group I | 61.88 | 0.00 |
| ACE 2006-NC1 | Group I | 54.46 | 0.00 |
| ACE 2006-NC2 | Group I | 54.13 | 0.00 |
| ACE 2006-NC3 | Group IA | 55.97 | 0.00 |
|  | Group IB | 56.24 | 0.00 |
| ACE 2006-OP1 | Group IA | 68.71 | 0.00 |
|  | Group IB | 70.55 | 0.00 |
| ACE 2006-OP2 | Group I | 57.82 | 0.00 |
| ACE 2007-ASAP1 | Group I | 52.62 | 0.00 |
| ACE 2007-ASAP2 | Group I | 47.95 | 0.00 |
| ACE 2007-ASL1 | Group I | 0.44 | 0.00 |
| ACE 2007-HE1 | Group I | 62.24 | 0.00 |

---

[8]    As used in this Amended Complaint, "LTV" refers to the original loan-to-value ratio for first lien mortgages and for properties with second liens that are subordinate to the lien that was included in the securitization (*i.e.*, only the securitized lien is included in the numerator of the LTV calculation).  However, for second lien mortgages, where the securitized lien is junior to another loan, the more senior lien has been added to the securitized one to determine the numerator in the LTV calculation (this latter calculation is sometimes referred to as the combined-loan-to-value ratio, or "CLTV").

| ACE 2007-HE2 | Group I | 64.47 | 0.00 |
|---|---|---|---|
| ACE 2007-HE3 | Group I | 58.60 | 0.00 |
| ACE 2007-HE4 | Group I | 56.62 | 0.00 |
| ACE 2007-HE5 | Group I | 47.21 | 0.00 |
| ACE 2007-SL1 | Group I | 7.73 | 0.00 |
| ACE 2007-WM1 | Group I | 67.71 | 0.00 |
| ACE 2007-WM2 | Group I | 69.33 | 0.00 |
| DBALT 2007-OA4 | Group II | 88.55 | 0.00 |
|  | Group III | 86.18 | 0.00 |
| INDX 2005-AR31 | Group II | 96.96 | 0.00 |
| INDX 2006-AR9 | Group II | 99.33 | 0.00 |
| MHL 2007-1 | Group I | 94.93 | 0.00 |
| NCHET 2006-2 | Group I | 51.52 | 0.00 |
| NHEL 2007-1 | Group I | 46.77 | 0.00 |
| RAST 2005-A15 | Group III | 92.62 | 0.00 |
|  | Group IV | 92.24 | 0.00 |

91.     As Table 5 makes clear, the Prospectus Supplements for nearly all of the

Securitizations reported that many or most of the mortgage loans in the Supporting Loan Groups

had an LTV ratio of 80 percent or less,[9] and the Prospectus Supplement for all of the

Securitizations reported that *none* of the mortgage loans in the Supporting Loan Groups had an

LTV ratio over 100 percent.

92.     The LTV ratio is among the most important measures of the risk of a mortgage

loan, and thus it is one of the most important indicators of the default risk of the mortgage loans

underlying the Certificates.  The lower the ratio, the less likely that a decline in the value of the

property will wipe out an owner's equity, and thereby give an owner an incentive to stop making

mortgage payments and abandon the property.  This ratio also predicts the severity of loss in the

event of default.  The lower the LTV ratio, the greater the "equity cushion," so the greater the

likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

93.     Thus, the LTV ratio is a material consideration to a reasonable investor, including

the GSEs, in deciding whether to purchase a certificate in a securitization of mortgage loans.

---

[9]   The only exceptions are the ACE 2007-ASL1 and ACE 2007-SL1 Securitizations, for
which the majority of mortgage loans was reported as having an LTV ratio greater than 80
percent and below 100 percent.

The 80 percent threshold is particularly relevant to a reasonable investor given that prudent lenders traditionally require borrowers to pay 20 percent of the value of the property in the absence of a mortgage insurance policy, and thus only lend 80 percent of the value of the property. Even small differences in the LTV ratios of the mortgage loans in the collateral group of a securitization can have a significant effect on the likelihood that the collateral groups will generate sufficient funds to pay certificateholders in that securitization, and thus are material to the decision of a reasonable investor whether to purchase any such certificate. As stated in the Prospectus Supplement for the NCHET 2006-2 Securitization: "Mortgage loans with a loan-to-value ratio of greater than 80% may present a greater risk of loss than mortgage loans with loan-to-value ratios of 80% or below." As discussed below in paragraphs 105 through 111, the Registration Statements for the Securitizations materially *overstated* the percentage of loans in the Supporting Loan Groups with an LTV ratio at or less than 80 percent, and materially *understated* the percentage of loans in the Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting the degree of risk of the GSE Certificates.[10]

### D.  Statements Regarding Credit Ratings

94.     Credit ratings are assigned to the tranches of mortgage-backed securitizations by the credit rating agencies, including Moody's Investors Service, Standard & Poor's, and Fitch Ratings. Each credit rating agency uses its own scale with letter designations to describe various levels of risk. In general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments. C and D ratings are at the bottom of the scale and refer to investments that are currently in default and exhibit little or no prospect for

---

[10]   The lone exception is that ACE 2007-ASL1 Securitization, for which the Registration Statement understated the percentage of loans with an LTV ratio above 100 percent by 42.2 percent, but did not overstate the percentage of loans with an LTV ratio at or less than 80 percent.

recovery.  At the time the GSEs purchased the GSE Certificates, investments with AAA or its

equivalent ratings historically experienced a loss rate of less than .05 percent.  Investments with

a BBB rating, or its equivalent, historically experienced a loss rate of less than one percent.  As a

result, securities with credit ratings between AAA or its equivalent through BBB- or its

equivalent were generally referred to as "investment grade."

95.     Rating agencies determine the credit rating for each tranche of a mortgage-backed

securitization by comparing the likelihood of contractual principal and interest repayment to the

"credit enhancements" available to protect investors.  Rating agencies determine the likelihood

of repayment by estimating cashflows based on the quality of the underlying mortgages by using

sponsor provided loan level data.  Credit enhancements, such as subordination, represent the

amount of "cushion" or protection from loss incorporated into a given securitization.[11]  This

cushion is intended to improve the likelihood that holders of highly rated certificates receive the

interest and principal to which they are contractually entitled.  The level of credit enhancement

offered is based on the make-up of the loans in the underlying collateral group and the entire

securitization.  Riskier loans underlying the securitization necessitate higher levels of credit

enhancement to insure payment to senior certificate holders.  If the collateral within the deal is of

a higher quality, then rating agencies require less credit enhancement for AAA or its equivalent

rating.

96.     Credit ratings have been an important tool to gauge risk when making investment

decisions.  For almost a hundred years, investors like pension funds, municipalities, insurance

---

[11]  "Subordination" refers to the fact that the certificates for a mortgage-backed
securitization are issued in a hierarchical structure, from senior to junior.  The junior certificates
are "subordinate" to the senior certificates in that, should the underlying mortgage loans become
delinquent or default, the junior certificates suffer losses first.  These subordinate certificates
thus provide a degree of protection to the senior certificates from losses on the underlying loans.

companies, and university endowments have relied heavily on credit ratings to assist them in distinguishing between safe and risky investments.  Fannie Mae and Freddie Mac's respective internal policies limited their purchases of private label residential mortgage-backed securities to those rated AAA (or its equivalent), and in very limited instances, AA or A bonds (or their equivalent).

97.     Each tranche of the Securitizations received a credit rating upon issuance, which purported to describe the riskiness of that tranche.  The Defendants reported the credit ratings for each tranche in the Prospectus Supplements.  The credit rating provided for each of the GSE Certificates was "investment grade," almost always AAA or its equivalent.  The accuracy of these ratings was material to a reasonable investor's, including the GSEs', decision to purchase the Certificates.  As set forth in Table 8, the ratings for the Securitizations were inflated as a result of Defendants' provision of incorrect data concerning the attributes of the underlying mortgage collateral to the ratings agencies, and, as a result, Defendants sold and marketed the GSE Certificates as AAA (or its equivalent) when, in fact, they were not.

## IV.     FALSITY OF STATEMENTS IN THE PROSPECTUS SUPPLEMENTS

### A.     The Statistical Data Provided in the Prospectus Supplements Concerning Owner Occupancy and LTV Ratios Was Materially False or Misleading

98.     A review of loan-level data for a sample of mortgage loans in each Securitization was conducted in order to assess whether the statistical information provided in the Prospectus Supplements was true and accurate.  For each Securitization, the sample consisted of 1,000 randomly selected loans per Supporting Loan Group, or all of the loans in the group if there were fewer than 1,000 loans in the Supporting Loan Group.  The sample data confirms, on a statistically-significant basis, material misrepresentations of underwriting standards and of certain key characteristics of the mortgage loans across the Securitizations at the time of their

origination.  Plaintiff's data review further demonstrates that the data concerning owner

occupancy and LTV ratios was materially false and misleading at the time of their origination.

### 1.    Owner Occupancy Data Was Materially False

99.    Plaintiff's data review reveals that the owner-occupancy statistics reported in the

Prospectus Supplements were materially false and inflated at the time of the loans' origination.

In fact, far fewer underlying properties were occupied by their owners than disclosed in the

Prospectus Supplements, and more correspondingly were held as second homes or investment

properties.

100.    To determine whether a given borrower actually occupied the property as

claimed, a number of tests were conducted during Plaintiff's data review, including, *inter alia*,

whether the borrower's tax bill was being mailed to the mortgaged property or to a different

address six months after the loan closed; whether the borrower had claimed an owner-occupied

tax exemption on the mortgaged property; and whether the mailing address of the property was

reflected in the borrower's credit reports, tax records, or lien records.  Failing two or more of

these tests is a strong indication that the borrower did not live at the mortgaged property and

instead used it as a second home or an investment property, both of which make it much more

likely that a borrower will not repay the loan.

101.    A significant number of the loans failed two or more of these tests, indicating that

the owner occupancy statistics provided to Fannie Mae and Freddie Mac were materially false

and misleading.  For example, for the ACE 2005-ASAP1 Securitization, for which DB Products

was the sponsor, ACE the depositor and DBS the underwriter, the Prospectus Supplement stated

that only 3.22 percent of the underlying properties by loan count in the Supporting Loan Group

were not owner-occupied, and therefore 96.78 percent were owner-occupied.  But the data

review revealed that for 10.30 percent of the properties represented as owner-occupied, the

owners lived elsewhere, indicating that the true percentage of non-owner occupied properties was 13.19 percent, more than three times the percentage reported in the Prospectus Supplement.[12]

102.    The data review revealed that for each Securitization, the Prospectus Supplement misrepresented the percentage of non-owner occupied properties.  The true percentage of non-owner occupied properties, as determined by the data review, versus the percentage stated in the Prospectus Supplement for each Securitization is reflected in Table 6 below.

**Table 6**

| Transaction | Supporting Loan Group | Percentage of Non-Owner Occupied Properties Reported in Prospectus | Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner Occupancy[13] | Actual Percentage of Non-Owner Occupied Properties | Prospectus Understatement of Non-Owner Occupied Properties (%) |
|---|---|---|---|---|---|
| ACE 2005-AG1 | Group IA | 2.84 | 10.73 | 13.26 | 10.42 |
| ACE 2005-ASAP1 | Group I | 3.22 | 10.30 | 13.19 | 9.97 |
| ACE 2005-HE6 | Group I | 11.92 | 12.86 | 23.24 | 11.33 |
| ACE 2005-HE7 | Group IA | 7.16 | 9.82 | 16.28 | 9.12 |
| ACE 2006-ASAP1 | Group I | 2.96 | 10.19 | 12.85 | 9.89 |
| ACE 2006-ASAP2 | Group I | 3.83 | 8.86 | 12.36 | 8.52 |
| ACE 2006-ASAP3 | Group I | 2.71 | 10.02 | 12.46 | 9.75 |
| ACE 2006-ASAP4 | Group I | 2.59 | 9.97 | 12.30 | 9.71 |
| ACE 2006-ASAP5 | Group IA | 3.69 | 10.37 | 13.68 | 9.99 |
|  | Group IB | 0.74 | 10.85 | 11.50 | 10.77 |
| ACE 2006-ASAP6 | Group IA | 3.46 | 10.44 | 13.53 | 10.08 |
|  | Group IB | 3.19 | 11.54 | 14.36 | 11.17 |
| ACE 2006-CW1 | Group I | 4.84 | 12.23 | 16.48 | 11.64 |
| ACE 2006-FM1 | Group I | 9.63 | 13.53 | 21.86 | 12.23 |
| ACE 2006-FM2 | Group I | 9.65 | 14.45 | 22.71 | 13.06 |

---

[12]    This conclusion is arrived at by summing (a) the stated non-owner-occupied percentage in the Prospectus Supplement (here, 3.22 percent), and (b) the product of (i) the stated owner-occupied percentage (here, 96.78 percent) and (ii) the percentage of the properties represented as owner-occupied in the sample that showed strong indications that their owners in fact lived elsewhere (here, 10.30 percent).

[13]    As described *supra*, failing two or more tests of owner-occupancy is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property.

| Transaction | Supporting Loan Group | Percentage of Non-Owner Occupied Properties Reported in Prospectus | Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner Occupancy[13] | Actual Percentage of Non-Owner Occupied Properties | Prospectus Understatement of Non-Owner Occupied Properties (%) |
|---|---|---|---|---|---|
| ACE 2006-HE1 | Group IA | 10.75 | 12.66 | 22.05 | 11.30 |
| | Group IB | 5.59 | 14.05 | 18.85 | 13.26 |
| ACE 2006-HE2 | Group I | 9.40 | 10.05 | 18.50 | 9.10 |
| ACE 2006-HE3 | Group I | 6.63 | 10.76 | 16.67 | 10.04 |
| ACE 2006-HE4 | Group I | 8.85 | 10.45 | 18.38 | 9.52 |
| ACE 2006-NC1 | Group I | 16.45 | 10.85 | 25.51 | 9.06 |
| ACE 2006-NC2 | Group I | 6.70 | 13.28 | 19.09 | 12.39 |
| ACE 2006-NC3 | Group IA | 17.48 | 10.83 | 26.41 | 8.94 |
| | Group IB | 5.68 | 11.88 | 16.89 | 11.21 |
| ACE 2006-OP1 | Group IA | 12.00 | 9.68 | 20.52 | 8.52 |
| | Group IB | 7.46 | 10.19 | 16.89 | 9.43 |
| ACE 2006-OP2 | Group I | 9.36 | 10.66 | 19.02 | 9.66 |
| ACE 2007-ASAP1 | Group I | 3.87 | 10.41 | 13.88 | 10.00 |
| ACE 2007-ASAP2 | Group I | 5.22 | 9.74 | 14.45 | 9.23 |
| ACE 2007-ASL1 | Group I | 0.00 | 9.79 | 9.79 | 9.79 |
| ACE 2007-HE1 | Group I | 8.09 | 11.15 | 18.33 | 10.25 |
| ACE 2007-HE2 | Group I | 11.32 | 12.30 | 22.22 | 10.90 |
| ACE 2007-HE3 | Group I | 7.44 | 13.51 | 19.95 | 12.50 |
| ACE 2007-HE4 | Group I | 9.91 | 11.42 | 20.20 | 10.28 |
| ACE 2007-HE5 | Group I | 12.86 | 14.34 | 25.35 | 12.49 |
| ACE 2007-SL1 | Group I | 0.00 | 13.59 | 13.59 | 13.59 |
| ACE 2007-WM1 | Group I | 5.98 | 13.24 | 18.43 | 12.44 |
| ACE 2007-WM2 | Group I | 4.51 | 14.19 | 18.06 | 13.55 |
| DBALT 2007-OA4 | Group II | 35.98 | 18.01 | 47.52 | 11.53 |
| | Group III | 35.88 | 16.82 | 46.67 | 10.79 |
| INDX 2005-AR31 | Group II | 17.24 | 15.00 | 29.66 | 12.41 |
| INDX 2006-AR9 | Group II | 17.44 | 13.73 | 28.77 | 11.33 |
| MHL 2007-1 | Group I | 38.04 | 12.91 | 46.04 | 8.00 |
| NCHET 2006-2 | Group I | 14.98 | 9.29 | 22.88 | 7.90 |
| NHEL 2007-1 | Group I | 13.13 | 13.06 | 24.47 | 11.34 |
| RAST 2005-A15 | Group III | 15.49 | 12.50 | 26.05 | 10.56 |
| | Group IV | 33.33 | 14.12 | 42.75 | 9.41 |

103.    The GSEs understood that Defendants had determined that the statistics provided in the Prospectus Supplements were true and correct in all material respects.  In reality, as Table 6 reflects, the Prospectus Supplement for each Securitization was materially inaccurate, understating the percentage of non-owner occupied properties by at least 7.90 percent and for

many Securitizations by 10 percent or more, thus materially understating the risk of the GSE Certificates.  The Prospectus Supplements containing the owner-occupancy statistics bore Deutsche Bank's name and Deutsche Bank was endorsing the statistics in these documents.

104.    Examples of the findings showing that the owner-occupancy statistics reported in the Prospectus Supplements were materially false and inflated at the time of origination are discussed in detail below.  *See infra* ¶¶ 129-130.  The forensic loan file reviews conducted by Plaintiff reaffirm what the above statistics demonstrate: the owner-occupancy data in the Prospectus Supplements was materially false at the time of origination.

### 2.    Loan-to-Value Data Was Materially False

105.    The data review further reveals that the LTV ratios disclosed in the Prospectus Supplements were materially false and understated at the time of the loans' origination, as more specifically set out below.  For each of the sampled loans, an industry standard automated valuation model ("AVM") was used to calculate the value of the underlying property at the time the mortgage loan was originated.  Such retroactive AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review and servicing.  AVMs rely upon similar data as appraisers—primarily county assessor records, tax rolls, and data on comparable properties.  Retroactive AVMs produce independent, statistically-derived valuation estimates at the time of the loan's origination by applying modeling techniques to this data.  The ValuePoint4 ("VP4") AVM was used to analyze the data via appraisal emulation, repeat sales indexes, and regression analysis, relying only on sales made within the last 24 months prior to the origination of the mortgage loan at issue.

106.    Applying the VP4 AVM to the available data for the properties securing the sampled loans shows that the appraised value given to such properties was significantly higher than the actual value of such properties.  The result of this overstatement of property values is a

material understatement of the LTV ratio.  That is, if a property's true value is significantly less

than the value used in the loan underwriting, then the loan represents a significantly higher

percentage of the property's value.  This, of course, increases the risk a borrower will not repay

the loan and the risk of greater losses in the event of a default.  As stated in the Prospectus

Supplement for the ACE 2005-ASAP1 Securitization, "[t]he rate of default on mortgage loans …

with high Loan-to-Value Ratios, may be higher than for other types of mortgage loans."

107.    For example, for the ACE 2007-HE1 Securitization, for which DB Products was

the sponsor, ACE the depositor and DBS the underwriter, the Prospectus Supplement stated that

no LTV ratios for the Supporting Loan Group were above 100 percent.  In fact, 20.90 percent of

the sample of loans included in the data review had LTV ratios above 100 percent.  In addition,

the Prospectus Supplement stated that 62.24 percent of the loans had LTV ratios at or below 80

percent.  The data review indicated, however, that only 31.20 percent of the loans had LTV ratios

at or below 80 percent.

108.    The data review revealed that for each Securitization, the Prospectus Supplement

misrepresented the percentage of loans with an LTV ratio above 100 percent, as well as the

percentage of loans that had an LTV ratio at or below 80 percent, at the time of their origination.

Table 7 reflects (i) the true percentage of mortgages in the Supporting Loan Group at the time of

origination with LTV ratios above 100 percent, versus the percentage reported in the Prospectus

Supplement; and (ii) the true percentage of mortgages in the Supporting Loan Group at the time

of origination with LTV ratios at or below 80 percent, versus the percentage reported in the

Prospectus Supplement.  The percentages listed in Table 7 were calculated by aggregated

principal balance.

**Table 7**

| Transaction | Supporting Loan Group | PROSPECTUS<br>Percentage of Loans Reported to Have LTV Ratio At Or Less Than 80% | DATA REVIEW<br>True Percentage of Loans With LTV Ratio At Or Less Than 80% | PROSPECTUS<br>Percentage of Loans Reported to Have LTV Ratio Over 100% | DATA REVIEW<br>True Percentage of Loans With LTV Ratio Over 100% |
|---|---|---|---|---|---|
| ACE 2005-AG1 | Group IA | 53.56 | 32.62 | 0.00 | 17.24 |
| ACE 2005-ASAP1 | Group I | 81.79 | 50.09 | 0.00 | 8.47 |
| ACE 2005-HE6 | Group I | 58.98 | 39.16 | 0.00 | 15.56 |
| ACE 2005-HE7 | Group IA | 63.19 | 42.27 | 0.00 | 16.25 |
| ACE 2006-ASAP1 | Group I | 83.88 | 48.66 | 0.00 | 7.56 |
| ACE 2006-ASAP2 | Group I | 82.93 | 48.24 | 0.00 | 7.56 |
| ACE 2006-ASAP3 | Group I | 82.81 | 44.35 | 0.00 | 9.65 |
| ACE 2006-ASAP4 | Group I | 79.68 | 44.90 | 0.00 | 12.92 |
| ACE 2006-ASAP5 | Group IA | 75.16 | 44.40 | 0.00 | 13.16 |
| | Group IB | 73.79 | 45.06 | 0.00 | 14.87 |
| ACE 2006-ASAP6 | Group IA | 63.98 | 35.57 | 0.00 | 16.72 |
| | Group IB | 58.72 | 34.20 | 0.00 | 22.82 |
| ACE 2006-CW1 | Group I | 63.34 | 43.55 | 0.00 | 12.92 |
| ACE 2006-FM1 | Group I | 65.70 | 34.08 | 0.00 | 16.19 |
| ACE 2006-FM2 | Group I | 66.39 | 40.28 | 0.00 | 17.19 |
| ACE 2006-HE1 | Group IA | 64.38 | 44.55 | 0.00 | 13.47 |
| | Group IB | 69.52 | 31.89 | 0.00 | 15.24 |
| ACE 2006-HE2 | Group I | 63.48 | 40.44 | 0.00 | 15.46 |
| ACE 2006-HE3 | Group I | 68.18 | 42.42 | 0.00 | 13.27 |
| ACE 2006-HE4 | Group I | 61.88 | 37.72 | 0.00 | 19.93 |
| ACE 2006-NC1 | Group I | 54.46 | 44.01 | 0.00 | 13.06 |
| ACE 2006-NC2 | Group I | 54.13 | 34.29 | 0.00 | 18.64 |
| ACE 2006-NC3 | Group IA | 55.97 | 39.48 | 0.00 | 17.83 |
| | Group IB | 56.24 | 38.76 | 0.00 | 19.47 |
| ACE 2006-OP1 | Group IA | 68.71 | 47.61 | 0.00 | 12.73 |
| | Group IB | 70.55 | 49.45 | 0.00 | 11.82 |
| ACE 2006-OP2 | Group I | 57.82 | 40.21 | 0.00 | 17.33 |
| ACE 2007-ASAP1 | Group I | 52.62 | 29.62 | 0.00 | 23.09 |
| ACE 2007-ASAP2 | Group I | 47.95 | 26.72 | 0.00 | 27.14 |
| ACE 2007-ASL1 | Group I | 0.44 | 1.44 | 0.00 | 42.23 |
| ACE 2007-HE1 | Group I | 62.24 | 31.20 | 0.00 | 20.90 |
| ACE 2007-HE2 | Group I | 64.47 | 42.01 | 0.00 | 16.55 |
| ACE 2007-HE3 | Group I | 58.60 | 39.28 | 0.00 | 21.64 |
| ACE 2007-HE4 | Group I | 56.62 | 28.41 | 0.00 | 25.85 |
| ACE 2007-HE5 | Group I | 47.21 | 29.61 | 0.00 | 31.34 |
| ACE 2007-SL1 | Group I | 7.73 | 5.67 | 0.00 | 43.91 |
| ACE 2007-WM1 | Group I | 67.71 | 35.36 | 0.00 | 16.97 |
| ACE 2007-WM2 | Group I | 69.33 | 39.55 | 0.00 | 19.99 |
| DBALT 2007-OA4 | Group II | 88.55 | 52.11 | 0.00 | 16.65 |
| | Group III | 86.18 | 47.35 | 0.00 | 18.78 |
| INDX 2005-AR31 | Group II | 96.96 | 61.77 | 0.00 | 5.42 |
| INDX 2006-AR9 | Group II | 99.33 | 68.27 | 0.00 | 4.37 |
| MHL 2007-1 | Group I | 94.93 | 52.21 | 0.00 | 12.83 |
| NCHET 2006-2 | Group I | 51.52 | 46.23 | 0.00 | 11.53 |

| Transaction | Supporting Loan Group | PROSPECTUS | DATA REVIEW | PROSPECTUS | DATA REVIEW |
|---|---|---|---|---|---|
| | | Percentage of Loans Reported to Have LTV Ratio At Or Less Than 80% | True Percentage of Loans With LTV Ratio At Or Less Than 80% | Percentage of Loans Reported to Have LTV Ratio Over 100% | True Percentage of Loans With LTV Ratio Over 100% |
| NHEL 2007-1 | Group I | 46.77 | 29.59 | 0.00 | 25.53 |
| RAST 2005-A15 | Group III | 92.62 | 80.43 | 0.00 | 2.99 |
| | Group IV | 92.24 | 65.49 | 0.00 | 6.20 |

109.     As Table 7 demonstrates, the Prospectus Supplements for all of the Securitizations reported that *none* of the mortgage loans in the Supporting Loan Groups had an LTV ratio over 100 percent.  In contrast, the data review revealed that at least 2.99 percent of the mortgage loans for each Securitization had an LTV ratio over 100 percent, and for most Securitizations this figure was much larger.  Indeed, for 33 of the 40 Securitizations, the data review revealed that more than 10 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent.  For 25 Securitizations, the data review revealed that more than 15 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent.

110.     These systematic inaccuracies with respect to reported LTV ratios also indicate that the representations and warranties in the Registration Statements relating to appraisal practices were false, and that the appraisers themselves routinely furnished appraisals that the appraisers understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties.  As described in greater detail below, government investigations and news reports have confirmed that appraisers for nearly all of the originators from which Deutsche Bank purchased mortgage loans did not produce independent appraisals and that the appraisers did not honestly believe their appraisals when they were made.  For example, the Massachusetts Attorney General filed suit against Option One, as described *infra* ¶ 146, alleging, *inter alia*, that Option One regularly inflated the appraised value of applicants'

46

homes; Option One ultimately settled the suit in 2011.  Similarly, a report by the Treasury

Department's Inspector General noted, as described *infra* ¶ 152, that IndyMac issued "shaky

loans based on inflated property values."  And again, as described *infra* ¶ 147, the Massachusetts

Attorney General brought an enforcement action against Fremont based, in part, on the fact that

Fremont "ma[de] loans based on information that Fremont knew or should have known was

inaccurate or false, including, but not limited to . . . property appraisals."  These and the many

other examples discussed below confirm that the appraisals underlying the LTV ratios described

above were both *objectively* false, because the appraisals vastly overstated the actual value of the

property, and not *subjectively* believed by the appraisers themselves at the time the appraisals

were made.

111.    Indeed, independent appraisers following proper practices and providing genuine

estimates as to valuation would not systematically generate appraisals that, as demonstrated by

Table 7, deviate so significantly (and so consistently upward) from the true values of the

appraised properties.  These consistent errors demonstrate that, contrary to the representations in

the Prospectus and Prospectus Supplements described above, the appraisers did not comply with

the Uniform Standards of Professional Appraisal Practice but instead generated inflated appraisal

values merely to justify the issuance of a mortgage loan for the benefit of the mortgage

originators.  This conclusion is further confirmed by the findings of the FCIC, which identified

"inflated appraisals" as a pervasive problem during the period of the Securitizations, and

determined through its investigation that appraisers were often pressured by mortgage

originators, among others, to produce inflated results.  *See* FCIC, Final Report of the National

Commission on the Causes of the Financial and Economic Crisis in the United States (January

2011), at 91; *see also infra* ¶¶ 154-155.

**B.     The Originators of the Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines**

112.    The Registration Statements contained material misstatements and omissions regarding compliance with underwriting guidelines.  Indeed, the originators for the loans underlying the Securitizations systematically disregarded their respective underwriting guidelines in order to increase production and profits derived from their mortgage lending businesses.  This is confirmed by the systematically misreported owner occupancy and LTV statistics, discussed above, and by (1) an initial forensic review of 2,743 loan files for loans in the Supporting Loan Groups for the ACE 2007-HE3, MHL 2007-1, ACE 2006-HE2, and NCHET 2006-2 Securitizations; (2) government and private investigations into the originators' underwriting practices, which have revealed widespread abandonment of the originators' reported underwriting guidelines during the relevant period; (3) the collapse of the Certificates' credit ratings; and (4) the surge in delinquencies and defaults in the mortgages in the Securitizations.

**1.     A Forensic Review of Loan Files Has Revealed Pervasive Failure to Adhere to Underwriting Guidelines**

113.    A forensic review of 1,273 loans from the ACE 2007-HE3 Securitization, for which DB Products served as the sponsor, ACE as the depositor, and DBS as the lead underwriter, has revealed that approximately 97 percent of the reviewed loans were not underwritten in accordance with the applicable guidelines or otherwise breached the representations contained in the transaction documents.

114.    A forensic review of 1,170 loans from the MHL 2007-1 Securitization, for which DB Products served as the sponsor, MortgageIT as the depositor, and DBS as the lead underwriter, has revealed that over 92 percent of the reviewed loans were not underwritten in

accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents.

115.     A forensic review of 193 loans from the ACE 2006-HE2 Securitization, for which DB Products served as the sponsor, ACE as the depositor, and DBS as the lead underwriter, has revealed that over 98 percent of the reviewed loans were not underwritten in accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents.

116.     A preliminary review of 107 loans from the NCHET 2006-2 Securitization, for which New Century served as the sponsor, New Century Mortgage Securities LLC ("New Century Securities") as the depositor, and DB Securities as the lead underwriter, has revealed that over 77 percent of the reviewed loans were not underwritten in accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents.

117.     The forensic review consisted of an analysis of the loan file for each loan, including the documents submitted by the individual borrowers in support of their loan applications, as well as an analysis of information extrinsic to each loan file, such as the borrower's motor vehicle registration, documentation with pertinent information indicating a borrower's assets or residence and other information that was available at the time of the loan application, as well as the borrower's filings in bankruptcy proceedings and other sources of information.

118.     The mortgage loans in the ACE 2007-HE3 Securitization were originated by ResMAE Mortgage Corporation ("ResMAE").  The ACE 2007-HE3 Prospectus Supplement stated that the mortgage loans underlying the Securitization were originated by ResMAE and

provided "a description of the underwriting guidelines used for Mortgage loans originated by ResMAE Mortgage Corporation."  The Prospectus Supplement further stated that "[t]he underwriting standards of ResMAE are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  ResMAE considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio … as well as the value, type and use of the mortgaged property."

119.    The mortgage loans in the MHL 2007-1 Securitization were originated by MortgageIT, Inc. ("MortgateIT").  The MHL 2007-1 Prospectus Supplement described MortgageIT's underwriting guidelines. The Prospectus Supplement stated that "MortgageIT's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt."

120.    The mortgage loans in the ACE 2006-HE2 Securitization were originated by Argent Mortgage Company LLC ("Argent") and several other originators.  The ACE 2006-HE2 Prospectus Supplement described the originators' underwriting standards, stating that "[t]he underwriting standards of the Originators are intended to assess the ability and willingness of the mortgagor to repay the debt and to evaluate the adequacy of the property as collateral for the mortgage loan.  The Originators consider, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the value, type and use of the mortgaged property."

121.    The mortgage loans in the NCHET 2006-2 Securitization were originated by New Century and Home123 Corporation.  The NCHET 2006-2 Prospectus Supplement described New

50

Century's underwriting guidelines and stated that all of the mortgage loans were originated or acquired in accordance with these guidelines, with exceptions made on a case-by-case basis where compensating factors exist. The Prospectus Supplement stated that New Century's guidelines "are primarily intended to assess the borrower's ability to repay the related mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan."

122.    The results of the forensic review demonstrate, however, that the disclosures in the Registration Statements, stating that the mortgage loans were originated in accordance with ResMAE's, MortgageIT's, Argent's, or New Century's underwriting guidelines and as described in the Prospectus Supplements, were materially false.

123.    The ResMAE, MortgageIT, Argent, and New Century underwriting guidelines that were disregarded were designed to assess the likelihood a borrower would be able to repay the loan. The forensic review revealed abandonment of underwriting guidelines, including as follows:

- failure to test the reasonableness of borrower's stated income contributing to material misrepresentations of income;

- failure to investigate properly the borrower's intention to occupy the subject properties when red flags surfaced in the origination process that should have alerted the underwriter that the property was intended for investment;

- failure to calculate properly the borrower's outstanding debt causing the debt-to-income ratio ("DTI") to exceed the maximum allowed under the underwriting guidelines; and

- failure to investigate properly information on the borrower's credit reports of potential misrepresentations of outstanding debt.

124.    The results of the forensic review demonstrate that the disclosures in the Registration Statements, that the mortgage loans were underwritten in accordance with applicable underwriting guidelines described in the Prospectus Supplement, were materially

51

false.  Moreover, although the Prospectus Supplements represented that exceptions would be justified "[o]n a case by case basis" by sufficient compensating factors, none of the loan files reflecting a breach of underwriting guidelines evidenced sufficient compensating factors that would justify or support such an exception.

125.    The below examples from the initial forensic review of the ACE 2007-HE3 Securitization, the MHL 2007-1 Securitization, the ACE 2006-HE2 Securitization, and the NCHET 2006-2 Securitization illustrate the types of breaches discussed above that pervade the loan pools for the Securitization.  These are examples of violations of the underwriting guidelines and are not a complete list of all the findings from the forensic review.

(a)        <strong>Stated Income Was Not Reasonable</strong>

126.    Although no verification of income was required for stated income loans, the applicable underwriting guidelines required the underwriter to verify the employment listed by the borrower on the application and to assess whether the stated income was reasonable given the applicant's line of work.  The applicable ResMae underwriting guidelines stated that "[t]he stated income must be reasonable for the profession and the borrower's tenure," and that "[t]he amount of income and length of employment must also pass the 'reasonability test'…."  The Prospectus Supplement for the ACE 2007-HE3 Securitization also stated that under all of ResMAE's loan programs, "the income stated must be reasonable and customary for the applicant's line of work."

127.    The following examples from the forensic review of the ACE 2007-HE3 Securitization, the MHL 2007-1 Securitization, and the NCHET 2006-2 Securitization reveal instances where there was no evidence that the underwriter tested the reasonableness of the borrower's stated income for the employment listed on the application as required by the applicable underwriting guidelines.  Additionally, the forensic review verified that the borrower,

in fact, misrepresented his or her income on the application.  Had the loan underwriter performed

a reasonableness test as required by the applicable underwriting guidelines, the unreasonableness

of the borrower's stated income would have been evident.

- A loan that closed in May 2006 with a principal balance of $310,250 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization.  The loan application stated that the borrower was employed as a construction worker earning $6,800 per month.  The borrower's stated income exceeded the Bureau of Labor Statistic's 90th percentile salary for a construction worker in the same geographic region, which should have been a red flag to the underwriter that the income was overstated.  Moreover, in the Statement of Financial Affairs filed by the borrower as part of a 2007 Chapter 13 Bankruptcy, the borrower reported total income of $17,170 for 2006, resulting in a monthly income $1,431.  There is no evidence in the file that the underwriter tested the reasonableness of the stated income.  A recalculation of DTI based on the borrower's verified income yields a DTI of 212.61 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $273,719, which is over 88 percent of the original loan amount.

- A loan originated in October 2006 with a principal amount of $373,500 was originated as a stated documentation loan and was included in the ACE 2007-HE3 Securitization.  The loan application stated that the borrower was self-employed as a nutritionist earning $7,000 per month.  Payscale.com reported the average salary at the 75th percentile for a nutritionist in the same geographic region was $4,611 per month.  That the borrower's stated income was more than 1.5 times Payscale.com's 75th percentile should have put a reasonably prudent underwriter on notice for potential misrepresentation.  The file contains no evidence that the underwriter assessed the reasonableness of the stated income.  Had the underwriter done so, the misrepresentation of income would have been uncovered. A re-calculation of the DTI based upon a more reasonable income of $4,611 per month yields a DTI of 74.61 percent, which exceeds the guideline maximum DTI of 50 percent.  Furthermore, according to a Statement of Financial Affairs, filed by the borrower with the Central District of California Bankruptcy Court in January 2008, the borrower's actual income for 2006, the year of the loan closing, was $1,186 per month.  A recalculation of DTI based on the borrower's verified income yields a DTI of 290.07 percent.  Had the loan underwriting process tested the reasonableness of the borrower's stated income, the borrower's misrepresentation of income would have been uncovered.  The loan defaulted and the property was liquidated, resulting in a loss of $258,141, which is approximately 70 percent of the original loan amount.

- A loan originated in October 2006 with a principal amount of $45,800 was originated as a stated documentation loan and was included in the ACE 2007-HE3 Securitization.  The loan application stated that the borrower was employed as a

marketing supervisor earning $6,124 per month.  The loan file contained verification of employment revealing that the borrower was a teleservices representative.  CBSalary.com reported the average salary at the 75th percentile for a telemarketing representative in the same geographic region was $3,344 per month.  That the borrower's stated income was more than 1.8 times CBSalary.com's 75th percentile should have put a reasonably prudent underwriter on notice for potential misrepresentation.  The file contains no evidence that the underwriter assessed the reasonableness of the stated income.  Had the underwriter done so, the misrepresentation of income would have been uncovered.  Furthermore, according to a Statement of Financial Affairs, filed by the borrower with the Middle District of Florida Bankruptcy Court in February 2008, the borrower's actual income for 2006, the year of the loan closing, was $1,161 per month.  A recalculation of DTI based on the borrower's verified income yields a DTI of 249.21 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  Had the loan underwriting process tested the reasonableness of the borrower's stated income, the borrower's misrepresentation of income would have been uncovered.  The loan defaulted and the property was liquidated, resulting in a loss of $48,097, which is approximately 105 percent of the original loan amount.[14]

- A loan originated in March 2007 with a principal amount of $273,000 was originated as a stated documentation loan and was included in the MHL 2007-1 Securitization.  The loan application stated that the borrower was employed as a project coordinator for a construction company earning $6,700 per month.  Payscale.com reported the average salary at the 75th percentile for a project coordinator in the same geographic region was $4,053 per month.  That the borrower's stated income was more than 1.5 times Payscale.com's 75th percentile should have put a reasonably prudent underwriter on notice for potential misrepresentation.  The file contains no evidence that the underwriter assessed the reasonableness of the stated income.  Had the underwriter done so, the misrepresentation of income would have been uncovered.  Furthermore, according to a Statement of Financial Affairs, filed by the borrower with the Central District of California Bankruptcy Court in October 2008, the borrower's actual income for 2007, the year of the loan closing, was $1,151 per month.  A recalculation of DTI based on the borrower's verified income yields a DTI of 314.84 percent, which exceeds the guideline maximum allowable DTI of 45 percent.  Had the loan underwriting process tested the reasonableness of the borrower's stated income, the borrower's misrepresentation of income would have been uncovered.  The loan defaulted and the property was liquidated, resulting in a loss of $168,425, which is over 61 percent of the original loan amount.

---

[14]  Loan losses may amount to more than 100 percent of the original loan amount due to loan service costs and costs incurred in the course of foreclosure and liquidation of the property.

- A loan that closed in May 2006 with a principal balance of $216,000 was
  originated by New Century as a stated income loan and was included in the
  NCHET 2006-2 Securitization.  The loan application stated that the borrower was
  self-employed as a realtor earning $14,000 per month.  The borrower's stated
  income exceeded CBSalary.com's 90th percentile salary for a small business
  owner, the most analogous occupation, in the same geographic region, which
  should have been a red flag to the underwriter that the borrower's income was
  overstated.  Moreover, the loan file contained post-closing loan modification
  documents, including the Borrower's 2006 tax return for the same employer at the
  time of loan origination, which reflected earnings for the borrower of $1,864 per
  month.  There is no evidence in the file that the underwriter tested the
  reasonableness of the stated income.  A recalculation of DTI based on all
  evidence uncovered by the forensic review, yields a DTI of 364.08 percent, which
  exceeds the guideline maximum allowable DTI of 50 percent.  The loan defaulted
  and the property was liquidated in a foreclosure sale, resulting in a loss of
  $121,937, which is over 56 percent of the original loan amount.

128. The results of the forensic review demonstrate that the statements in the

Registration Statements concerning the originators' verification of the reasonableness of the

stated income were materially false and misleading.  In particular, a significant number of

mortgage loans were made on the basis of "stated incomes" that were unreasonable on their face,

and were not properly underwritten through efforts to verify the reasonableness of borrowers'

incomes.

**(b)     Evidence of Occupancy Misrepresentations**

129. ResMae's underwriting guidelines require owner occupancy for certain types of

loans and provide for higher maximum dollar amounts for loans on an owner-occupied property.

The guidelines also include, on a list of "red flags" indicating potential fraud, "All file

documentation (e.g., pay stubs, W-2s, tax returns, bank statements, credit report address, etc.)

reflect the borrower living at another address, but the loan was presented as 'owner-occupied.'"

The following examples illustrate instances where the loan underwriter did not adequately

question the borrower's intended occupancy of the subject property despite several facts or

circumstances that would have put a prudent underwriter on notice for potential occupancy

misrepresentations. The lack of compliance with the underwriting process in this regard

materially increased the credit risk of the loans and the portfolio because investment and second

home properties generally have a higher rate of default and higher loss severities than owner-

occupied primary residences.

- A loan originated in October 2006 with a principal amount of $420,300 was originated as a stated documentation loan and was included in the ACE 2007-HE3 Securitization. The applicable guidelines required that at least one of the borrowers occupy the subject property, and the borrower represented that the loan was an owner-occupied transaction. The borrower claimed on the loan application to have resided at the subject property for four years. Public records revealed that an individual who was not the borrower on the transaction resided at the subject property from January 2006 through January 2011. The borrower furnished a driver's license that listed a different property as the borrower's address. A search of public records revealed no utility bills sent to the borrower at the subject address; rather, the borrower received utility bills at a property in the same city listed on the driver's license. A statement in the loan file lists the borrower's husband's address as the same address reflected in the utility bills. No evidence in the file indicates that the underwriting process addressed these inconsistencies. The loan defaulted and the property was liquidated, resulting in a loss of $375,460, which is nearly 90 percent of the original loan amount.

- A loan originated in October 2006 with a principal amount of $328,500 was originated as a stated documentation loan and was included in the ACE 2007-HE3 Securitization. The applicable guidelines required that at least one of the borrowers occupy the subject property, and the borrower represented that the loan was an owner-occupied transaction. The initial loan application, however, stated that the subject property in California was a second home, and that the borrower lived and worked in Texas. The final loan application showed the California property as the primary. No evidence in the file indicates that the underwriting process addressed this inconsistency. Furthermore, a search of public records showed that the borrower's driver's license identified the borrower's address in Texas, and utilities from April 2000 to August 2011 were connected to the property located in Texas. The loan defaulted and the property was liquidated, resulting in a loss of $254,783, which is over 77 percent of the original loan amount.

- A loan originated in October 2006 with a principal amount of $33,000, which was included in the ACE 2007-HE3 Securitization, required that at least one of the borrowers occupy the subject property, and the loan was represented by the borrower as an owner-occupied transaction. However, the loan file contained a homeowner's insurance policy reflecting the subject property policy type as a rental dwelling. No evidence in the files indicates that the underwriter addressed

this inconsistency.  The loan defaulted and the property was liquidated, causing a loss of $34,264, which is over 100 percent of the original loan amount.

- A loan originated in October 2006 with a principal amount of $136,000 was originated as a stated documentation loan and was included in the ACE 2007-HE3 Securitization.  The applicable guidelines required that at least one of the borrowers occupy the subject property, and the borrower represented that the loan was an owner-occupied transaction.  The final loan application, for a property in Illinois, indicated that the borrower's employer and the borrower's mailing address were in California.  The origination file included a Homeowners Declaration page that reflected the borrower's mailing address as a rental address in Illinois other than the property address.  No evidence in the file indicates that the underwriter addressed these inconsistencies.  The loan defaulted and the property was liquidated, resulting in a loss of $121,325, which is nearly 90 percent of the original loan amount.

- A loan that closed in January 2006 with a principal balance of $154,400 was originated by Ace as a no income documentation loan and was included in the ACE 2006-HE2 Securitization.  The loan was a purchase of an owner-occupied residence.  The underwriting guidelines for this loan required that the borrower occupy the subject property.  The loan was represented as being for an owner-occupied residence.  However, the application in the loan file revealed the Borrower already owned and occupied a property located in the same town as the subject property.  Furthermore, a post-closing hardship letter from the Borrower revealed the Borrower never occupied the subject property, and instead planned to use the property as an investment property.  No evidence in the loan file indicates that the loan underwriter addressed or challenged the borrower's claim that he intended to reside at the new location.  The loan defaulted and the property was liquidated, resulting in a loss of $126,252, which is over 81 percent of the original loan amount.

130.    The results of the forensic review demonstrate that the statements concerning the borrowers' occupancy status in the Registration Statement for the ACE 2007-HE3 Securitization and the ACE 2006-HE2 Securitization were materially false or misleading.  The underwriting failed to address numerous red flags throughout the loan files, and the Prospectus Supplements materially understated the proportion of loans secured by non-owner occupied properties.

### (c)    Debts Incorrectly Calculated; Debt-To-Income Ratios Exceeded Guidelines

131.    Failure to incorporate all of a borrower's monthly obligations precludes the lender from properly evaluating the borrower's ability to repay the loan.  The following are some

examples where the underwriting process either failed to incorporate all of the borrower's debt or the monthly debt obligations were incorrectly calculated. When properly calculated, the borrower's actual DTI ratio exceeded the limits established by applicable underwriting guidelines. The failure to properly calculate debt led to material misstatements regarding the credit risk of the securitized loans.

- A loan originated in March 2007 with a principal amount of $88,000 was originated as a full documentation loan and was included in the MHL 2007-1 Securitization. Prior to the loan closing, the borrower obtained six mortgages to three undisclosed properties totaling $450,000, and did not disclose them. A search of the public records revealed the undisclosed mortgages. The origination credit report showed multiple credit inquiries, but there was no evidence in the origination loan file that the loan underwriter researched these credit inquires; had the originator investigated them, the additional debt obligations would have been discovered. There is no evidence in the file that the underwriter took these additional debt obligations into account in originating the loan. A recalculation of the DTI that includes the borrower's undisclosed debt raises the DTI from 39.22 percent to 115 percent, which exceeds the guideline maximum allowable DTI of 45 percent. The loan defaulted and the property was liquidated, resulting in a loss of $104,821, which is more than 119 percent of the original loan amount.

- A loan originated in October 2006 with a principal amount of $220,500 was originated under as a stated documentation loan and was included in the ACE 2007-HE3 Securitization. A search of public records revealed the borrower had purchased a condominium secured by a mortgage originated seven months prior to the subject loan application. The origination credit report showed four credit inquiries within one month, but there was no evidence in the origination loan file that the loan underwriter researched these credit inquires; had the originator investigated them, the additional debt obligations would have been discovered. There is no evidence in the file that the underwriter took this additional debt obligation into account in originating the loan. A recalculation of DTI based on the borrower's undisclosed debt yields a DTI of 103.87 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The loan defaulted and the property was liquidated, resulting in a loss of $186,673, which is nearly 85 percent of the original loan amount.

- A loan originated in October 2006 with a principal amount of $61,731 was originated as a full documentation loan and was included in the ACE 2007-HE3 Securitization. Public records indicate that the borrower obtained three undisclosed mortgages within the six months preceding the subject loan closing date. The origination credit report showed eight credit inquiries within the previous two months, but there was no evidence in the origination loan file that the loan underwriter researched these credit inquires; had the originator

investigated them, the additional debt obligations would have been discovered. There is no evidence in the file that the underwriter took this additional debt obligation into account in originating the loan. The borrower's undisclosed debt changes the borrower's DTI from the calculated 29.06 percent to 59.42 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated, resulting in a loss of $91,780, which is 148 percent of the original loan amount.

- A loan that closed in March 2006 with a principal balance of $442,000 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. A forensic review of the loan file reveals that the underwriter improperly excluded the monthly mortgage insurance payment of $118 along with two mortgage loans with total monthly payments of $2,206, and the underwriter improperly calculated the borrower's hazard insurance and taxes. A recalculation of the DTI based on all evidence uncovered by the forensic review results in an increase from 49.84 percent to 215.79 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $248,501, which is over 56 percent of the original loan amount.

- A loan that closed in March 2006 with a principal balance of $130,500 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. A forensic review of the loan file reveals that the borrower obtained a mortgage prior to the closing of the subject loan, which resulted in an additional monthly payment of $2,747.00. Although this loan was not listed on the application for the subject loan, there were eight credit inquiries listed on the origination credit report for the previous 90 days. There is no evidence in the file that the underwriter investigated the credit inquiries or took the additional debt obligations into account in originating the loan. Moreover, the borrower failed to include the monthly mortgage insurance of $57 per month. A recalculation of the DTI that includes the borrower's undisclosed debt and monthly mortgage insurance results in an increase from 46.68 percent to 181.06 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $134,223, which is over 102 percent of the original loan amount.

- A loan that closed in May 2006 with a principal balance of $174,250 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. A forensic review of the loan file reveals that the borrower obtained another mortgage prior to the closing of the subject loan, which resulted in an additional monthly payment of $1,933. Although this loan was not listed on the application for the subject loan, there were ten credit inquiries listed on the origination credit report for the previous 90 days. There is no evidence in the file that the underwriter investigated the credit inquiries or took the additional debt obligations into account in originating the loan. Moreover, while the underwriter calculated a $70 monthly payment for a student loan with a balance of $2,874, the applicable guidelines required the underwriter to use five

percent of the balance as the payment, or $144.  The underwriter also failed to include the subject property's monthly mortgage insurance obligation of $47.  A recalculation of the DTI based on the borrower's properly calculated debts, including the borrower's undisclosed debt, results in an increase from 45.52 percent to 139.44 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $111,492, which is approximately 64 percent of the original loan amount.

- A loan that closed in May 2006 with a principal balance of $356,400 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization.  The underwriter excluded a child support obligation, two other mortgage loans, and 16 student loans that were listed on the subject loan application.  The applicable guidelines required the underwriter to account for these debts in originating the subject loan, and there's no evidence in the file that these debts were properly excluded.  A forensic review of the loan file further reveals that three installment debts and a child support obligation were not included on the subject loan application.  There is no indication that the underwriter took these undisclosed debts into consideration when originating the subject loan.  A recalculation of the DTI based on the borrower's properly calculated debts, including the undisclosed debts, results in an increase from 43.01 percent to 98.31 percent, which exceeds the guideline maximum of 50 percent.  The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $281,120, which is approximately 79 percent of the original loan amount.

- A loan that closed in May 2006 with a principal balance of $51,300 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization.  A forensic review of the loan file reveals that the borrower obtained another mortgage prior to the closing of the subject loan, which resulted in an additional monthly payment of $538.  Although this loan was not listed on the application for the subject loan, a public record search reflected the borrower had purchased the property associated with the undisclosed mortgage two months prior to the closing of the subject loan, and there were seven credit inquiries listed on the origination credit report for the previous 90 days.  There is no evidence in the file that the underwriter investigated the credit inquiries or took this additional debt obligation into account in originating the loan.  A recalculation of the DTI that includes the borrower's undisclosed debt results in an increase from 28.91 percent to 99.02 percent, which exceeds the guideline maximum of 50 percent.  The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $60,280, which is over 117 percent of the original loan amount.

- A loan that closed in March 2006 with a principal balance of $285,500 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization.  A forensic review of the loan file reveals that the borrower obtained another mortgage prior to the closing of the subject loan,

60

which resulted in an additional monthly payment of $3,420.  Although this loan was not listed on the application for the subject loan, there were eight credit inquiries listed on the origination credit report for the previous 90 days.  There is no evidence in the file that the underwriter investigated the credit inquiries or took the additional debt obligation into account in originating the loan.  A recalculation of the DTI that includes the borrower's undisclosed debt results in an increase from 38.08 percent to 277.95 percent, which exceeds the guideline maximum of 50 percent.  The loan defaulted, and the property was liquidated in a foreclosure sale, resulting in a loss of $304,363, which is over 106 percent of the original loan amount.

- A loan that closed in January 2006 with a principal balance of $341,600 was originated by Ace as a stated income loan and was included in the ACE 2006-HE2 Securitization.  A forensic review of the loan file reveals that the borrower obtained two mortgages prior to the closing of the subject loan, which resulted in additional monthly payments of $3,708.  Although these loans were not listed on the application for the subject loan, there were four credit inquiries listed on the origination credit report for the previous 90 days.  There is no evidence in the file that the underwriter investigated the credit inquiries or took the additional debt obligations into account in originating the loan.  A recalculation of the DTI that includes the borrower's undisclosed debt results in an increase from 47.87 percent to 205.70 percent, which exceeds the guideline maximum of 50 percent.  The loan defaulted and the property was liquidated, resulting in a loss of $279,555, which is approximately 82 percent of the original loan amount.

- A loan that closed in August 2005 with a principal balance of $67,500 was originated by Ace as a stated income loan and was included in the ACE 2006-HE2 Securitization.  A forensic review of the loan file reveals that the borrower obtained two mortgages prior to the closing of the subject loan, which resulted in an additional monthly payment of $2,001.  Although these loans were not listed on the application for the subject loan, there were ten credit inquiries from multiple mortgage loan companies listed on the origination credit report for the previous 90 days.  There is no evidence in the file that the underwriter investigated the credit inquiries or took the additional debt obligations into account in originating the loan.  A recalculation of the DTI that includes the borrower's undisclosed debt results in an increase from 23.75 percent to 91 percent, which exceeds the guideline maximum of 50 percent.  The loan defaulted and the property was liquidated, resulting in a loss of $77,568, which is approximately 115 percent of the original loan amount.

- A loan that closed in January 2006 with a principal balance of $135,680 was originated by Ace as a stated income loan and was included in the ACE 2006-HE2 Securitization.  A forensic review of the loan file reveals that the borrower obtained a mortgage prior to the closing of the subject loan, which resulted in an additional monthly payment of $1,395.  Although this loan was not listed on the application for the subject loan, there were four credit inquiries listed on the origination credit report for the previous 90 days.  There is no evidence in the file

that the underwriter investigated the credit inquiries or took the additional debt obligation into account in originating the loan. A recalculation of the DTI that includes the borrower's undisclosed debt results in an increase from 47.39 percent to 66.85 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated, resulting in a loss of $93,565, which is approximately 69 percent of the original loan amount.

- A loan that closed in January 2006 with a principal balance of $157,410 was originated by Ace as a stated income loan and was included in the ACE 2006-HE2 Securitization. A forensic review of the loan file reveals that the borrower obtained a mortgage prior to the closing of the subject loan, which resulted in an additional monthly payment of $1,301. Although this loan was not listed on the application for the subject loan, there were four credit inquiries listed on the origination credit report for the previous 90 days. There is no evidence in the file that the underwriter investigated the credit inquiries or took the additional debt obligation into account in originating the loan. A recalculation of the DTI that includes the borrower's undisclosed debt results in an increase from 49.20 percent to 63.05 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated, resulting in a loss of $121,579, which is over 77 percent of the original loan amount.

### (d) Credit Inquiries That Indicated Misrepresentation of Debt

132. The ResMae underwriting guidelines require a qualified credit report to be present in the loan file and state that "[c]redit inquiries between the loan application date and the credit report date should be investigated to verify that no new debt has been opened … The loan file should contain documentation that adequately explains that the borrower has not taken on any new debt." The guidelines also include "[a]ny recent inquiries shown on the credit report" on a list of factors that should be considered to determine if a borrower's credit is acceptable. Similarly, the Prospectus Supplement for the MHL 2007-1 Securitization states that MortgageIT "obtains a credit report that summarizes each borrower's credit history," and that MortgageIT takes the credit report into account when evaluating loan applicants. The Prospectus Supplement for the ACE 2006-HE2 Securitization also states that "Argent also obtains (or the broker submits) a credit report on each applicant from a credit reporting company."

133.    The following examples illustrate instances where the borrower's credit report contained numerous credit inquiries which should have put the underwriters on notice for potential misrepresentations of debt obligations, and the resulting impact on the DTI ratio.  Had the loan underwriter properly addressed these irregularities, the undisclosed liabilities would have been discovered.  Failure to investigate these issues prevented the loan underwriting process from appropriately qualifying the loan and evaluating the borrower's ability to repay the loan.

- A loan originated in October 2006 with a principal amount of $144,000 was originated as a stated documentation loan and was included in the ACE 2007-HE3 Securitization.  The origination credit report in the file showed 10 credit inquiries within the three-month period before the origination.  In the three months prior to the closing of the loan, the borrower obtained two undisclosed mortgages, one for $268,000 and one for $107,200.  There was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.  Had the underwriter investigated the 10 credit inquiries in the previous three months, the undisclosed mortgage debts would have been discovered.  A recalculation of DTI using the undisclosed debt yields a DTI of 95.89 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The loan defaulted and the property was liquidated, resulting in a loss of $173,601, which is over 120 percent of the original loan amount.

- A loan originated in March 2007 with a principal amount of $55,800 was originated as a stated documentation loan and was included in the MHL 2007-1 Securitization.  There was no evidence in the file that the underwriter requested or obtained an explanation from the borrower for the 23 credit inquiries during the four-month period preceding the closing of the loan.  Had the underwriter investigated, he would have discovered that the borrower had failed to disclose four mortgages, two of which were obtained two months prior to and an additional one in the same month as the subject loan.  A recalculation of DTI based on the borrower's undisclosed debt increases DTI from 41.53 percent to 54.69 percent, which exceeds the guideline maximum of 45 percent.  The loan defaulted and the property was liquidated, resulting in a loss of $66,172, which is over 118 percent of the original loan amount.

- A loan originated in October 2006 with a principal amount of $64,000 was originated as a stated documentation loan and was included in the ACE 2007-HE3 Securitization.  The origination credit report in the file showed 10 recent credit inquiries.  The forensic analysis uncovered a mortgage loan acquired several months prior to the loan closing; it was neither included in the DTI nor disclosed

on the loan application. There was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. Had the underwriter investigated the credit inquiries, the undisclosed mortgage debt would have been discovered. A recalculation of DTI based on the borrowers' undisclosed debt yields a DTI of 76.60 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The loan defaulted and the property was liquidated, resulting in a loss of $68,438, which is approximately 107 percent of the original loan amount.

- A loan that closed in May 2006 with a principal balance of $156,478 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. A credit report included in the origination file dated prior to closing shows eight credit inquiries within the previous 90 days, including numerous inquiries from mortgage lenders and servicers. There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. Moreover, the borrower obtained another mortgage prior to the closing of the subject loan, which resulted in an additional monthly payment of $1,509. A recalculation of the DTI based on all evidence uncovered in the forensic review results in an increase in DTI from 48.25 percent to 76.77 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $1,815.

- A loan that closed in May 2006 with a principal balance of $100,251 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. A credit report included in the origination file dated prior to closing shows nine credit inquiries within the previous 90 days, including numerous inquiries from mortgage lenders and servicers. There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. Moreover, the borrower obtained another mortgage prior to the closing of the subject loan, which resulted in an additional monthly payment of $1,688. The additional mortgage was not listed on the application for the subject loan. A recalculation of the DTI based on all evidence uncovered in the forensic review results in an increase from 38.93 percent to 80.17 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $74,295, which is over 74 percent of the original loan amount.

- A loan that closed in October 2005 with a principal balance of $220,000 was originated by Ace as a stated income loan and was included in the ACE 2006-HE2 Securitization. A credit report included in the origination file dated prior to closing shows nine credit inquiries within the previous 90 days, including numerous inquiries from mortgage lenders and servicers. There was no evidence in the origination file that the loan underwriter researched these credit inquiries or

took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.  Moreover, in October 2005, before the subject loan closed, the borrower obtained two mortgages with a combined monthly payment of $2,137.  A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 147.98 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The loan defaulted and the property was liquidated, resulting in a loss of $106,539, which is over 48 percent of the original loan amount.

- A loan that closed in October 2005 with a principal balance of $323,000 was originated as a stated income loan and was included in the ACE 2006-HE2 Securitization.  A credit report included in the origination file dated prior to closing shows 14 credit inquiries within the previous 90 days, including numerous inquiries from mortgage lenders and servicers.  There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.  Moreover, in August 2005 the borrower obtained a mortgage with a monthly payment of $2,148.  A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 105.23 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The loan defaulted and the property was liquidated, resulting in a loss of $356,207, which is over 110 percent of the original loan amount.

- A loan that closed in January 2006 with a principal balance of $396,000 was originated as a full documentation loan and was included in the ACE 2006-HE2 Securitization.  A credit report included in the origination file dated prior to closing shows eight credit inquiries within the previous 90 days, including numerous inquiries from mortgage lenders and servicers.  There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.  Moreover, between October 2005 and November 2005 the borrower obtained three mortgages with a combined monthly payment of $6,715.  A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 116.52 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The loan defaulted and the property was liquidated, resulting in a loss of $166,459, which is approximately 42 percent of the original loan amount.

134.    In each of these instances there was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.  Had the loan underwriter properly addressed these irregularities, the undisclosed liabilities would have been discovered.

Failure to investigate these issues prevented the loan underwriting process from appropriately qualifying the loan and evaluating the borrower's ability to make timely payments.

### 2. Both Government and Private Investigations Have Confirmed That the Originators of the Loans in the Securitizations Systematically Failed to Adhere to Their Underwriting Guidelines

135.     The abandonment of underwriting guidelines is confirmed by several government reports and investigations that have described rampant underwriting failures throughout the period of the Securitizations, and, more specifically, have described underwriting failures by the very originators whose loans were included by Defendants in the Securitizations.

136.     For example, in November 2008, the Office of the Comptroller of the Currency, an office within the United States Department of the Treasury, issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas.  The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations.  Fremont, Countrywide, IndyMac, New Century and Option One, which originated many of the loans for the Securitizations at issue here, were all on that list.  New Century was in fact identified as the worst subprime lender in the country based on the delinquency rates of the mortgages it originated in the ten metropolitan areas between 2005 and 2007 with the highest rates of delinquency.  *See* "Worst Ten in the Worst Ten," Office of the Comptroller of the Currency Press Release, November 13, 2008.

### (a)     Countrywide

137.     Countrywide originated the loans for four of the Securitizations.  In January 2011, the FCIC issued its final report, which detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.  *See* Financial Crisis Inquiry Commission, Final Report of the National Commission of the Causes of

the Financial and Economic Crisis in the United States (2011) ("FCIC Report").  The FCIC

Report singled out Countrywide for its role:

> Lenders made loans that they knew borrowers could not afford and
> that could cause massive losses to investors in mortgage securities.
> As early as September 2004, Countrywide executives recognized
> that many of the loans they were originating could result in
> "catastrophic consequences."  Less than a year later, they noted
> that certain high-risk loans they were making could result not only
> in foreclosures but also in "financial and reputational catastrophe"
> for the firm.  But they did not stop.

*See* FCIC Report at xxii.

138.    Countrywide has also been the subject of several investigations and actions

concerning its lax and deficient underwriting practices.  In June 2009, for instance, the SEC

initiated a civil action against Countrywide executives Angelo Mozilo (founder and Chief

Executive Officer), David Sambol (Chief Operating Officer), and Eric Sieracki (Chief Financial

Officer) for securities fraud and insider trading.  In a September 16, 2010 opinion denying these

defendants' motions for summary judgment, the United States District Court for the Central

District of California found that the SEC raised genuine issues of fact as to, among other things,

whether the defendants had misrepresented the quality of Countrywide's underwriting processes.

The court noted that the SEC presented evidence that Countrywide "routinely ignored its official

underwriting to such an extent that Countrywide would underwrite any loan it could sell into the

secondary mortgage market," and that "a significant portion (typically in excess of 20%) of

Countrywide's loans were issued as exceptions to its official underwriting guidelines …."  The

court concluded that "a reasonable jury could conclude that Countrywide all but abandoned

managing credit risk through its underwriting guidelines …."  *S.E.C. v. Mozilo*, No. CV 09-3994,

2010 WL 3656068, at *10 (C.D. Cal. Sept. 16, 2010).  Mozilo, Sambol, and Sieracki

subsequently settled with the SEC.

139.     The testimony and documents only recently made publicly available by way of the SEC's investigation confirm that Countrywide was systematically abusing "exceptions" and low-documentation processes in order to circumvent its own underwriting standards.  For example, in an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned that certain subprime loans had been originated "with serious disregard for process [and] compliance with guidelines," resulting in the delivery of loans "with deficient documentation." Mozilo further stated that "I have personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

### (b)     New Century

140.     New Century originated the loans for five of the Securitizations.  As stated in the Prospectus Supplement for the NCHET 2007-1 Securitization, "[f]or the quarter ending March 31, 2006, New Century Financial Corporation originated $13.4 billion in mortgage loans."  By the end of 2006, New Century was the third largest subprime mortgage loan originator in the United States, with a loan production volume that year of $51.6 billion.  And before its collapse in the first half of 2007, New Century was one of the largest subprime lenders in the country.

141.     In its final report addressing the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy, the FCIC singled out New Century for its role:

> New Century—once the nation's second-largest subprime lender—
> ignored early warnings that its own loan quality was deteriorating
> and stripped power from two risk-control departments that had
> noted the evidence.  In a June 2004 presentation, the Quality
> Assurance staff reported they had found severe underwriting
> errors, including evidence of predatory lending, federal and state
> violations, and credit issues, in 25% of the loans they audited in
> November and December 2003.  In 2004, Chief Operating Officer
> and later CEO Brad Morrice recommended these results be

removed from the statistical tools used to track loan performance, and in 2005, the department was dissolved and its personnel terminated. The same year, the Internal Audit department identified numerous deficiencies in loan files; out of nine reviews it conducted in 2005, it gave the company's loan production department "unsatisfactory" ratings seven times. Patrick Flanagan, president of New Century's mortgage-originating subsidiary, cut the department's budget, saying in a memo that the "group was out of control and tries to dictate business practices instead of audit."

142.    On February 29, 2008, after conducting an extensive document review and over 100 interviews, Michael J. Missal, the Bankruptcy Court Examiner for New Century, issued a detailed report on the various deficiencies at New Century, including lax mortgage standards and a failure to follow its own underwriting guidelines.  Among his findings, the Examiner reported:

- "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy…. Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels."

- New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan.  A senior officer of New Century warned in 2004 that the "number one issue is exceptions to the guidelines."  Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies.

- "New Century … layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers."

Final Report of Michael J. Missal, Bankruptcy Examiner, *In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC) (Bankr. Del. Feb. 29, 2008), *available at* http://graphics8.nytimes.com/packages/pdf/business/Final_Report_New_Century.pdf.

143.    On December 9, 2009, the SEC charged three of New Century's top officers with violations of federal securities laws.  The SEC's complaint details how New Century's representations regarding its underwriting guidelines, *e.g.*, that New Century was committed to "adher[ing] to high origination standards in order to sell [its] loan products in the secondary

market" and "only approv[ing] subprime loan applications that evidence a borrower's ability to repay the loan," were blatantly false.

144.     Confidential witnesses confirmed that New Century abandoned its underwriting guidelines.  One confidential witness, who was an internal bureau quality assurance underwriter for New Century, stated that he had doubts about the quality of the loans he reviewed.  A second confidential witness managed an appraisal review staff at New Century.  His team would review the application to ensure that the collateral was sufficient to support the loan.  He estimated that over 50 percent of the loans his group reviewed did not have the proper collateral, and as such his group would rate the loans either "Low" or "Unacceptable"; however, those above him often overrode these decisions.

145.     Patricia Lindsay, a former Vice President of Corporate Risk at New Century, testified before the FCIC in April 2010 that, beginning in 2004, underwriting guidelines had been all but abandoned at New Century.  Ms. Lindsay further testified that New Century systematically approved loans with 100 percent financing to borrowers with extremely low credit scores and no supporting proof of income.  *See* Written Testimony of Patricia Lindsay for the FCIC Hearing, April 7, 2010 ("Lindsay Testimony"), http://fcic-static.law.stanford.edu/cdn-media/fcic.testimony/2010-0407-Lindsay.pdf, at 3.

### (c)     Option One

146.     Option One, which originated the loans for two Securitizations, has also been identified through multiple reports and investigations for its faulty underwriting.  On June 3, 2008, for instance, the Attorney General for the Commonwealth of Massachusetts filed an action against Option One (the "Option One Complaint"), and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans.  *See* Complaint, *Commonwealth v. H&R Block, Inc*., CV NO. 08-2474-BLS (Mass. Super. Ct. June. 3, 2008).

According to the Massachusetts Attorney General, since 2004, Option One had "increasingly disregarded underwriting standards … and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market." *Id.* at ¶ 4. The Massachusetts Attorney General alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home," and that Option One "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices." *Id.* at ¶ 8. Option One's "origination policies … employed from 2004 through 2007 have resulted in an explosion of foreclosures." *Id*. at ¶ 10. On August 9, 2011, the Massachusetts Attorney General announced that H&R Block, Inc., Option One's parent company, has agreed to settle the suit for approximately $125 million. *See* Massachusetts Attorney General Press Release, "H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions," Aug. 9, 2011.

### (d)    Fremont

147.    On October 4, 2007, the Commonwealth of Massachusetts, through its Attorney General, brought an enforcement action against Fremont, which originated loans for six of the Securitizations, for an array of "unfair and deceptive business conduct," "on a broad scale." *See* Complaint, *Commonwealth v. Fremont Investment & Loan and Fremont General Corp*., No. 07-4373 (Mass. Super. Ct.) (the "Fremont Complaint"). According to the complaint, Fremont (i) "approve[ed] borrowers without considering or verifying the relevant documentation related to the borrower's credit qualifications, including the borrower's income;" (ii) "approv[ed] borrowers *for loans with inadequate debt-to-income analyses that do not properly* consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses;"

(iii) "failed to meaningfully account for [ARM] payment adjustments in approving and selling loans;" (iv) "approved borrowers for these ARM loans based only on the initial fixed 'teaser' rate, without regard for borrowers' ability to pay after the initial two year period;" (v) "consistently failed to monitor or supervise brokers' practices or to independently verify the information provided to Fremont by brokers;" and (vi) "ma[de] loans based on information that Fremont knew or should have known was inaccurate or false, including, but not limited to, borrowers' income, property appraisals, and credit scores." *See* Fremont Complaint.

148.    On December 9, 2008, the Supreme Judicial Court of Massachusetts affirmed a preliminary injunction that prevented Fremont from foreclosing on thousands of its loans issued to Massachusetts residents.  As a basis for its unanimous ruling, the Supreme Judicial Court found that the record supported the lower court's conclusions that "Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan,'" and that "Fremont knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow."  *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556 (Mass. 2008).  The terms of the preliminary injunction were made permanent by a settlement reached on June 9, 2009.

149.    A confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Fremont consistently cut corners and sacrificed underwriting standards in order to issue loans.  He noted that "Fremont was all about volume and profit," and that when he attempted to decline a loan, he was regularly told, "you have signed worse loans than this."  The same witness also said that employees at Fremont would create documents that were not provided by the borrowers, including check stubs and tax documents, in

order to get loans approved.  The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on internal underwriting exams.  He explained that like many Fremont employees, he quit because he was uncomfortable with the company's practices.

### (e)   IndyMac

150.   IndyMac, which originated the loans for three of the Securitizations, was the subject of a February 26, 2009 report issued by the Office of Inspector General of the U.S. Department of Treasury, entitled "Safety and Soundness: Material Loss Review of IndyMac Bank, FSB" (the "OIG Report").  The OIG Report found that IndyMac Bank had "embarked on a path of aggressive growth" that was supported by its high risk business strategy of "originating … Alt-A loans on a large scale" and then "packag[ing] them together in securities" and selling "them on the secondary market" to investors.  OIG Report at 2, 6, 7.  The OIG Report further stated that: "To facilitate this level of [loan] production … IndyMac often did not perform adequate underwriting …."  *Id.* at 2.

151.   According to a recently filed SEC complaint, in 2007 Blair Abernathy, who at the time was IndyMac's executive vice president, "made misleading statements about the quality of the loans in six IndyMac offerings of residential mortgage-backed securities totaling $2.5 billion."  Sarah N. Lynch, "SEC Charges Ex-IndyMac Execs with Fraud," Reuters, Feb. 11, 2011.  Specifically:

> Abernathy received internal monthly reports showing that 12% to 18% of a random sample of IndyMac Bank's loans contained misrepresentations regarding important information about the loans' characteristics (such as a loan's status as an owner-occupied loan or its loan-to-value ("LTV") ratio) and/or the borrowers' creditworthiness (such as a borrower's identity, income, or debt load).  Despite receiving those monthly reports showing that a significant percentage of loans contained misrepresentations, Abernathy negligently failed to take reasonable or responsible steps to ensure that the RMBS offering documents, which had been prepared by inside and outside counsel, included accurate disclosures concerning

the loans in the RMBS or notified investors that the presented information was materially misleading in light of IndyMac Bank's monthly reports . . . These six offerings have experienced substantial loan delinquencies and ratings downgrades.

Complaint, *SEC v. Abernathy*, CV11-01308 (C.D. Cal. Feb. 11, 2011).  In a settlement with the SEC, Abernathy agreed to pay a fine and "consented to the issuance of an administrative order … suspending him from appearing or practicing before the SEC as an accountant."  SEC Press Release, "SEC Charges Former Mortgage Lending Executives with Securities Fraud," Feb. 11, 2011.

152.    Similarly, a February 2009 report by the Treasury Department's Inspector General noted that IndyMac issued "shaky loans based on inflated property values."  William Heisel, "Federal Regulators Ignored Problems at IndyMac, Report Finds: The Treasury Department's Inspector General Says The Office Of Thrift Supervision Missed Key Signals Pointing To Shaky Loans, Leading To The Mortgage Lender's Collapse Last Summer," *Los Angeles Times*, Feb. 27, 2009.  The report cited an instance where a borrower took out a $926,000 loan to buy what was supposedly a $1.4 million home.  According to Inspector General Eric Thurson, when the buyer defaulted "[t]he property went up for sale for $599,000."  *Id*.  The report also found that "in one case IndyMac sought multiple appraisals on a property that ranged from $500,000 to $5 million."  *Id*.  Assistant Inspector General Marla Freedman noted that IndyMac used the $5 million appraisal "'because their goal was to get these loans done and make a profit.'"  *Id*.

153.    A June 30, 2008 report issued by the Center for Responsible Lending ("CRL") also found that IndyMac Bank often ignored its stated underwriting and appraisal standards and encouraged its employees to approve loans regardless of the borrower's ability to repay them. *See* IndyMac: What Went Wrong? How an 'Alt-A' Leader Fueled its Growth with Unsound and

Abusive Mortgage Lending (the "CRL Report").  For example, the CRL Report noted that

IndyMac Bank "engaged in unsound and abusive lending practices" and "allowed outside

mortgage brokers and in-house sales staffers to inflate applicants' [financial information] … [to]

make them look like better credit risks."  *See* CRL Report at 2, 8.  Further, former IndyMac

employees stated that they relied on "bogus appraisals" in giving out loans and that employees

"were intimidated by higher-ups and told they would be fired if they tried to block fraudulent

appraisals."  *Id.* at 2, 13.

**(f)     Inflated Appraisals Generally**

154.    As described above, the originators of the mortgage loans underlying the

Securitizations went beyond the systematic disregard of their own underwriting guidelines.

Indeed, as the FCIC has confirmed, mortgage loan originators throughout the industry pressured

appraisers, during the period of the Securitizations, to issue inflated appraisals that met or

exceeded the amount needed for the subject loans to be approved, regardless of the accuracy of

such appraisals.  Appraisal pressure was especially strong when the originators aimed at putting

the mortgages into a package of mortgages that would be sold for securitization.  This resulted in

lower LTV ratios, which in turn made the loans appear to the investors less risky than they were.

155.    As described by Patricia Lindsay, a former wholesale lender who testified before

the FCIC in April 2010, appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked

data "that would help support the needed value rather than finding the best comparables to come

up with the most accurate value."  *See* Written Testimony of Patricia Lindsay to the FCIC, April

7, 2010, at 5.  Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his

testimony that "[i]n many cases, appraisers are ordered or severely pressured to doctor their

reports and to convey a particular, higher value for a property, or else never see work from those

parties again … [T]oo often state licensed and certified appraisers are forced into making a

'Hobson's Choice.'"  *See* Testimony of Jim Amorin to the FCIC, *available at*

www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/2009/AI-ASA-ASFMRA-

NAIFATestimonyonMortgageReform042309final.pdf.  Faced with this choice, appraisers

systematically abandoned applicable guidelines and over-valued properties in order to facilitate

the issuance of mortgages that could then be collateralized into mortgage-backed securitizations.

> **3.     The Collapse of the Certificates' Credit Ratings Further Indicates
> that the Mortgage Loans were not Originated in Adherence to the
> Stated Underwriting Guidelines**

156.    The total collapse in the credit ratings of the GSE Certificates, typically from

AAA or its equivalent to non-investment speculative grade, is further evidence of the originators'

systematic disregard of underwriting guidelines, amplifying that the GSE Certificates were

impaired from the start.

157.    The GSE Certificates that Fannie Mae and Freddie Mac purchased were originally

assigned credit ratings of AAA or its equivalent, which purportedly reflected the description of

the mortgage loan collateral and underwriting practices set forth in the Registration Statements.

These ratings were artificially inflated, however, as a result of the very same misrepresentations

that Defendants made to investors in the Prospectus Supplements.

158.    Deutsche Bank provided or caused to be provided loan-level information,

including the borrower's LTV ratio, debt-to-income ratio, owner occupancy status and other loan

level information described in aggregation reports in the Prospectus Supplements, to the rating

agencies.  The rating agencies in turn relied on this information to calculate the Certificates'

assigned credit ratings.  Because the information that Deutsche Bank provided or caused to be

provided was materially false, the models used by the ratings agencies under-predicted the

likelihood of default and loss severity.  As a result of the false information provided by Deutsche

Bank, the Securitizations lacked the level of subordination required for the Certificates to be

truly rated AAA (or its equivalent), and investors, including Fannie Mae and Freddie Mac, were deprived of the level of protection commensurate with a AAA (or its equivalent) rating. As a result, the GSEs paid Defendants inflated prices for purportedly AAA (or its equivalent) Certificates, unaware that those Certificates in reality carried a greater risk of loss and inadequate credit enhancement, and thus should not have been rated AAA (or its equivalent).

159.    The GSEs could not have discovered facts indicating Defendants' false and misleading statements and omissions prior to, at the earliest, April 1, 2008 for Freddie Mac and September 9, 2008 for Fannie Mae. These are the first dates on which any of the GSE Certificates were downgraded below investment grade by a credit ratings agency. In subsequent months and years, most of the GSE Certificates were downgraded by the credit rating agencies from AAA (or its equivalent) to below investment grade. Prior to the initial downgrades in April and September 2008, respectively, Freddie Mac and Fannie Mae had no basis to suspect Defendants' widespread misrepresentations and omissions of material fact in the Registration Statements. After these downgrades, it required significant investigation and fact-finding for the GSEs to formulate the claims stated herein. The downgrades beginning in 2008 raised questions regarding the true underwriting practices used to originate the mortgage loans, and the mortgage loans' true value and credit quality. Table 8 details the extent of the downgrades.[15]

Table 8

| Transaction | Tranche | Rating at Issuance (Moody's/S&P/Fitch) | Rating at April 30, 2012 (Moody's/S&P/Fitch) |
|---|---|---|---|
| ACE 2005-AG1 | A1A | Aaa/AAA/-- | A3/AA+/-- |
| ACE 2005-ASAP1 | A1 | Aaa/AAA/-- | Aa2/AAA/-- |
| ACE 2005-HE6 | A1 | Aaa/AAA/AAA | A1/AAA/BB |
| ACE 2005-HE7 | A1A | Aaa/AAA/-- | Aa1/AA-/-- |

---

[15]    Applicable ratings are shown in sequential order separated by forward slashes: Moody's/S&P/Fitch. Hyphens between forward slashes indicate that the relevant agency did not provide a rating at issuance.

| Transaction | Tranche | Rating at Issuance (Moody's/S&P/Fitch) | Rating at April 30, 2012 (Moody's/S&P/Fitch) |
|---|---|---|---|
| ACE 2006-ASAP1 | A1 | Aaa/AAA/-- | Ba3/BB/-- |
| ACE 2006-ASAP2 | A1 | Aaa/AAA/-- | Ba2/A+/-- |
| ACE 2006-ASAP3 | A1 | Aaa/AAA/-- | Caa2/B-/-- |
| ACE 2006-ASAP4 | A1 | Aaa/AAA/-- | Caa2/CCC/-- |
| ACE 2006-ASAP5 | A1A | Aaa/AAA/-- | Caa3/CCC/-- |
| | A1B | Aaa/AAA/-- | Caa2/CCC/-- |
| ACE 2006-ASAP6 | A1A | Aaa/AAA/-- | Caa3/CCC/-- |
| | A1B | Aaa/AAA/-- | Caa3/CCC/-- |
| ACE 2006-CW1 | A1 | Aaa/AAA/-- | Caa2/CCC/-- |
| ACE 2006-FM1 | A1 | Aaa/AAA/-- | Ca/CCC/-- |
| ACE 2006-FM2 | A1 | Aaa/AAA/-- | Ca/CCC/-- |
| ACE 2006-HE1 | A1A | Aaa/AAA/AAA | Ba2/B/CCC |
| | A1B1 | Aaa/AAA/AAA | Baa3/BB/CCC |
| | A1B2 | Aaa/AAA/AAA | Ca/B-/CC |
| ACE 2006-HE2 | A1 | Aaa/AAA/AAA | Caa2/B-/CC |
| ACE 2006-HE3 | A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| ACE 2006-HE4 | A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| ACE 2006-NC1 | A1 | Aaa/AAA/-- | B2/BB/-- |
| ACE 2006-NC2 | A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| ACE 2006-NC3 | A1A | Aaa/AAA/-- | Ca/CCC/-- |
| | A1B | Aaa/AAA/-- | Ca/CCC/-- |
| ACE 2006-OP1 | A1A | Aaa/AAA/-- | Caa2/BBB+/-- |
| | A1B | Aaa/AAA/-- | Caa1/AA-/-- |
| ACE 2006-OP2 | A1 | Aaa/AAA/-- | Caa3/B+/-- |
| ACE 2007-ASAP1 | A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| ACE 2007-ASAP2 | A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| ACE 2007-ASL1 | A1 | Aaa/AAA/-- | C/CC/-- |
| ACE 2007-HE1 | A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| ACE 2007-HE2 | A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| ACE 2007-HE3 | A1 | Aaa/AAA/-- | Ca/CCC/-- |
| ACE 2007-HE4 | A1 | Aaa/AAA/-- | Ca/CCC/-- |
| ACE 2007-HE5 | A1 | Aaa/AAA/-- | Ca/CCC/-- |
| ACE 2007-SL1 | A1 | Aaa/AAA/-- | C/CC/-- |
| ACE 2007-WM1 | A1 | Aaa/AAA/-- | Ca/CCC/-- |
| ACE 2007-WM2 | A1 | Aaa/AAA/-- | Ca/CCC/-- |
| DBALT 2007-OA4 | IIA1 | Aaa/AAA/AAA | Caa2/CCC/CCC |
| | IIIA1 | Aaa/AAA/AAA | Ca/CCC/CC |
| INDX 2005-AR31 | 2A1 | Aaa/AAA/-- | Caa3/D/-- |
| INDX 2006-AR9 | 2A1 | Aaa/AAA/-- | Caa3/D/-- |
| MHL 2007-1 | 1A1 | Aaa/AAA/-- | Ca/D/-- |
| NCHET 2006-2 | A1 | Aaa/AAA/-- | Caa3/B-/-- |
| NHEL 2007-1 | A1A | Aaa/AAA/-- | Caa3/CCC/-- |
| RAST 2005-A15 | 3A1 | Aaa/AAA/-- | Caa3/D/-- |
| | 4A1 | Aaa/AAA/-- | Caa3/D/-- |

### 4.   The Surge in Mortgage Delinquency and Default Further Demonstrates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines

160.   Even though the Certificates purchased by Fannie Mae and Freddie Mac were supposed to represent long-term, stable investments, a significant percentage of the mortgage loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders.  The overall poor performance of the mortgage loans is further evidence of and a direct consequence of the fact that they were not underwritten in accordance with applicable underwriting guidelines as represented in the Registration Statements.

161.   Loan groups that were properly underwritten and contained loans with the characteristics represented in the Registration Statements would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies than occurred here.  Table 9 reflects the percentage of loans in the Supporting Loan Groups that are in default, have been foreclosed upon, or are delinquent as of March 2012.

**Table 9**

| Transaction | Loan Group | Percentage of Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|
| ACE 2005-AG1 | Group IA | 46.3 |
| ACE 2005-ASAP1 | Group I | 26.1 |
| ACE 2005-HE6 | Group I | 37.4 |
| ACE 2005-HE7 | Group IA | 50.8 |
| ACE 2006-ASAP1 | Group I | 46.3 |
| ACE 2006-ASAP2 | Group I | 32.2 |
| ACE 2006-ASAP3 | Group I | 32.3 |
| ACE 2006-ASAP4 | Group I | 30.9 |
| ACE 2006-ASAP5 | Group IA | 34.8 |
| ACE 2006-ASAP5 | Group IB | 31.9 |
| ACE 2006-ASAP6 | Group IA | 29.6 |
| ACE 2006-ASAP6 | Group IB | 31.2 |
| ACE 2006-CW1 | Group I | 65.4 |
| ACE 2006-FM1 | Group I | 52.8 |
| ACE 2006-FM2 | Group I | 71.2 |
| ACE 2006-HE1 | Group IA | 51.5 |

| Transaction | Loan Group | Percentage of Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|
| | Group IB | 63.8 |
| ACE 2006-HE2 | Group I | 35.3 |
| ACE 2006-HE3 | Group I | 38.4 |
| ACE 2006-HE4 | Group I | 36.9 |
| ACE 2006-NC1 | Group I | 41.0 |
| ACE 2006-NC2 | Group I | 72.3 |
| ACE 2006-NC3 | Group IA | 66.5 |
| | Group IB | 61.8 |
| ACE 2006-OP1 | Group IA | 45.2 |
| | Group IB | 45.6 |
| ACE 2006-OP2 | Group I | 44.8 |
| ACE 2007-ASAP1 | Group I | 33.5 |
| ACE 2007-ASAP2 | Group I | 42.4 |
| ACE 2007-ASL1 | Group I | 22.0 |
| ACE 2007-HE1 | Group I | 31.5 |
| ACE 2007-HE2 | Group I | 36.0 |
| ACE 2007-HE3 | Group I | 49.1 |
| ACE 2007-HE4 | Group I | 66.9 |
| ACE 2007-HE5 | Group I | 55.4 |
| ACE 2007-SL1 | Group I | 12.8 |
| ACE 2007-WM1 | Group I | 74.9 |
| ACE 2007-WM2 | Group I | 35.6 |
| DBALT 2007-OA4 | Group II | 50.9 |
| | Group III | 59.7 |
| INDX 2005-AR31 | Group II | 18.9 |
| INDX 2006-AR9 | Group II | 30.2 |
| MHL 2007-1 | Group I | 35.1 |
| NCHET 2006-2 | Group I | 42.6 |
| NHEL 2007-1 | Group I | 50.9 |
| RAST 2005-A15 | Group III | 22.6 |
| | Group IV | 25.6 |

162.    In July 2010, the Financial Industry Regulatory Authority ("FINRA") fined DBS

$7.5 million based on findings that DBS misstated delinquency data.  Specifically, FINRA

alleged that DBS made misrepresentations in the Prospectus Supplements of the ACE 2006-

ASAP1 and ACE 2006-ASAP2 Securitizations, as well as 14 other securitizations.  In a FINRA

Letter of Acceptance, Waiver and Consent from DB Securities, dated July 7, 2010, DBS

accepted and consented to (without admitting or denying) the findings of the FINRA Department

of Enforcement that "the prospectus supplements at issue reported fewer delinquencies contained

in the mortgage pool than would have been reported had the [represented] method actually been

employed …. DBSI's negligent misrepresentations concerning the methodology for calculating delinquency rates in six subprime RMBS securitizations constituted a violation of NASD Rule 2110."

163.    The confirmed misstatements concerning owner occupancy and LTV ratios, the initial forensic review of 2,743 loan files for the ACE 2007-HE3, MHL 2007-1, ACE 2006-HE2, and NCHET 2006-2 Securitizations, the confirmed systematic underwriting failures by the originators responsible for the mortgage loans across the Securitizations, and the extraordinary drop in credit rating and rise in delinquencies across those Securitizations, all confirm that the mortgage loans in the Supporting Loan Groups, contrary to the representations in the Registration Statements, were not originated in accordance with the stated underwriting guidelines.

## V.    DEUTSCHE BANK KNEW ITS REPRESENTATIONS WERE FALSE AND THE GSES JUSTIFIABLY RELIED ON DEUTSCHE BANK'S REPRESENTATIONS

164.    The allegations in this section (paragraphs 164 through 208) are made in support of Plaintiff's common law fraud and aiding and abetting fraud claims, and *not* in support of Plaintiff's claims under (i) Sections 11, 12(a)(2) and 15 of the Securities Act, (ii) Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, or (iii) Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, which are based solely on strict liability and negligence.

165.    Deutsche Bank *knew*, or was reckless in not knowing, that it was falsely representing the underwriting process and the risk profiles of the mortgage loans. For instance:

- The extreme discrepancies in basic information about the underlying mortgage loans, such as owner occupancy and LTV statistics, demonstrates a systemic underwriting failure about which Deutsche Bank knew or was reckless in not knowing.

- Clayton, who acted as credit risk manager in many of the Securitizations, admitted that in the period from the first quarter of 2006 to the second quarter of 2007, 34.9 percent of the mortgage loans Deutsche Bank submitted to Clayton to review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines, and yet Deutsche Bank waived half of those loans into its securitizations.

- The Levin-Coburn Report found that "Deutsche Bank underwrote securities using loans from subprime lenders known for issuing high risk, poor quality mortgages, and sold risky securities to investors across the United States and around the world." Levin-Coburn Report at 11.  Indeed, numerous government investigations have separately confirmed that Deutsche Bank relied on loan originators who, *inter alia*, were "out of control," had "a brazen obsession with increasing loan originations, without due regard to the risks," "did not perform adequate underwriting," and "essentially guarantee[d] that the borrower[s] would be unable to pay and default would follow."

## A.  Deutsche Bank Knew, Through Its Own Due Diligence And The Findings Of Its Outside Consultants, That The Representations in the Registration Statements Were False

### 1.  Deutsche Bank Knew Based On Its Own Diligence That The Loans Were Not Adequately Underwritten

166.    In the Prospectus Supplements, Deutsche Bank assured investors that, as one of its "quality control procedures," it re-underwrote sample pools of the loans it purchased from originators to ensure that those loans were originated in compliance with applicable underwriting guidelines.  For instance:

> The Sponsor conducts a number of quality control procedures, including a full re-underwriting of a random selection of mortgage loans to assure asset quality.  Under the asset quality procedure, a random selection of each month's originations is reviewed.  The mortgage loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.  A report detailing audit findings and level of error is sent monthly to management for response.  The audit findings and management responses are then reviewed by the Sponsor's senior management.  Adverse findings are tracked monthly and over a rolling six month period.

ACE 2006-ASAP5 Prospectus Supplement, filed on Oct. 13, 2006.  Similar representations are made in the Prospectus Supplements for the other Securitizations.

167.     This protocol was confirmed by the FCIC's interview of Joseph Swartz, who served as a vice president of Deutsche Bank's due diligence department, which oversaw all of Deutsche Bank's residential mortgage business.  Transcript of July 21, 2010 FCIC Staff Interview with Joseph Swartz, at 54.  According to Swartz:

> We did kind of a pre-due diligence review inside Deutsche Bank.  I had a team of people that assisted me and I liked to try and find underwriters to bring in for my team, people who understood how to look at loans and credit bureaus, and we would run through credit bureaus hour after hour through hundreds and hundreds of loans, loans that had drifted to see, "Is there anything about this credit, about the borrower that is alarming?"

Swartz Interview at 9.

168.     Deutsche Bank's "pre-review" necessarily would have revealed to Deutsche Bank that the underwriting performed with respect to a significant portion of the mortgage loans being designated for inclusion in its securitizations, including the Securitizations here, was deficient and that numerous loans failed to meet the specific criteria described in the Registration Statements.  Indeed, as set forth in Tables 6 and 7, the loan level data for LTV ratios and owner occupancy was not just misreported in a few Securitizations; rather, that data was misrepresented, systematically, in every one of the 40 Securitizations.  Furthermore, the statistics were consistently misrepresented so as to make the underlying mortgage loans appear less risky than they actually were.

169.     In fact, Deutsche Bank did not conduct extensive diligence to ensure the accuracy of its representations.  Rather, as the FCIC concluded, Deutsche devoted inadequate resources to performing diligence on the loans that it collateralized for its securitizations, including the

Securitizations here.  FCIC Report at 168.  Even its limited diligence, however, was more than

enough to reveal defects in the loan underwriting—indeed, those defects were pervasive—and

Deutsche Bank nevertheless failed to exclude faulty loans from its securitizations.  Unlike

Deutsche Bank, the GSEs did not have access to the loan files for the individual mortgages, and

were not in a position to detect the underwriting failures that would have been readily apparent to

Deutsche in its capacity as sponsor, depositor and underwriter for the Securitizations.

> **2.     Deutsche Bank Also Knew, Based On The Findings Of Its Hired
> Consultants, That The Mortgage Loans Were Not Adequately
> Underwritten**

170.     As discussed above, Deutsche Bank, in addition to performing its own limited

diligence, retained outside consultants, including Clayton, to review samples of the loans.

Clayton's reports reveal that from January 2006 to June 2007, *35 percent of the mortgages*

*Deutsche Bank submitted to Clayton for review were rejected as outside underwriting*

*guidelines*.  Of the mortgages that Clayton found defective, *some 50 percent were subsequently*

*"waived in"* by Deutsche Bank and included in securitizations, like the ones in which the GSEs

invested.  Of the nine banks that FCIC investigated, Deutsche Bank was second both in the

number of loans rejected by Clayton and in the number of loans it subsequently waived in.

171.     Thus, Deutsche Bank systematically accepted loans that its own hired consultants

had determined — and had advised Deutsche Bank — were not properly underwritten.

Clayton's personnel provided insight into Deutsche Bank's decision making in testimony before

the FCIC.  For example, Clayton's Vice President Vicki Beal agreed during her testimony that

Deutsche Bank waived a high number of rejected loans because it was "trying to get this stuff

out the door."  Transcript of July 22, 2010 FCIC Staff Interview of Vicki Beal, at 112:19-113:1.

According to Ms. Beal, the reasoning behind Deutsche Bank's high waiver rate was: "We're not

holding it on our books.  We're pushing it out. We'll take anything [any loan] and do it."  Beal

Tr. at 112:21-113:1.

172.     In 2006, Clayton began to produce trending reports for some of its clients,

including Deutsche Bank, which specified the extent to which Clayton was detecting faulty

loans.  Ms. Beal recalled that Deutsche Bank's Managing Director, Michael Commaroto, did not

"receive" the first trending report "well."  Beal Tr. at 110:21-25.  Commaroto expressed concern

that "[i]n the hands of the wrong people it could be misunderstood."  Beal Tr. at 111:1-16.

According to Beal, Commaroto was "probably … defensive about" the fact that Deutsche Bank

was securitizing loans without regard for their quality.  Beal Tr. at 112:19-113:1.  A former

Executive Vice President of Clayton, Kerry O'Neill, reported to the FCIC that not only did the

meeting with Commaroto not "go over so well," but that it was "explosive."  Transcript of

August 8, 2010 FCIC Staff Interview of Kerry O'Neill, at 13:9-14.  According to O'Neill,

Commaroto "was displeased—certainly unhappy," so much so, that "what happened was scary."

O'Neill Tr. at 113:19-20; 114:10-11.

173.     In response to Clayton's findings, Deutsche Bank did not improve its practices by

excluding the faulty loans identified by Clayton, or by expanding the number of loans that were

subject to review.  Just the opposite.  According to Swartz, the sample size of loans to be

reviewed by Clayton was negotiated between the trader and the loan seller — neither of which

had any incentive to increase the sample size because it could result in more loans being rejected

from the pool.  Indeed, the traders were "very, very sensitive about sample size" and "they

always wanted … to sample less."  However, as the FCIC pointed out, "one could reasonably

expect [the untested loans] to have many of the same deficiencies, and at the same rate, as the

sampled loans."  The FCIC therefore concluded that the failure by Deutsche Bank and other

investment banks to disclose the Clayton findings in the offering materials for the RMBS "rais[ed] the question whether the disclosures were *materially misleading, in violation of the securities laws*."  (Emphasis added.)

174.    Finally, Deutsche Bank was not content simply to let poor loans pass into its securitizations in exchange for fees.  Deutsche Bank took the fraud further, affirmatively seeking to profit from this knowledge.  Rather than rejecting the loans that Clayton identified as defective, as it should have, Deutsche Bank used the evidence of underwriting defects to negotiate lower prices for the loans and thus boost Deutsche Bank's own profits.  According to the September 2010 FCIC testimony of Clayton's former president, D. Keith Johnson, the investment banks would use the exception reports to force a lower price for themselves, and not for the benefit of investors at all:

> I don't think that we added any value to the investor, the end investor, to get down to your point.  I think only our value was done in negotiating the purchase between the seller and securitizer.  Perhaps the securitizer was able to negotiate a lower price, and could maximize the line.  We added no value to the investor, to the rating agencies.

FCIC Staff Int'v with D. Keith Johnson, Clayton Holdings, LLC (Sept. 2, 2010), available at http://fcic.law.stanford.edu/resource/interviews.  In other words, rather than reject defective loans from collateral pools, or cease doing business with consistently failing originators, investment banks like Deutsche Bank would instead use the Clayton data simply to insist on a lower price from the loan originators, leaving more room for its own profits while the defective loans were hidden from investors such as Fannie Mae and Freddie Mac in the securitization pools.

**B. Deutsche Bank Knew Based On Its Relationship With The Loan Originators That The Representations In The Registration Statements Were False**

    **1.    Deutsche Bank's Role as Warehouse Lender Further Ensured that it Knew that the Representations Were False**

175.    Defendants operated—and made huge profits—on every level of the securitization process, acting as originators, underwriters, sponsors, sellers, and depositors.  As a result of this "vertical integration," Defendants were able to maximize the output of their securitization business, and were also keenly aware of the underwriting failures that permeated the underlying collateral.

176.    In order to ensure that a large volume of mortgage loans would be available to feed its securitization machine, Deutsche Bank established lines of credit with loan originators. These credit lines, in turn, were secured by the very mortgage loans that Deutsche Bank would purchase for securitization.  Deutsche Bank's privileged position as a source of "warehouse" lines of credit gave it unique knowledge of the conditions under which mortgage loans were originated.  These arrangements also allowed Deutsch Bank to control the origination practices of these lenders, which depended on Deutsche Bank for funding, and gave Deutsche Bank an inside look into the true quality of the loans they originated.  As one industry publication explained, warehouse lenders like Deutsche Bank have "detailed knowledge of the lender's operations."  Kevin Connor, *Wall Street and the Making of the Subprime Disaster*, at 11 (2007).

177.    The Senate Permanent Committee on Investigations aptly summarized Deutsche Bank's misconduct during the "gold rush" years of subprime lending: "Deutsche Bank underwrote securities using loans from subprime lenders known for issuing high risk, poor quality mortgages, and sold risky securities to investors across the United States and around the world.  They also enabled the lenders to acquire new funds to originate still more high risk, poor quality loans."  Levin-Coburn Report at 11.

### 2. Deutsche Bank Knew That The Representations Were False Through Its Affiliation with MortgageIT

178.    As part of its strategy to gain control of the securitization process, and to ensure a steady supply of mortgage loans to securitize, Deutsche Bank acquired a number of loan originators, including MortgageIT.  Announcing the MortgageIT acquisition in a July 12, 2006 press release, Deutsche Bank boasted that "the vertical integration of a leading mortgage originator like MortgageIT will provide significant competitive advantages, such as access to a steady source of product for distribution into the mortgage capital markets."

179.    Indeed, controlling a subprime lender allowed an investment bank like Deutsche Bank to dictate underwriting standards at the origination level and guarantee a constant stream of loans to securitize and sell to investors like the GSEs.  Because Deutsche Bank needed high volumes of loans to securitize—and because it passed off the default risk to investors—Deutsche Bank had every incentive to, and in fact did, lower the underwriting standards at its affiliated lenders.

180.    MortgageIT originated 22.69 percent of the loans in the ACE 2007-HE5 Securitization and 100 percent of the loans in the MHL 2007-1 Securitization, and was thus directly responsible for whether the underlying mortgage loans for those Securitizations conformed to the representations made in their prospective Registration Statements.  As set forth in Tables 6 and 7, above, moreover, the Registration Statements for these Securitizations vastly misrepresented key data, including LTV ratios and owner occupancy percentages.  It is not possible that MortgageIT—which, by this time, was an arm of Deutsche Bank—could examine the income, liabilities, credit history, employment history, credit reports, personal information, and property appraisals for each loan in these Securitizations, all of which it purportedly did as a

part of its underwriting, and still misstate the quality of the mortgage loans to the extent that it did.

### C. Multiple Investigations Confirm that Deutsche Bank Knew that the Mortgage Loans Did Not Conform to the Stated Underwriting Guidelines

181.    An investigation by the Financial Industry Regulatory Authority ("FINRA") confirms that several Securitizations contain material misrepresentations.  Indeed, FINRA found that with respect to sixteen securitizations, including nine of the Securitizations in this action,[16] Deutsche Bank "continued to refer customers in its prospectus materials to the erroneous [delinquency] data" even after it "became aware that the static pool information underreported historical delinquency rates."  FINRA Letter at 2.  Thus, the FINRA investigation confirms not only that Deutsche Bank knew that the representations in its Registration Statements were false, but that Deutsche Bank failed to correct the misrepresentations and actively directed investors to rely on those misrepresentations.

182.    The United States Department of Justice ("DOJ") has reached similar conclusions.  On August 22, 2011, the DOJ filed a complaint against Deutsche Bank and MortgageIT, accusing the two companies of "knowingly, wantonly, and recklessly" permitting violations of underwriting guidelines.  *See* Am. Compl. *United States v. Deutsche Bank AG, et al.*, No. 11 Civ. 2976 (S.D.N.Y. 2011) (the "DOJ Complaint").  The DOJ alleged that Deutsche Bank and MortgageIT falsely represented that mortgages included in certain Deutsche Bank and MortgageIT RMBS — including the ACE 2006-ASAP1 and ACE 2006-ASAP2 Securitizations — complied with certain federal origination requirements, materially similar to the underwriting standards applicable here.

---

[16]    ACE 2007-ASL1, ACE 2007-SL1, ACE 2007-HE1, ACE 2007-HE2, ACE 2007-HE3, ACE 2007-HE4, ACE 2007-HE5, ACE 2007-ASAP1 and ACE 2007-ASAP2.

183.   According to the DOJ complaint, Deutsche Bank and MortgageIT "failed to implement basic quality control" procedures to ensure that the loans it originated conformed to these requirements.  DOJ Complaint at 29.  The DOJ further detailed Mortgage IT's lax underwriting processes over several years.  Among other things, the DOJ reported that MortgageIT had no in-house quality control procedure in place until late 2005; that it instead contracted with a vendor who prepared letters detailing "serious underwriting violations"; and that MortgageIT employees, rather than reviewing and acting upon those findings, "stuffed the letters, unopened and unread, in a closet in MortgageIT's Manhattan headquarters."  *Id.* at 31–32.

184.   Beginning in December 2004, Mortgage IT's quality control manager attempted to implement MortgageIT's first quality control system.  However, according to the DOJ, that system "quickly proved dysfunctional" and "never worked."  For example, in late 2004-early 2005, the quality control manager identified a MortgageIT underwriter who "engag[ed] in the pattern of serious underwriting violations with common brokers," which included "submitting ineligible and/or fraudulent mortgages."  The quality control manager asked MortgageIT's President and other senior executives to take action, but neither the President, nor other executives acted on the report.  *Id.* at 33.

185.   The situation did not improve with Deutsche Bank's acquisition of Mortgage IT. In fact, beginning in 2006, during the period in which Deutsche Bank initially announced the planned acquisition and performed its diligence for that transaction, Mortgage IT, in an effort "[t]o increase sales," further cut down its quality control procedures, shifting the work of quality control personnel "from quality control reviews of closed mortgages . . . to assistance with production."  This led the DOJ to conclude that "after Deutsche Bank acquired MortgageIT, it

not only failed to fix the existing quality control deficiencies at MortgageIT, ***but it made a very bad problem even worse***." *Id.* at 35–36 (emphasis added).

### D. Multiple Witnesses, Including Former Deutsche Bank Personnel, Have Confirmed that Deutsche Bank Knew that the Mortgage Loans Did Not Conform to Stated Underwriting Guidelines

186.    Emails and testimony from the Levin-Coburn Report further confirm that Deutsche Bank knew that the representations in the Registration Statements were false.  For instance, Deutsche Bank employee Greg Lippmann stated, in an email dated September 21, 2006, that "ace is generally horrible." *See* Levin-Coburn Report at 339.  This assessment was of course correct—as reflected above in Table 1, ACE was the depositor for 34 of the 40 Securitizations, and the Registration Statements *for all* of those Securitizations misstated key loan data, including owner occupancy percentages and LTV ratios.  In other emails, Mr. Lippmann was more explicit, calling Deutsche Bank's residential mortgage-backed securitizations "crap" and "pigs" and predicting, correctly (though without advising the GSEs or other investors), that they would lose value.  *Id.* at 10 (Lippman emails of September 1, 2006, and August 4, 2006, respectively).

187.    Even more troubling, at the same time that Deutsche Bank was marketing its residential mortgage-backed securitizations to investors, it "allowed Mr. Lippmann to develop a large proprietary short position for the bank in the RMBS market," which ultimately resulted in "a profit of $1.5 billion, which Mr. Lippmann claims is more money on a single position than any other trade had ever made for Deutsche Bank in its history." *Id.*  Mr. Lippmann's emails and the huge profit that Deutsch Bank reaped by betting against mortgage-backed securities through its short position confirm that Deutsche Bank was aware that the mortgage loans underlying the Securitizations were much riskier than indicated by the representations in the Registration Statements.

188.     Other former Deutsche Bank employees have described the manner in which

Deutsche Bank used the false information in the Registration Statements to obtain AAA credit

ratings essential for marketing Certificates to investors such as the GSEs.  Just as the GSEs relied

on Defendants to provide accurate information concerning the credit quality of the mortgage

pools, the rating agencies relied on Defendants to provide them with accurate information on

which to base their ratings.  As Susan Barnes, the North American Practice Leader for RMBS at

S&P from 2005 to 2008, explained:

> The securitization process relies on the quality of the data
> generated about the loans going into the securitizations.  **S&P**
> **relies on the data produced by others and reported to both S&P**
> **and investors about those loans.**  At the time that it begins its
> analysis of a securitization, S&P received detailed data concerning
> the loan characteristics of each of the loans in the pool—up to 70
> separate characteristics for each loan in a pool of, potentially,
> thousands of loans.  **S&P does not receive the original loan files**
> **for the loans in the pool.**  Those files are reviewed by the arranger
> or sponsor of the transaction, who is also responsible for reporting
> accurate information about the loans in the deal documents and
> offering documents to potential investors.

Transcript of Testimony of Susan Barnes before the Senate Permanent Subcommittee on

Investigations, April 23, 2010, at 9 (emphasis added).

189.     Defendants fed the rating agencies the same false loan level data regarding loan-

to-value ratios, owner-occupancy status, home values, and debt-to-income ratios that they

provided to investors in aggregate form in the Prospectuses and Prospectus Supplements.  The

rating agencies then input this false data into their quantitative models to assess the credit risk

associated with the RMBS, project likely future defaults, and ultimately, determine the ratings on

Defendants' RMBS products.  As a result, Defendants essentially pre-determined the ratings by

feeding bad data into the ratings system.

190.    Defendants had knowledge of the practice of submitting bad data.  For example,

reports have recently surfaced that in 2007, a junior analyst at Deutsche Bank, Ajit Jain,

complained internally that he had been asked by a Deutsche Bank executive to alter spreadsheets

that were sent to rating agencies.  These spreadsheets "modeled" how securities were likely to

perform and played a role in the agencies' rating decisions.  Jain revealed that the executive told

Jain to alter the payment schedules on the spreadsheets to gain a higher rating on securitizations.

The incident apparently resulted in an internal investigation and was not publicly disclosed until

a 2012 news article reported it.  *See* ukprogressive.co.uk, Deutsche Analyst Sounded Alarm

When Asked to Alter Numbers, Jan. 21, 2012.

191.    In addition to feeding the rating agencies bad loan data, Deutsche Bank pressured

rating agencies into assigning ratings that Deutsche Bank knew were inflated.  For example, in a

March 2007 email, obtained by Senate investigators, a Moody's analyst complained to a

colleague that after Moody's suggested certain downward rating adjustments for a particular

RMBS, a Deutsche Bank investment banker "push[ed] back dearly saying that the deal has been

marketed already and that we [Moody's] came back 'too late' with this discovery."  According to

the analyst, the investment banker further argued that it was "hard" for Deutsche Bank to

"change the structure at this point," effectively conceding that the rating assigned to the RMBS

would not reflect the actual likelihood of default.  Levin-Coburn Report at 280, fn. 1082.

192.    In another instance, a Deutsche Bank banker expressly encouraged an analyst at

Moody's to focus on short term profits at the expense of rating accuracy.  The Former Senior

Vice President and Senior Credit Officer at Moody's, Richard Michalek, testified to the Senate

Permanent Subcommittee on Investigations that a Deutsche Bank investment banker once told

Michalek: ''I'll be gone, you'll be gone. So why are you making life difficult right now over this

particular comment?''  According to Michalek, the comment exemplified "short-term thinking"

on the part the investment banks: "Short term, get this deal done, get this quarter closed, get this

bonus booked, because I do not know whether or not my group is going to be here at the end of

next quarter, so I have to think of this next bonus."  Transcript of Testimony of Richard

Michalek before the Senate Permanent Subcommittee on Investigations, April 23, 2010, Vol. 3 at

44.

### E.  The GSEs Justifiably Relied on Deutsche Bank's Representations

193.    Generally, when purchasing RMBS, the GSEs require compliance with their

investment requirements, as well as various representations and warranties concerning, among

other things, the credit quality of the underlying loans, evaluation of the borrower's ability to

pay, the accuracy of loan data provided, and adherence to applicable local, state, and federal law.

Such representations and warranties were material to the GSEs' decisions to purchase RMBS,

including the GSE Certificates.

194.    Deutsche Bank knew that the GSEs had specific requirements for investing in

non-agency mortgage-backed securities, such as the GSE Certificates, and Deutsche Bank

intended for the GSEs to rely on its fraudulent misstatements as shown by their provision of

representations, warranties, and anticipated credit ratings in connection with the GSE

Certificates, and their repetition of false loan statistics in the term sheets, free writing

prospectuses, and Prospectus Supplements, among other offering materials.

195.    When Deutsche Bank made misrepresentations and omissions in the offering

materials, it was aware of the GSEs' investment requirements for purchasing RMBS.

196.    For example, Fannie Mae's guidelines to sellers provided, among other things:

- "With respect to each Mortgage Loan, all loan data (including information about
  borrower income, census tract, occupancy) set forth in the PSA, Mortgage Loan

Purchase Agreement, prospectus, prospectus supplement and any electronic files delivered in connection herewith, is true, correct, and complete."

- "Each Mortgage Loan at the time it was made complied in all material respects with all applicable local, state, and federal laws, including, but not limited to, all applicable predatory and abusive lending laws."

- "The methodology used in underwriting the extension of credit for each Mortgage Loan employs objective quantitative principles which relate to the borrower's credit characteristics, income, assets and liabilities (as applicable to a particular underwriting methodology program) to the proposed payment, and such underwriting methodology does not rely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such credit extension. Such underwriting methodology confirmed that the time of origination (application/approval) the borrower had a reasonable ability to make timely payments on the Mortgage Loan."

197.  Similarly, Freddie Mac's guidelines to sellers provided, among other things:

"The methodology used in underwriting the extension of credit for each mortgage loan in the trust employs objective mathematical principles which relate the borrower's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such credit extension. Such underwriting methodology confirmed that at the time of origination (application/approval) the borrower had the ability to make timely payments on the mortgage loan."

198.  Accordingly, Fannie Mae and Freddie Mac required Deutsche Bank to provide

representations and warranties regarding the origination and quality of the mortgage loans,

including that the mortgage loans had been underwritten in accordance with the loan originators'

underwriting guidelines.

199.  Fannie Mae and Freddie Mac purchased the GSE Certificates based on the

representations by Deutsche Bank as the sponsor, depositor, and lead and selling underwriter.

Deutsche Bank provided term sheets to the GSEs that contained critical data as to the

Securitizations, including with respect to anticipated credit ratings by the credit rating agencies,

loan-to-value and combined loan-to-value ratios for the underlying collateral, and owner

95

occupancy statistics. This data was subsequently incorporated into Prospectus Supplements that were received by the GSEs upon the close of each Securitization.

200. The GSEs relied upon the accuracy of the data transmitted to them and subsequently reflected in the Prospectus Supplements. In particular, the GSEs relied upon the credit ratings that the credit rating agencies indicated they would bestow on the Certificates. These credit ratings represented a determination by the credit rating agencies that the GSE Certificates were "AAA" quality (or its equivalent) — meaning the Certificates had an extremely strong capacity to meet the payment obligations described in the respective PSAs.

201. Deutsche Bank, in its various roles as sponsor, depositor, and lead and selling underwriter in the Securitizations, provided detailed information about the collateral and structure of each Securitization it sponsored to the credit rating agencies. The credit rating agencies based their ratings on the information provided to them by Deutsche Bank, and the agencies' anticipated ratings of the Certificates were dependent on the accuracy of that information. The GSEs relied on the accuracy of the anticipated credit ratings and the actual credit ratings assigned to the Certificates by the credit rating agencies, and upon the accuracy of Deutsche Bank's representations in the term sheets and Prospectus Supplements.

202. In addition, the GSEs relied on the fact that the originators of the mortgage loans in the Securitizations had acted in conformity with their underwriting guidelines, which were described in the Prospectus Supplements. Compliance with underwriting guidelines was a sine qua non to agreeing to purchase the Certificates, since the strength of the mortgage loan collateral — and the GSEs' decision to purchase the Certificates — was directly premised on the GSEs' reasonable belief that applicable underwriting standards had been observed.

203.    In purchasing the GSE Certificates, the GSEs justifiably relied on Deutsche Bank's false representations and omissions of material fact detailed above, including the misstatements and omissions in the term sheets about the underlying collateral, which were reflected in the Prospectus Supplements.

204.    The GSEs' reliance was reasonable because industry practice was for an investor to rely upon the representations and warranties of the sponsors, depositors and underwriters regarding the quality of the mortgage loans and the standards under which they were originated. Information regarding the originators' compliance with underwriting guidelines, owner-occupancy rates, LTV ratios, and data provided to credit ratings agencies was peculiarly within the knowledge of Deutsche Bank, and investors were therefore required to rely upon the representations made by the sponsors, depositors, and underwriters to address the asymmetry of information concerning the mortgage loans underlying the securitizations. Deutsche Bank's offering materials, including those filed with the SEC, did not provide sufficient information about the individual mortgage loans underlying the GSE Certificates to render Deutsche Bank's false statements or omissions not misleading.

205.    Deutsche Bank intended for investors, including Fannie Mae and Freddie Mac, to rely on its representations of material facts about the assets backing the GSE Certificates. Deutsche Bank instructed investors to rely on the information provided by them in the Registration Statements and no other information. Thus, for example, the Prospectus for the ACE ASAP-2 Securitization states: "You should rely only on the information contained in this document. We have not authorized anyone to provide you with different information." The offering materials for the remaining Securitizations contain similar language.

206.    Furthermore, Deutsche Bank regularly provided prospective RMBS investors with information concerning the volume of its own annual securitization business to assure investors that, by virtue of Deutsche Bank's expertise in and share of the RMBS market, Fannie Mae and Freddie Mac should rely upon the representations and warranties in its offering materials.  *See, e.g.*, ACE 2006-ASAP 2 Prospectus Supplement, at S-134.

207.    But for the above misrepresentations and omissions, the GSEs would not have purchased or acquired the Certificates as they ultimately did, because those representations and omissions were material to their decision to acquire the GSE Certificates, as described above.

208.    From the day the GSEs purchased the GSE Certificates, the GSEs suffered injury. As a result of Deutsche Bank's misrepresentations, the true value of the GSE Certificates on the date of purchase was far lower than the price paid for them by the GSEs.

## VI.    FANNIE MAE'S AND FREDDIE MAC'S PURCHASES OF THE GSE CERTIFICATES AND THE RESULTING DAMAGES

209.    In total, between September 28, 2005 and June 29, 2007, Fannie Mae and Freddie Mac purchased over $14.2 billion in residential mortgage-backed securities issued in connection with the Securitizations.  Table 10 reflects Freddie Mac's purchases of the GSE Certificates.[17]

**Table 10**

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| ACE 2005-AG1 | A1A | 004427BV1 | 10/28/2005 | 181,194,000.00 | 100.00 | DBS |
| ACE 2005-ASAP1 | A1 | 004421SY0 | 10/31/2005 | 199,395,000.00 | 100.00 | DBS |
| ACE 2005-HE6 | A1 | 004421SG9 | 9/28/2005 | 531,329,000.00 | 100.00 | DBS |
| ACE 2005-HE7 | A1A | 004421TV5 | 11/28/2005 | 572,103,000.00 | 100.00 | DBS |
| ACE 2006-ASAP1 | A1 | 004421VS9 | 1/30/2006 | 200,510,000.00 | 100.00 | DBS |
| ACE 2006-ASAP2 | A1 | 004421XB4 | 3/30/2006 | 219,739,000.00 | 100.00 | DBS |

---

[17]    Purchased securities in Tables 10 and 11 are stated in terms of unpaid principal balance of the relevant Certificates.  Purchase prices are stated in terms of percentage of par.

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| ACE 2006-ASAP3 | A1 | 00442VAA5 | 5/30/2006 | 351,056,000.00 | 100.00 | DBS |
| ACE 2006-ASAP4 | A1 | 00441UAA8 | 7/31/2006 | 285,643,000.00 | 100.00 | DBS |
| ACE 2006-ASAP5 | A1A | 004422AA9 | 9/28/2006 | 204,109,000.00 | 100.00 | DBS |
| ACE 2006-ASAP6 | A1A | 00443KAA8 | 11/29/2006 | 166,575,000.00 | 100.00 | DBS |
| ACE 2006-CW1 | A1 | 00441QAA7 | 7/25/2006 | 348,483,000.00 | 100.00 | DBS |
| ACE 2006-FM1 | A1 | 00441VAA6 | 8/29/2006 | 379,752,000.00 | 100.00 | DBS |
| ACE 2006-FM2 | A1 | 00442CAA7 | 10/30/2006 | 331,351,000.00 | 100.00 | DBS |
| ACE 2006-HE1 | A1A | 004421WJ8 | 2/28/2006 | 757,819,000.00 | 100.00 | DBS |
| ACE 2006-HE2 | A1 | 004421YR8 | 4/28/2006 | 417,932,000.00 | 100.00 | DBS |
| ACE 2006-HE3 | A1 | 00441TAA1 | 6/27/2006 | 585,651,000.00 | 100.00 | DBS |
| ACE 2006-HE4 | A1 | 00442BAA9 | 9/28/2006 | 224,129,000.00 | 100.00 | DBS |
| ACE 2006-NC1 | A1 | 004421UP6 | 1/30/2006 | 596,262,000.00 | 100.00 | DBS |
| ACE 2006-NC3 | A1A | 00442EAC9 | 11/30/2006 | 411,186,000.00 | 100.00 | DBS |
| ACE 2006-OP1 | A1A | 00442PAA8 | 5/25/2006 | 356,901,000.00 | 100.00 | DBS |
| ACE 2006-OP2 | A1 | 00441YAA0 | 10/30/2006 | 355,789,000.00 | 100.00 | DBS |
| ACE 2007-ASAP1 | A1 | 00442JAA2 | 3/15/2007 | 284,631,000.00 | 100.00 | DBS |
| ACE 2007-ASAP2 | A1 | 00442UAA7 | 5/30/2007 | 196,819,000.00 | 100.00 | DBS |
| ACE 2007-ASL1 | A1 | 00443MAA4 | 2/15/2007 | 28,625,000.00 | 100.00 | DBS |
| ACE 2007-HE1 | A1 | 00443LAA6 | 1/30/2007 | 299,722,000.00 | 100.00 | DBS |
| ACE 2007-HE2 | A1 | 00443PAA7 | 3/8/2007 | 283,073,000.00 | 99.96 | DBS |
| ACE 2007-HE3 | A1 | 00442GAA8 | 3/22/2007 | 222,412,000.00 | 100.00 | DBS |
| ACE 2007-HE4 | A1 | 00442LAA7 | 4/30/2007 | 320,222,000.00 | 100.00 | DBS |
| ACE 2007-HE5 | A1 | 000797AA8 | 6/29/2007 | 156,231,000.00 | 100.00 | DBS |
| ACE 2007-SL1 | A1 | 00442FAA0 | 3/2/2007 | 48,608,000.00 | 100.00 | DBS |
| ACE 2007-WM1 | A1 | 004424AA5 | 1/29/2007 | 219,104,000.00 | 100.00 | DBS |
| ACE 2007-WM2 | A1 | 00442KAA9 | 3/30/2007 | 203,823,000.00 | 100.00 | DBS |
| DBALT 2007-OA4 | IIA1 | 25151XAC5 | 6/29/2007 | 151,671,000.00 | 100.00 | DBS |
| INDX 2006-AR9 | 2A1 | 45661EGE8 | 4/28/2006 | 188,330,000.00 | 100.52 | DBS |
| MHL 2007-1 | 1A1 | 61915YAA9 | 5/31/2007 | 440,151,000.00 | 100.00 | DBS |
| NCHET 2006-2 | A1 | 64360YAP0 | 6/29/2006 | 435,122,000.00 | 100.00 | DBS |
| NHEL 2007-1 | A1A | 669971AA1 | 2/28/2007 | 803,560,000.00 | 100.00 | DBS |

210.    Table 11 reflects Fannie Mae's purchases of the Certificates:

**Table 11**

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|
| ACE 2006-NC2 | A1 | 00441XAA2 | 9/15/2006 | 310,440,000 | 100.00 | DBS |
| ACE 2006-HE1 | A1B1 | 004421WK5 | 2/28/2006 | 417,082,000 | 100.00 | DBS |
| | A1B2 | 004421WL3 | 2/28/2006 | 104,270,000 | 100.00 | DBS |
| ACE 2006-ASAP5 | A1B | 004422AB7 | 9/28/2006 | 124,883,000 | 100.00 | DBS |
| ACE 2006-NC3 | A1B | 00442EAD7 | 11/30/2006 | 310,606,000 | 100.00 | DBS |
| ACE 2006-OP1 | A1B | 00442PAB6 | 5/25/2006 | 180,507,000 | 100.00 | DBS |
| ACE 2006-ASAP6 | A1B | 00443KAB6 | 11/29/2006 | 96,477,000 | 100.00 | DBS |
| DBALT 2007-OA4 | IIIA1 | 25151XAE1 | 6/29/2007 | 149,369,000 | 100.00 | DBS |
| INDX 2005-AR31 | 2A1 | 45660LW39 | 11/30/2005 | 247,033,000 | 99.77 | DBS |
| RAST 2005-A15 | 3A1 | 45660L4E6 | 12/29/2005 | 170,981,200 | 99.30 | DBS |
| RAST 2005-A15 | 4A1 | 45660L4F3 | 12/30/2005 | 209,067,600 | 100.23 | DBS |

211.    The statements and assurances in the Registration Statements regarding the credit

quality and characteristics of the mortgage loans underlying the GSE Certificates, and the

origination and underwriting practices pursuant to which the mortgage loans were originated,

which were summarized in such documents, were material to a reasonable investor's decision to

purchase the GSE Certificates.  A reasonable investor would have understood that Defendants

were responsible for the contents of those Registration Statements, and that would have

influenced its purchasing decision.

212.    The false statements of material facts and omissions of material facts in the

Registration Statements, including the Prospectuses and Prospectus Supplements, directly caused

Fannie Mae and Freddie Mac to suffer billions of dollars in damages, including without

limitation depreciation in the value of the Certificates.  The mortgage loans underlying the GSE

Certificates experienced defaults and delinquencies at a much higher rate than they would have

had the loan originators adhered to the underwriting guidelines set forth in the Registration

Statements, and the payments to the trusts were therefore much lower than they would have been

had the loans been underwritten as described in the Registration Statements.

100

213.    Fannie Mae's and Freddie Mac's losses have been much greater than they would have been if the mortgage loans had the credit quality represented in the Registration Statements.

214.    Defendants' misstatements and omissions in the Registration Statements regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchases of the GSE Certificates.  Fannie Mae and Freddie Mac did not know of Defendants' misstatements and omissions at the time they purchased the Certificates.  Defendants' misstatements and omissions both understated the risk and overstated the value of the GSE Certificates, and had the GSEs known of these misstatements and omissions, they would not have purchased the GSE Certificates.  Defendants' misrepresentations and omissions, which proximately caused the GSEs' losses, also contributed to the Nation's housing crisis.  See Tara Andringa, *Senate Committee Investigating Financial Crisis Releases Documents on Role of Investment Banks*, Levin Press Release, Apr. 24, 2010, *available at* http://graphics8.nytimes.com/packages/pdf/business/20100424-goldman1.pdf ("Investment banks ... were not simply market-makers, they were self-interested promoters of risky and complicated financial schemes that helped trigger the [financial] crisis").

215.    Based upon sales of the Certificates or similar certificates in the secondary market, Defendants proximately caused billions of dollars in damages to Fannie Mae and Freddie Mac in an amount to be determined at trial.

### VII.    TOLLING OF FHFA'S SECURITIES CLAIMS BY PREVIOUSLY FILED CLASS ACTION COMPLAINTS

216.    DBS was named as a defendant in a class action filed on May 15, 2008 in New York Supreme Court, Case No. 601563-2008, asserting claims under Sections 11, 12(a)(2), and 15 of the Securities Act arising from a number of securitizations, including NHEL 2007-1.  On June 10, 2008, the action was removed to the United States District Court for the Southern

District of New York.  *See New Jersey Carpenters Health Fund v. The Royal Bank of Scotland Group, PLC et al.*, 1:08-CV-05310 (S.D.N.Y.).  Freddie Mac was included in this class.  The claims involving the NHEL 2007-1 Securitization were dismissed on March 31, 2011.

217.     Under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), all putative class members are treated as if they filed their own individual actions until they either opt out or until a certification decision excludes them.  As the Second Circuit stated in *In re WorldCom Securities Litigation*, 496 F.3d 245 (2d Cir. 2007): "[B]ecause Appellants were members of a class asserted in a class action complaint, their limitations period was tolled under the doctrine of *American Pipe* until such time as they ceased to be members of the asserted class, notwithstanding that they also filed individual actions prior to the class certification decision." *Id.* at 256.

218.     Freddie Mac was a member of the putative class asserted in *New Jersey Carpenters*, and FHFA's securities claims as to NHEL 2007-1 are therefore timely, among other reasons, pursuant to *American Pipe* and *In re WorldCom*.

## FIRST CAUSE OF ACTION

### Violation of Section 11 of the Securities Act of 1933
### (Against Defendants DBS, ACE, MIT Securities, DB Products, and the Individual Defendants)

219.     Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud. This cause of action specifically excludes the allegations as to Defendants' scienter and the GSEs' reliance, including those set forth in Section V.

220.     This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements.  This claim is brought against

102

Defendant DBS with respect to each of the Registration Statements, against Defendant MIT

Securities with respect to the MHL 2007-1 Securitization, and against Defendant ACE and the

Individual Defendants with respect to the Registration Statements filed by ACE that registered

securities that were bona fide offered to the public on or after September 6, 2005.

221.    Defendant DBS is strictly liable for making false and materially misleading

statements in each of the Registration Statements for the Securitizations, and for omitting facts

necessary to make the facts stated therein not misleading.  Defendant ACE and the Individual

Defendants are strictly liable for making false and materially misleading statements in the ACE

Shelf Registration Statements that registered securities that were bona fide offered to the public

on or after September 6, 2005, and for omitting facts necessary to make the facts stated therein

not misleading.  Defendants MIT Securities and DB Products (as successor-in-interest to MIT

Securities) are strictly liable for making false and materially misleading statements in the

Registration Statement filed by MIT Securities, which is applicable the MHL 2007-1

Securitization, and for omitting facts necessary to make the facts stated therein not misleading.

222.    Defendant DBS served as underwriter of each Securitization, and as such, is liable

for the misstatements and omissions in the Registration Statements under Section 11 of the

Securities Act.

223.    Defendant ACE filed three Registration Statements under which 34 of the 40

Securitizations were carried out.  As depositor, Defendant ACE is an issuer of the GSE

Certificates issued pursuant to the Registration Statements ACE filed within the meaning of

Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section

11(a), 15 U.S.C. § 77k(a).  As such, ACE is liable under Section 11 of the Securities Act for the

misstatements and omissions in the ACE Shelf Registration Statements that registered securities

that were bona fide offered to the public on or after September 6, 2005.

224.    At the time Defendant ACE filed three Registration Statements applicable to 34 of

the Securitizations, the Individual Defendants were officers and/or directors of ACE.  In

addition, the Individual Defendants signed those Registration Statements and either signed or

authorized another to sign on their behalf the amendments to those Registration Statements.  As

such, the Individual Defendants are liable under Section 11 of the Securities Act for the

misstatements and omissions in the ACE Shelf Registration Statements that registered securities

that were bona fide offered to the public on or after September 6, 2005.

225.    Defendant MIT Securities filed the Registration Statement under which the MHL

2007-1 Securitization was carried out.  As depositor, MIT Securities is an issuer of the MHL

2007-1 Certificate within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. §

77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a).  As such, MIT Securities is

liable for the misstatements and omissions in this Registration Statement under Section 11 of the

Securities Act.  As discussed at paragraph 19 above, in January 2007, Defendant DB Products

acquired MIT Securities.  Defendant DB Products is liable as successor-in-interest to MIT

Securities for the misstatements and omissions in that Registration Statement under Section 11 of

the Securities Act.

226.    At the time that they became effective, each of the Registration Statements

contained material misstatements of fact and omitted information necessary to make the facts

stated therein not misleading, as set forth above.  The facts misstated or omitted were material to

a reasonable investor reviewing the Registration Statements.

227.    The untrue statements of material facts and omissions of material fact in the

Registration Statements are set forth above in Section IV and pertain to compliance with

underwriting guidelines, occupancy status and loan-to-value ratios.

228.    Fannie Mae and Freddie Mac purchased or otherwise acquired the GSE

Certificates pursuant to the false and misleading Registration Statements.  Fannie Mae and

Freddie Mac made these purchases in the primary market.  At the time they purchased the GSE

Certificates, Fannie Mae and Freddie Mac did not know of the facts concerning the false and

misleading statements and omissions alleged herein, and if the GSEs would have known those

facts, they would not have purchased the GSE Certificates.

229.    DBS owed to Fannie Mae, Freddie Mac, and other investors a duty to make a

reasonable and diligent investigation of the statements contained in the Registration Statements

at the time they became effective to ensure that such statements were true and correct and that

there were no omissions of material facts required to be stated in order to make the statements

contained therein not misleading.  The Individual Defendants owed the same duty with respect to

the ACE Shelf Registration Statements that they signed that registered securities that were bona

fide offered to the public on or after September 6, 2005.

230.    DBS and the Individual Defendants did not exercise such due diligence and failed

to conduct a reasonable investigation.  In the exercise of reasonable care, these Defendants

should have known of the false statements and omissions contained in or omitted from the

Registration Statements filed in connection with the Securitizations, as set forth herein.  In

addition, ACE and MIT Securities, though subject to strict liability without regard to whether

they performed diligence, also failed to take reasonable steps to ensure the accuracy of the

representations.  As discussed at paragraph 19 above, DB Products is liable as successor-in-interest to MIT Securities, which it acquired in January 2007.

231.    Fannie Mae and Freddie Mac sustained substantial damages as a result of the misstatements and omissions in the Registration Statements.

232.    The time period from July 1, 2011 through August 29, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between FHFA, Fannie Mae, Freddie Mac, DB Products, ACE, DBS, MIT Holdings, MIT Securities and Altamont.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

233.    In addition, this action is timely as to the NHEL 2007-1 Securitization by virtue of the timely filing of the above-referenced *New Jersey Carpenters Health Fund* complaint and the tolling of Freddie Mac's claims resulting from those filings to which Freddie Mac was a putative class member.  *See* Section VII.  The class action tolling doctrines articulated in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and *In re WorldCom Securities Litigation*, 496 F.3d 245, 256 (2d Cir. 2007), tolled the statute of limitations on Freddie Mac's Section 11 cause of action for the entire period of time during which its Securitization was the subject of the class action.

234.    By reason of the conduct herein alleged, DBS, ACE, MIT Securities, DB Products (as successor-in-interest to MIT Securities), and the Individual Defendants are jointly and severally liable for their wrongdoing.

## SECOND CAUSE OF ACTION

### Violation of Section 12(a)(2) of the Securities Act of 1933
### (Against DBS, ACE, MIT Securities, and DB Products)

235.    Plaintiff realleges each allegation above as if fully set forth herein, except to the

extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

This cause of action specifically excludes the allegations as to Defendants' scienter and the

GSEs' reliance, including those set forth in Section V.

236.    This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities

Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE

Certificates issued pursuant to the Registration Statements in the Securitizations listed in

paragraph 2.

237.    This claim is predicated upon DBS's negligence in making false and materially

misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements,

hereinafter referred to in this Section as "Prospectuses") for each of the Securitizations.

Defendant ACE acted negligently in making false and materially misleading statements in the

Prospectuses for the Securitizations carried out under the Registration Statements it filed, which

are applicable to 34 of the Securitizations.  Defendant MIT Securities acted negligently in

making false and materially misleading statements in the Prospectuses for the Securitization

carried out under the Registration Statement it filed, which is applicable to the MHL 2007-1

Securitization.  As discussed at paragraph 19, above, DB Products is liable as successor-in-

interest to MIT Securities, which it acquired in January 2007.

238.    DBS is prominently identified in the Prospectuses, the primary documents that

were used to sell the GSE Certificates.  DBS offered the Certificates publicly, including selling

to Fannie Mae and Freddie Mac their GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

239.    DBS offered and sold the GSE Certificates to Fannie Mae and Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  DBS reviewed and participated in drafting the Prospectuses.

240.    DBS successfully solicited Fannie Mae's and Freddie Mac's purchase of the GSE Certificates.  As underwriter, DBS obtained substantial commissions based on the amount received from the sale of the Certificates to the public.

241.    DBS offered the GSE Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

242.    ACE and MIT Securities are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the primary documents each used to sell Certificates for the Securitizations under those Registration Statements, and each Prospectus provided contact information for ACE or MIT Securities in the event that investors had questions about their potential investment.  ACE and MIT Securities, statutory sellers, prepared the offering materials, offered the Certificates publicly and actively solicited their sale, including to Fannie Mae and Freddie Mac, for the benefit of Deutsche Bank.  ACE and MIT Securities were motivated to do so in order to further the interests of DBS, DB Products, Deutsche Bank AG, and Taunus.  In addition, ACE and MIT Securities earned substantial fees and benefits from a fully subscribed securitization, including their ability to market future securitizations.  As discussed at paragraph 19, above, DB Products is liable as successor-in-interest to MIT Securities, which it acquired in January 2007.

243.    With respect to the Securitizations for which they filed Registration Statements, ACE and MIT Securities offered the GSE Certificates to Fannie Mae and Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  ACE and MIT Securities reviewed and participated in drafting the Prospectuses.

244.    ACE and MIT Securities offered the GSE Certificates for sale by the use of means or instruments of transportation and communication in interstate commerce.

245.    ACE and MIT Securities actively participated in the solicitation of the GSEs' purchase of the GSE Certificates, and did so in order benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in the marketing of the GSE Certificates.

246.    Each of the Prospectuses contained material misstatements of fact and omitted facts and information necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

247.    The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

248.    DBS, ACE and MIT Securities offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Fannie Mae and Freddie Mac, pursuant to the false and misleading Prospectuses.

249.    DBS owed to Fannie Mae and Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the

Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  ACE and MIT Securities owed the same duty with respect to the Prospectuses for the Securitizations carried out under the Registration Statements filed by them.

250.    DBS, ACE and MIT Securities failed to exercise such reasonable care.  These defendants should have known, in the exercise of reasonable care, that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.  As discussed at paragraph 19, above, DB Products is liable as successor-in-interest to MIT Securities, which it acquired in January 2007.

251.    In contrast, Fannie Mae and Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates.  If the GSEs would have known of those untruths and omissions, they would not have purchased the GSE Certificates.

252.    Fannie Mae and Freddie Mac acquired the GSE Certificates in the primary market pursuant to the Prospectuses.

253.    Fannie Mae and Freddie Mac sustained substantial damages in connection with their investments in the GSE Certificates and have the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

254.     The time period from July 1, 2011 through August 29, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between FHFA, Fannie Mae, Freddie Mac, DB Products, ACE, DBS, MIT Holdings, MIT Securities and Altamont.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

255.    In addition, this action is timely as to the NHEL 2007-1 Securitization by virtue

of the timely filing of the above-referenced *New Jersey Carpenters Health Fund* complaint and

the tolling of Freddie Mac's claims resulting from those filings to which Freddie Mac was a

putative class member.  *See* Section VII.  The class action tolling doctrines articulated in

*American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and *In re WorldCom Securities

Litigation*, 496 F.3d 245, 256 (2d Cir. 2007), tolled the statute of limitations on Freddie Mac's

Section 12(a)(2) cause of action for the entire period of time during which its Securitization was

the subject of the class action.

### THIRD CAUSE OF ACTION

**Violation of Section 15 of the Securities Act of 1933**
**(Against DB Products, Deutsche Bank AG, Taunus, and the Individual Defendants)**

256.    Plaintiff realleges each allegation above as if fully set forth herein, except to the

extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

This cause of action specifically excludes the allegations as to Defendants' scienter and the

GSEs' reliance, including those set forth in Section V.

257.    This claim is brought under Section 15 of the Securities Act of 1933, 15 U.S.C.

§77o ("Section 15"), against DB Products, Deutsche Bank AG, Taunus, and the Individual

Defendants for controlling-person liability with regard to the Section 11 and Section 12(a)(2)

causes of actions set forth above.

258.    The Individual Defendants at all relevant times participated in the operation and

management of ACE and its related subsidiaries, and conducted and culpably participated,

directly and indirectly, in the conduct of ACE's business affairs.  Defendant Douglas K. Johnson

was the President and Director of Defendant ACE.  Defendant Evelyn Echevarria was the

Secretary and Director of Defendant ACE.  Defendant Juliana C. Johnson was the Treasurer and Director of Defendant ACE.

259.    Defendant DB Products was the sponsor for 35 of the Securitizations, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting ACE and MIT Securities as the special purpose vehicles, and selecting DBS as underwriter.  In its role as sponsor, DB Products knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

260.    Defendant DB Products also acted as the seller of the mortgage loans for 35 of the Securitizations, carried out under the Registration Statements filed by ACE and MIT Securities, in that it conveyed such mortgage loans to Defendant ACE or MIT Securities pursuant to a Mortgage Loan Purchase Agreement.  In addition, because of its position as sponsor, DB Products was able to, and did in fact, control the contents of the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

261.    Defendant DB Products also controlled all aspects of the business of ACE, as ACE was merely a special purpose entity created for the purpose of acting as a pass-through for the issuance of the Certificates.  In addition, because of its position as sponsor, DB Products was able to, and did in fact, control the contents of the Registration Statements filed by ACE, including the Prospectuses and Prospectus Supplements, which pertained to 34 Securitizations

and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

262.    Defendant Deutsche Bank AG controlled the business operations of DBS and ACE.  Defendant Taunus controlled the business operations of DBS.  Deutsche Bank AG and Taunus culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  As the ultimate corporate parent of DBS and ACE, Deutsche Bank AG had the practical ability to direct and control the actions of these entities in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of DBS and ACE in connection with the issuance and sale of the Certificates.  As the direct parent of DBS, Taunus had the practical ability to direct and control the actions of this entity in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of DBS in connection with the issuance and sale of the Certificates.

263.    Deutsche Bank AG expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

264.    DB Products, Deutsche Bank AG, Taunus and the Individual Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of DBS and/or ACE at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.  By virtue of this coordinated approach across the various Defendants, Deutsche Bank generated profits at multiple levels of the securitization process.

265.    Deutsche Bank AG and Taunus culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  They oversaw the actions of the Deutsche Bank subsidiaries, including DBS and ACE, and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as ACE and the issuing trusts to serve as conduits for the mortgage loans

266.    Fannie Mae and Freddie Mac purchased in the primary market Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

267.    Fannie Mae and Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had the GSEs known of those misstatements and omissions, they would not have purchased the GSE Certificates.

268.    Fannie Mae and Freddie Mac have sustained damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

269.    The time period from July 1, 2011 through August 29, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between FHFA, Fannie Mae, Freddie Mac, DB Products, ACE, DBS, MIT Holdings, MIT Securities and Altamont.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

270.    In addition, this action is timely as to the NHEL 2007-1 Securitization by virtue of the timely filing of the above-referenced *New Jersey Carpenters Health Fund* complaint and

the tolling of Freddie Mac's claims resulting from those filings to which Freddie Mac was a putative class member. *See* Section VII. The class action tolling doctrines articulated in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and *In re WorldCom Securities Litigation*, 496 F.3d 245, 256 (2d Cir. 2007), tolled the statute of limitations on Freddie Mac's Section 15 cause of action for the entire period of time during which its Securitization was the subject of the class action.

### FOURTH CAUSE OF ACTION

#### Violation of Section 13.1-522(A)(ii) of the Virginia Code
#### (Against DBS, ACE, MIT Securities, and DB Products)

271.     Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud. This cause of action specifically excludes the allegations as to Defendants' scienter and the GSEs' reliance, including those set forth in Section V.

272.     This claim is brought by Plaintiff pursuant to Section 13.1-522(A)(ii) of the Virginia Code and is asserted on behalf of Freddie Mac. The allegations set forth below in this Cause of Action pertain only to those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac on or after September 6, 2006.

273.     This claim is predicated upon DBS's negligence in making false and materially misleading statements in the Prospectuses for each of the Securitizations (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses"). Defendant ACE acted negligently in making false and materially misleading statements in the Prospectuses for the Securitizations carried out under the Registration Statements it filed. Defendant MIT Securities acted negligently in making false and materially misleading statements in the Prospectuses for the Securitization carried out under the Registration Statement it filed, which is

applicable to the MHL 2007-1 Securitization.  As discussed at paragraph 19 above, DB Products

is liable as successor-in-interest to MIT Securities, which it acquired in January 2007.

274.    DBS is prominently identified in the Prospectuses, the primary documents that

were used to sell the GSE Certificates.  DBS offered the Certificates publicly, including selling

to Freddie Mac the GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting"

sections of the Prospectuses.

275.    DBS offered and sold the GSE Certificates to Freddie Mac by means of the

Prospectuses, which contained untrue statements of material facts and omitted to state material

facts necessary to make the statements, in light of the circumstances under which they were

made, not misleading.  DBS reviewed and participated in drafting the Prospectuses.

276.    DBS successfully solicited Freddie Mac's purchase of the GSE Certificates.  As

underwriter, DBS obtained substantial commissions based on the amount received from the sale

of the Certificates to the public.

277.    DBS offered the GSE Certificates for sale, sold them, and distributed them to

Freddie Mac in the State of Virginia.

278.    ACE and MIT Securities are prominently identified in the Prospectuses for the

Securitizations carried out under the Registration Statements that they filed.  These Prospectuses

were the primary documents each used to sell Certificates for these Securitizations, and each

Prospectus provided contact information for ACE or MIT Securities in the event that investors

had questions about their potential investment. ACE and MIT Securities, statutory sellers,

prepared the offering materials, offered the Certificates publicly and actively solicited their sale,

including to Freddie Mac, for the benefit of Deutsche Bank.  ACE and MIT Securities were

motivated to do so in order to further the interests of DBS, DB Products, Deutsche Bank AG, and

116

Taunus.  In addition, ACE and MIT Securities earned substantial fees and benefits from a fully subscribed securitization, including their ability to market future securitizations.  As discussed at paragraph 19, above, DB Products is liable as successor-in-interest to MIT Securities, which it acquired in January 2007.

279.     With respect to the Securitizations for which they filed Registration Statements, ACE and MIT Securities offered the GSE Certificates to Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  ACE and MIT Securities reviewed and participated in drafting the Prospectuses.

280.     ACE and MIT Securities actively participated in the solicitation of Freddie Mac's purchase of the GSE Certificates, and did so in order benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in the marketing of the GSE Certificates.

281.     Each of the Prospectuses contained material misstatements of fact and omitted facts and information necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

282.     The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

283.     DBS, ACE and MIT Securities offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Freddie Mac, pursuant to the false and misleading Prospectuses.

284.     DBS owed to Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  ACE and MIT Securities owed the same duty with respect to the Prospectuses for the Securitizations carried out under the Registration Statements filed by them.

285.     DBS, ACE and MIT Securities failed to exercise such reasonable care.  These defendants should have known, in the exercise of reasonable care, that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.  As discussed at paragraph 19 above, DB Products is liable as successor-in-interest to MIT Securities, which it acquired in January 2007.

286.     In contrast, Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates.  If Freddie Mac would have known of those untruths and omissions, it would not have purchased the GSE Certificates.

287.     Freddie Mac sustained substantial damages in connection with its investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

288.      The time period from July 1, 2011 through August 29, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between FHFA, Fannie Mae, Freddie Mac, DB Products, ACE, DBS, MIT Holdings, MIT Securities and Altamont.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

**FIFTH CAUSE OF ACTION**

**Violation of Section 13.1-522(C) of the Virginia Code**
**(Against DB Products, Deutsche Bank AG, Taunus and the Individual Defendants)**

289.    Plaintiff realleges each allegation above as if fully set forth herein, except to the

extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

This cause of action specifically excludes the allegations as to Defendants' scienter and the

GSEs' reliance, including those set forth in Section V.

290.    This claim is brought under Section 13.1-522(C) of the Virginia Code and is

asserted on behalf of Freddie Mac.  The allegations set forth below in this cause of action pertain

only to those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac

on or after September 6, 2006.  This claim is brought against DB Products, Deutsche Bank AG,

Taunus, and the Individual Defendants for controlling-person liability with regard to the Fourth

Cause of Action set forth above.

291.    The Individual Defendants at all relevant times participated in the operation and

management of ACE and its related subsidiaries, and conducted and participated, directly and

indirectly, in the conduct of ACE's business affairs.  Defendant Douglas K. Johnson was the

President and Director of Defendant ACE.  Defendant Evelyn Echevarria was the Secretary and

Director of Defendant ACE.  Defendant Juliana C. Johnson was the Treasurer and Director of

Defendant ACE.

292.    Defendant DB Products was the sponsor for 34 of the Securitizations purchased

by Freddie Mac, and culpably participated in the violations of Section 13.1-522(A)(ii) set forth

above with respect to the offering of the GSE Certificates by initiating these Securitizations,

purchasing the mortgage loans to be securitized, determining the structure of the Securitizations,

selecting ACE and MIT Securities as the special purpose vehicles, and selecting DBS as

119

underwriter.  In its role as sponsor, DB Products knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

293.    Defendant DB Products also acted as the seller of the mortgage loans for 34 of the Securitizations purchased by Freddie Mac, carried out under the Registration Statements filed by ACE and MIT Securities, in that it conveyed such mortgage loans to Defendant ACE or MIT Securities pursuant to a Mortgage Loan Purchase Agreement.  In addition, because of its position as sponsor, DB Products was able to, and did in fact, control the contents of the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

294.    Defendant DB Products also controlled all aspects of the business of ACE, as ACE was merely a special purpose entity created for the purpose of acting as a pass-through for the issuance of the Certificates.  In addition, because of its position as sponsor, DB Products was able to, and did in fact, control the contents of the Registration Statements filed by ACE, including the Prospectuses and Prospectus Supplements, which pertained to the 34 Securitizations purchased by Freddie Mac and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

295.    Defendant Deutsche Bank AG controlled the business operations of DBS and ACE.  Defendant Taunus controlled the business operations of DBS.  Deutsche Bank AG and Taunus culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  As the ultimate corporate parent of DBS and ACE, Deutsche Bank AG had the practical ability to direct and control the actions of these entities in issuing and selling the Certificates, and in fact

exercised such direction and control over the activities of DBS and ACE in connection with the issuance and sale of the Certificates.  As the direct parent of DBS, Taunus had the practical ability to direct and control the actions of this entity in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of DBS in connection with the issuance and sale of the Certificates.

296.    Deutsche Bank AG expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

297.    DB Products, Deutsche Bank AG, Taunus and the Individual Defendants are controlling persons within the meaning of Section 13.1-522(C) by virtue of their actual power over, control of, ownership of, and/or directorship of DBS and/or ACE at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.  By virtue of this coordinated approach across the various Defendants, Deutsche Bank generated profits at multiple levels of the securitization process.

298.    Deutsche Bank AG and Taunus culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  They oversaw the actions of the Deutsche Bank subsidiaries, including DBS and ACE, and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as ACE and the issuing trusts to serve as conduits for the mortgage loans

299.    Freddie Mac purchased Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make

the facts stated therein not misleading.  The facts misstated and omitted were material to a

reasonable investor reviewing the Registration Statements.

301.     Freddie Mac did not know of the misstatements and omissions in the Registration

Statements; had Freddie Mac known of those misstatements and omissions, it would not have

purchased the GSE Certificates.

301.     Freddie Mac has sustained damages as a result of the misstatements and

omissions in the Registration Statements, for which it is entitled to compensation.

302.     The time period from July 1, 2011 through August 29, 2011 is tolled for statute of

limitations purposes by virtue of a tolling agreement entered into between FHFA, Fannie Mae,

Freddie Mac, DB Products, ACE, DBS, MIT Holdings, MIT Securities and Altamont.  In

addition, this action is brought within three years of the date that the FHFA was appointed as

Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## SIXTH CAUSE OF ACTION
### Violation of Section 31-5606.05(a)(1)(B) of the District of Columbia Code
### (Against DBS and ACE)

303.     Plaintiff realleges each allegation above as if fully set forth herein, except to the

extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

This cause of action specifically excludes the allegations as to Defendants' scienter and the

GSEs' reliance, including those set forth in Section V.

304.     This claim is brought by Plaintiff pursuant to Section 31-5606.05(a)(1)(B) of the

District of Columbia Code and is asserted on behalf of Fannie Mae with respect to the GSE

Certificates identified in Table 11 above, which were purchased by Fannie Mae.

305.     This claim is predicated upon DBS's negligence in making false and materially

misleading statements in the Prospectuses for each of the above Securitizations (as supplemented

by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses"). Defendant ACE acted negligently in making false and materially misleading statements in the Prospectuses for the Securitizations carried out under the Registration Statements it filed, which are applicable to 34 of the Securitizations.

306.    DBS is prominently identified in the Prospectuses, the primary documents that were used to sell the GSE Certificates.  DBS offered the Certificates publicly, including selling to Fannie Mae the GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

307.    DBS offered and sold the GSE Certificates to Fannie Mae by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  DBS reviewed and participated in drafting the Prospectuses.

308.    DBS successfully solicited Fannie Mae's purchase of the GSE Certificates.  As underwriter, DBS obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

309.    DBS offered the GSE Certificates for sale, sold them, and distributed them to Fannie Mae in the District of Columbia.

310.    ACE is prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that it filed.  These Prospectuses were the primary documents each used to sell Certificates for those Securitizations, and each Prospectus provided contact information for ACE in the event that investors had questions about their potential investment.  ACE, a statutory seller, prepared the offering materials, offered the Certificates publicly and actively solicited their sale, including to Fannie Mae, for the benefit of Deutsche

Bank.  ACE was motivated to do so in order to further the interests of DBS, DB Products, Deutsche Bank AG, and Taunus.  In addition, ACE earned substantial fees and benefits from a fully subscribed securitization, including their ability to market future securitizations.

311.   With respect to the Securitizations for which it filed Registration Statements, ACE offered the GSE Certificates to Fannie Mae by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  ACE reviewed and participated in drafting the Prospectuses.

312.   ACE actively participated in the solicitation of Fannie Mae's purchase of the GSE Certificates, and did so in order to benefit itself and Deutsche Bank.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in the marketing of the GSE Certificates.

313.   Each of the Prospectuses contained material misstatements of fact and omitted facts and information necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

314.   The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

315.   DBS and ACE offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Fannie Mae, pursuant to the false and misleading Prospectuses.

316.   DBS owed to Fannie Mae, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to

ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  ACE owed the same duty with respect to the Prospectuses for the Securitizations carried out under the Registration Statements it filed.

317.    DBS and ACE failed to exercise such reasonable care.  These defendants should have known, in the exercise of reasonable care, that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

318.    In contrast, Fannie Mae did not know of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates.  If Fannie Mae would have known of those untruths and omissions, it would not have purchased the GSE Certificates.

319.    Fannie Mae sustained substantial damages in connection with their investments in the GSE Certificates and have the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

320.     The time period from July 1, 2011 through August 29, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between FHFA, Fannie Mae, Freddie Mac, DB Products, ACE, DBS, MIT Holdings, MIT Securities and Altamont.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

### SEVENTH CAUSE OF ACTION

**Violation of Section 31-5606.05(c) of the District of Columbia Code**
**(Against DB Products, Deutsche Bank AG, Taunus, and the Individual Defendants)**

321.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

This cause of action specifically excludes the allegations as to Defendants' scienter and the GSEs' reliance, including those set forth in Section V.

322.    This claim is brought under Section 31-5606.05(c) of the District of Columbia Code and is asserted on behalf of Fannie Mae.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above, which were purchased by Fannie Mae.

323.    The Individual Defendants at all relevant times participated in the operation and management of ACE and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of ACE's business affairs.  Defendant Douglas K. Johnson was the President and Director of Defendant ACE.  Defendant Evelyn Echevarria was the Secretary and Director of Defendant ACE.  Defendant Juliana C. Johnson was the Treasurer and Director of Defendant ACE.

324.    Defendant DB Products was the sponsor for seven of the Securitizations purchased by Fannie Mae, and culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting ACE as the special purpose vehicle, and selecting DBS as underwriter.  In its role as sponsor, DB Products knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

325.    Defendant DB Products also acted as the seller of the mortgage loans for seven of the Securitizations purchased by Fannie Mae carried out under the Registration Statements filed

by ACE, in that it conveyed such mortgage loans to Defendant ACE pursuant to a Mortgage

Loan Purchase Agreement.  In addition, because of its position as sponsor, DB Products was able

to, and did in fact, control the contents of the Registration Statements, including the Prospectuses

and Prospectus Supplements, which contained material misstatements of fact and omitted facts

necessary to make the facts stated therein not misleading.

326.    Defendant DB Products also controlled all aspects of the business of ACE, as

ACE was merely a special purpose entity created for the purpose of acting as a pass-through for

the issuance of the Certificates.  In addition, because of its position as sponsor, DB Products was

able to, and did in fact, control the contents of the Registration Statements filed by ACE,

including the Prospectuses and Prospectus Supplements, which pertained to seven of the

Securitizations purchased by Fannie Mae and which contained material misstatements of fact and

omitted facts necessary to make the facts stated therein not misleading.

327.    Defendant Deutsche Bank AG controlled the business operations of DBS and

ACE.  Defendant Taunus controlled the business operations of DBS.  Deutsche Bank AG and

Taunus culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above.

As the ultimate corporate parent of DBS and ACE, Deutsche Bank AG had the practical ability

to direct and control the actions of these entities in issuing and selling the Certificates, and in fact

exercised such direction and control over the activities of DBS and ACE in connection with the

issuance and sale of the Certificates.  As the direct parent of DBS, Taunus had the practical

ability to direct and control the actions of this entity in issuing and selling the Certificates, and in

fact exercised such direction and control over the activities of DBS in connection with the

issuance and sale of the Certificates.

328.    Deutsche Bank AG expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

329.    DB Products, Deutsche Bank AG, Taunus and the Individual Defendants are controlling persons within the meaning of Section 31-5606.05(c) by virtue of their actual power over, control of, ownership of, and/or directorship of DBS and/or ACE at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.  By virtue of this coordinated approach across the various Defendants, Deutsche Bank generated profits at multiple levels of the securitization process.

330.    Deutsche Bank AG and Taunus culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above.  They oversaw the actions of the Deutsche Bank subsidiaries, including DBS and ACE, and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as ACE and the issuing trusts to serve as conduits for the mortgage loans

331.    Fannie Mae purchased Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

332.    Fannie Mae did not know of the misstatements and omissions in the Registration Statements; had Fannie Mae known of those misstatements and omissions, it would not have purchased the GSE Certificates.

333.    Fannie Mae has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation.

334.    The time period from July 1, 2011 through August 29, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between FHFA, Fannie Mae, Freddie Mac, DB Products, ACE, DBS, MIT Holdings, MIT Securities and Altamont.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

<u>EIGHTH CAUSE OF ACTION</u>

**Common Law Fraud**
**(Against DB Products, ACE, MIT Securities, and DBS)**

335.    Plaintiff realleges each allegation above as if fully set forth herein.

336.    This is a claim for common law fraud against Defendants DB Products, ACE, MIT Securities, and DBS with respect to the Securitizations that DB Products sponsored. Defendant DB Products is also liable for common law fraud as successor-in-interest to MIT Securities, as discussed above at paragraph 19.

337.    The material representations set forth above were fraudulent, and Deutsche Bank's representations falsely and misleadingly misrepresented and omitted material statements of fact.

338.    DB Products, ACE, MIT Securities, and DBS knew, or were reckless in not knowing, that their representations and omissions were false and/or misleading at the time they were made.

339.    Each of DB Products, ACE, MIT Securities and DBS made the misleading statements for the purpose of inducing the GSEs to purchase the GSE Certificates.

340.     The GSEs justifiably relied on DB Products', ACE's, MIT Securities', and DBS's false representations and misleading omissions.

341.     Had the GSEs known the true facts regarding DBS's underwriting practices and quality of the mortgage loans collateralizing the GSE Certificates, they would not have purchased the GSE Certificates.

342.     As a result of the foregoing, the GSEs have suffered damages according to proof. In the alternative, Plaintiff hereby demands rescission and makes any necessary tender of the GSE Certificates.

343.     DB Products', ACE's, MIT Securities', and DBS's misconduct was intentional and wanton.  The immediate victims of DB Products', ACE's, MIT Securities', and DBS's fraud were Fannie Mae and Freddie Mac, two entities whose primary mission was assuring affordable housing to millions of Americans.  Further, the public nature of the harm is apparent in the congressional hearings and federal enforcement actions that have been pursued against Deutsche Bank as a direct result of its fraudulent conduct at issue in this Complaint.  *See, e.g.*, the Levin-Coburn Report; the FCIC Report; the DoJ Complaint.  Punitive damages are therefore warranted for DB Products', ACE's, MIT Securities', and DBS's actions in order to punish and deter them from future misconduct.

344.     The time period from July 1, 2011 through August 29, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between FHFA, Fannie Mae, Freddie Mac, DB Products, ACE, DBS, MIT Holdings, MIT Securities and Altamont.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## NINTH CAUSE OF ACTION

### Aiding and Abetting Fraud
### (Against DB Products, ACE, and MIT Securities)

345.    Plaintiff realleges each allegation above as if fully set forth herein.

346.    This is a claim for aiding and abetting fraud against Defendants DB Products, ACE, and MIT Securities with respect to the Securitizations DB Products sponsored.

347.    DB Products, as sponsor for 35 of the Securitizations, substantially assisted DBS's fraud by choosing which mortgage loans would be included in those Securitizations.  It also extended warehouse lines of credit to mortgage originators that it *knew* had shoddy standards with the intent of later purchasing and securitizing those loans to purchasers, such as the GSEs.  DB Products' action in assisting in the origination of, and then purchasing, poorly underwritten loans was an integral part of the Securitizations.

348.    ACE, as depositor for 34 of the Securitizations, substantially assisted DBS's fraud by issuing the Registration Statements that were used to offer publicly the Certificates.  As the issuer of the Certificates, ACE was an integral part of DBS's sale of the Certificates to the GSEs.

349.    MIT Securities, as depositor for the MHL 2007-1 Securitization, substantially assisted DBS's fraud by issuing the Registration Statement that was used to offer publicly the GSE Certificate for that Securitization.  As the issuer of that Certificate, MIT Securities was an integral part of DBS's sale of that Certificate to the GSEs.  As discussed above in paragraph 19, DB Products is liable as the successor-in-interest to MIT Securities.

350.    As described above, DBS made fraudulent and untrue statements of material fact and omitted to state material facts regarding the true credit quality of the GSE Certificates, the true rate of owner occupancy, the true LTV and CLTV ratio of the underlying mortgage loans, and compliance by the originators with applicable underwriting guidelines.

351.    The central role of ACE, MIT Securities and DB Products in Deutsche Bank's vertically integrated sales strategy for the Certificates substantially assisted in DBS's fraud.  DB Products, as the purchaser of the underlying mortgage loans, worked closely with ACE and MIT Securities, as the vehicles for securitizing the mortgage loans, which in turn worked closely with DBS, as the distribution arm for the Certificates that were collateralized by those mortgage loans and then sold to the GSEs.  Each of ACE, MIT Securities and DB Products worked hand-in-glove to provide DBS with Certificates that it could fraudulently sell to the GSEs.

352.    ACE's, MIT Securities', and DB Products' substantial assistance in DBS's fraud played a significant and material role in inducing the GSEs to purchase the GSE Certificates.  As a direct, proximate and foreseeable result of ACE's, MIT Securities' and DB Products' aiding and abetting DBS in its fraud against the GSEs, the GSEs have been damaged in an amount to be determined at trial.

353.    Because ACE, MIT Securities, and DB Products aided and abetted DBS's fraud willfully and wantonly, and because, by their acts, ACE, MIT Securities, and DB Products knowingly affected the general public, including but not limited to all persons with interests in the Certificates, FHFA is entitled to recover punitive damages.

354.    The time period from July 1, 2011 through August 29, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between FHFA, Fannie Mae, Freddie Mac, DB Products, ACE, DBS, MIT Holdings, MIT Securities and Altamont.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## TENTH CAUSE OF ACTION

### Successor and Vicarious Liability
### (Against DB Products)

355.    Plaintiff realleges each allegation above as if fully set forth herein.

356.    Defendant DB Products is the successor to MIT Securities, pursuant to the merger of MIT Holdings (of which MIT Securities was a wholly owned subsidiary) and DB Products. DB Products is liable for MIT Securities' wrongdoing, in its entirety, under common law and under Maryland General Corporation Law § 3-114(f)(1), because MIT Holdings merged and consolidated with DB Products, because DB Products has expressly or impliedly assumed MIT Securities' liabilities, and because DB Products is a mere continuation of MIT Securities.  This action is thus brought against DB Products both in its own capacity and as successor to MIT Securities.

357.    The time period from July 1, 2011 through August 29, 2011 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between FHFA, Fannie Mae, Freddie Mac, DB Products, ACE, DBS, MIT Holdings, MIT Securities and Altamont.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

358.    An award in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including:

a.    Rescission and recovery of the consideration paid for the GSE Certificates, with interest thereon;

b.    Each GSE's monetary losses, including any diminution in value of the GSE Certificates, lost principal and lost interest payments thereon, and consequential damages, including the cost of investigating the misrepresentations and performance of the underlying collateral to the Certificates, as well as any increased coupon payment on the GSEs' senior preferred stock held by the U.S. Treasury Department, arising from losses on the GSE Certificates;

c.    Punitive damages;

d.    Attorneys' fees and costs;

e.    Prejudgment interest at the maximum legal rate; and

f.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

359.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues triable by jury.

DATED:   New York, New York
         June 13, 2012

                                        QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP

                                        By: _____
                                             Philippe Z. Selendy
                                             Adam M. Abensohn


                                        51 Madison Avenue, 22nd Floor
                                        New York, New York  10010-1601
                                        (212) 849-7000

                                        *Attorneys for Plaintiff Federal Housing
                                            Finance Agency*