UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>Plaintiff,<br><br>-against-<br><br>DEUTSCHE BANK AG; TAUNUS CORPORATION; DB STRUCTURED PRODUCTS, INC.; DEUTSCHE BANK SECURITIES INC.; ACE SECURITIES CORP.; MORTGAGEIT SECURITIES CORP.; DOUGLAS K. JOHNSON; EVELYN ECHEVARRIA; AND JULIANA C. JOHNSON<br><br>Defendants. | 11 CIV. 6192 (DLC) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

QUINN EMANUEL URQUHART &
     SULLIVAN, LLP
Philippe Z. Selendy
Kathleen M. Sullivan
Adam M. Abensohn
Jordan A. Goldstein
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
Finance Agency, as Conservator for Fannie
Mae and Freddie Mac*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 3

    A.    The Defendants Market And Sell Defective Certificates To The GSEs ................. 3

    B.    Defendants Knew, Or Were Reckless In Not Knowing, That Their
        Representations Were False ..................................................................................... 4

    C.    The GSEs Reasonably Relied On Defendants' False Statements ........................... 6

    D.    The Prior Proceedings ............................................................................................ 7

ARGUMENT ....................................................................................................................... 7

I.     THE COMPLAINT STATES A CLAIM FOR FRAUD ........................................... 8

    A.    The Complaint Alleges That The GSEs Reasonably Relied On
        Defendants' Misrepresentations .............................................................................. 9

        1.    The GSEs Relied On Misrepresentations In The Offering Materials ......... 9

        2.    The Complaint Raises A Factual Dispute As To Reasonable
            Reliance .................................................................................................... 13

    B.    The Complaint Adequately Alleges Scienter .......................................................... 16

    C.    The Complaint Adequately Alleges Actionable Misrepresentations ...................... 20

    D.    The Complaint Adequately Alleges Causation ....................................................... 22

    E.    The Complaint Adequately Alleges Damages ........................................................ 23

II.    BOTH THE VIRGINIA AND DC BLUE SKY LAWS APPLY IN THIS
      ACTION .................................................................................................................. 24

III.   DB PRODUCTS IS LIABLE AS A SUCCESSOR OF MORTGAGEIT ................... 25

CONCLUSION ................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

### <u>CASES</u>

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009) ............................................................ 12, 14, 16, 17

*ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*,
   2012 WL 1450022 (N.Y. Sup. Ct. Apr. 23, 2012) ............................................................ 17

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
   824 F. Supp. 2d 1164, n.1, 1187 (C.D. Cal. 2011) ............................................... 10, 21, 23

*AnchorBank, FSB v. Hofer*,
   649 F.3d 610 (7th Cir. 2011) ............................................................................................. 22

*Bank of Am. Corp. v. Lemgruber*,
   385 F. Supp. 2d 200 (S.D.N.Y. 2005) ................................................................................ 14

*Chrysler Capital Corp. v. Century Power Corp.*,
   1992 WL 163006, at *2 (S.D.N.Y. June 24, 1992) ............................................................. 24

*Colabella v. Am. Inst. of Certified Pub. Accountants*,
   2011 WL 4532132, at *7 (E.D.N.Y. Sept. 28, 2011) ......................................................... 21

*Dandong v. Pinnacle Performance Ltd.*,
   2011 WL 5170293, at *11 (S.D.N.Y. Oct. 31, 2011) ......................................................... 17

*DDJ Mgt., LLC v. Rhone Grp. L.L.C.*,
   15 N.Y.3d 147 (2010) ........................................................................................................ 15

*Dodona I, LLC v. Goldman, Sachs & Co.*,
   847 F. Supp. 2d 624 (S.D.N.Y. 2012) ............................................................ 14, 17, 19, 20

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
   551 F. Supp. 2d 210 (S.D.N.Y. 2008) ................................................................................ 23

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
   343 F.3d 189 (2d Cir. 2003) ............................................................................................... 22

*Employees' Ret. Sys. of the Virgin Islands v. J.P. Morgan Chase & Co.*,
   804 F. Supp. 2d 141 (S.D.N.Y. 2011) ................................................................................ 21

*Fed. Home Loan Bank of Seattle v. Banc of Am. Sec.*,
   *LLC*, 2011 WL 2693115, at *1 (Wash. Sup. Ct. June 23, 2011) ...................................... 24

*FHFA v. UBS Americas*,
   11 Civ. 5201 (DLC), Dkt. 52, at 41–42 ......................................................................... 7, 15

*Gabriel Capital, L.P. v. NatWest Fin., Inc.*
    177 F. Supp. 2d 169 (S.D.N.Y. 2001)................................................................. 9

*Gabriel Capital, L.P. v. NatWest Fin., Inc.,*
    94 F. Supp. 2d 491 (S.D.N.Y. 2000)................................................................ 13

*Good Hill Partners L.P. v. WM Asset Holdings Corp. CI 2007-WM2,*
    583 F. Supp. 2d 517 (S.D.N.Y. 2008)............................................................. 13

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.,*
    2012 WL 1322884, at *2 (C.D. Cal. Apr. 16, 2012) ...................................... 24

*In re Countrywide Fin. Corp. Sec. Litig.,*
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................... 18, 21

*In re Optimal U.S. Litig.,*
    837 F. Supp. 2d 244 (S.D.N.Y. 2011) ............................................................ 18

*In re Philip Servs. Corp. Sec. Litig.,*
    383 F. Supp. 2d 463 (S.D.N.Y. 2004)........................................................ 8, 20

*In re Sadia S.A. Sec. Litig.,*
    269 F.R.D. 298 (S.D.N.Y. 2010) .................................................................... 22

*In re Scottish Re Grp. Sec. Litig.,*
    524 F. Supp. 2d 370 & n.174 (S.D.N.Y. 2007) ............................................. 18

*In re Wells Fargo Mortg.-Backed Certs. Litig.,*
    712 F. Supp. 2d 958 (N.D. Cal. 2010) ........................................................... 21

*In re WorldCom, Inc. Sec. Litig.,*
    2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003)..................................... 17

*Interpublic Grp. of Cos., Inc. v. Fratarcangelo,*
    2002 WL 31682389, at *13 (S.D.N.Y. Nov. 26, 2002) .................................. 15

*Katz v. Image Innovations Holdings, Inc.,*
    542 F. Supp. 2d 269 (S.D.N.Y. 2008)............................................................ 17

*King Cnty. v. Deutsche Industriebank AG,*
    708 F. Supp. 2d 334 (S.D.N.Y. 2010)............................................................ 23

*Landesbank Baden-Wurttemburg v. Goldman, Sachs & Co.* ("*Landesbank*"),
    821 F. Supp. 2d 616 (S.D.N.Y. 2011)............................................................ 19

*Lazard Freres & Co. v. Protective Life Ins. Co.,*
    108 F.3d 1531 (2d Cir. 1997)......................................................................... 14

*Lerner v. Fleet Bank, N.A.,*
    459 F.3d 273 (2d Cir. 2006)........................................................................... 16

*Liberty Ridge LLC v. RealTech Sys. Corp.,*
    173 F. Supp. 2d 129 (S.D.N.Y. 2001)....................................................... 16, 21

*Lintz v. Carey Manor Ltd.*,
    613 F. Supp. 543 (W.D. Va. 1985) ................................................................. 25

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) ........................................................................ 7

*Luce v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986) ......................................................................... 18

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ...................................................................... 18

*Maldonado v. Dominguez*,
    137 F.3d 1 (1st Cir. 1998) ......................................................................... 21

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007) ....................................................................... 23

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*,
    272 F.R.D. 160 (S.D.N.Y. 2011) ................................................................. 23

*Ouaknine v. MacFarlane*,
    897 F.2d 75 (2d Cir. 1990) ......................................................................... 7

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    592 F. Supp. 2d 608 (S.D.N.Y. 2009) ......................................................... 9

*Ross v. Louise Wise Servs., Inc.*,
    8 N.Y.3d 478 (2007) ................................................................................. 8

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009) ......................................................................... 16

*Schlaifer Nance & Co. v. Estate of Warhol*,
    119 F.3d 91 (2d Cir. 1997) ......................................................................... 9

*STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC*,
    648 F.3d 68 (2d Cir. 2011) ......................................................................... 9

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ....................................................................... 18

*Tsereteli v. Resid. Asset Securitization Trust 2006-A8*,
    --- F. Supp. 2d ----, 2012 WL 2532172, at *8 (S.D.N.Y. June 29, 2012) ...................... 13

*Valentini v. Citigroup, Inc.*,
    837 F. Supp. 2d 304 (S.D.N.Y. 2011) ......................................................... 22

*Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*,
    192 F. Supp. 2d 852 (N.D. Ill. 2002) ......................................................... 13

*Yoder v. Orthomolecular Nutrition Inst., Inc.*,
    751 F.2d 555 (2d Cir. 1985) ....................................................................... 7

## STATUTES

17 C.F.R. § 230.405 ................................................................................................... 10

D.C. Code § 31-5608.01 .............................................................................................. 25

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 22

Fed. R. Civ. P. 9(b) ............................................................................................... 7, 18

Va. Code § 13.1-522 ................................................................................................... 25

## OTHER AUTHORITIES

12 Joseph C. Long, *Blue Sky Law* § 4:1 n.5 ............................................................. 24

Plaintiff The Federal Housing Finance Agency ("FHFA"), as conservator for The Federal National Mortgage Association ("Fannie Mae") and The Federal Home Loan Mortgage Corporation ("Freddie Mac" and, together with Fannie Mae, the "GSEs"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, respectfully submits this memorandum of law in opposition to the Motion to Dismiss ("Mem.") the Amended Complaint ("Complaint" or "AC") by Defendants DB Structured Products, Inc. ("DB Products"), Deutsche Bank AG, Deutsche Bank Securities Inc. ("DBS"), Taunus Corporation ("Taunus"), ACE Securities Corp. ("ACE"), MortgageIT Securities Corp. ("MortgageIT") (collectively, "Deutsche Bank"), Douglas K. Johnson, Evelyn Echevarria, and Juliana C. Johnson (the "Individual Defendants" and, together with Deutsche Bank, the "Defendants").[1]

## PRELIMINARY STATEMENT

On May 4, 2012, the Court issued its Decision and Order denying the motion to dismiss submitted by UBS, addressed to issues common across the 16 FHFA matters pending before this Court (the "Actions").  In its current stand-alone motion to dismiss, Deutsche Bank concedes that FHFA's claims under the federal Securities Act will proceed, but seeks dismissal of FHFA's fraud and state Blue Sky claims.  Deutsche Bank's primary strategy is to avoid focusing on its own misconduct by shifting blame to the GSEs.  There is no avoiding, however, that the Complaint provides a detailed and troubling account of Defendants' systematic false statements in the sale and marketing to the GSEs of more than $ 14.2 billion in defective certificates in forty securitizations (the "Securitizations").  These allegations are more than sufficient to support FHFA's claims, and Defendants' motion should be denied.

---

[1]   References to "Ex. __" are to the Exhibits to the accompanying affirmation of Wing F. Ng.  Except where otherwise defined, capitalized terms have the meanings indicated in the Complaint.

Deutsche Bank makes the same lead argument as several other defendants with motions now pending before the Court. Deutsche Bank contends that the GSEs, as "highly sophisticated" participants in the mortgage backed securities ("MBS") market, could not have "plausibly" relied on Defendants' systematic false statements. UBS made nearly the identical argument, in its "common issues" motion, when it claimed that the GSEs, given their knowledge of MBS investing, were on notice of Defendants' false statements. This argument fails for similar reasons now as it did before. As the Court explained in its Decision and Order, the GSEs' knowledge of the MBS market generally does not answer the claim that they were misled specifically about the Certificates at issue in this litigation. As multiple courts have recognized, this is a classic fact issue that cannot be resolved on the pleadings.

Defendants' remaining challenges to FHFA's fraud claims also fail. Defendants challenge, for instance, the Complaint's scienter allegations. This ignores extensive allegations, supported by witness accounts and the results of multiple investigations, detailing Defendants' motive and opportunity to defraud the GSEs, as well as Defendants' knowledge of numerous defects in the loans they nevertheless chose to securitize. Defendants also argue that the Complaint does not adequately describe their misrepresentations, but there are extensive allegations detailing Defendants' false statements in three critical areas—loan-to-value ratios, owner-occupancy rates and compliance with underwriting guidelines—across thousands of individual loans. And Defendants' insistence that the GSEs were damaged by a "market event," not by Defendants' rampant false statements, is a dubious factual assertion that numerous courts have already deemed improper for resolution on a motion to dismiss.

Deutsche Bank's arguments addressed to FHFA's Blue Sky and successor liability claims also fail. Deutsche Bank argues that FHFA's claims under the Virginia and DC Blue Sky

provisions—claims that this Court already upheld in denying UBS's "common issues" motion to dismiss—should be rejected under New York choice of law principles.  But Defendants acknowledge that there is substantial (in reality, overwhelming) authority holding choice of law principles do not apply as a basis for avoiding application of state securities statutes.  Defendants also seek to avoid successor liability by backtracking from their public statements that MortgageIT was integrated into Deutsche Bank's MBS operations, insisting that it was merged instead into a separate independent entity.  At a minimum, this is a factual question, like many other issues Defendants prematurely pursue, that cannot be resolved on the pleadings.

## FACTUAL BACKGROUND

### A.    The Defendants Market And Sell Defective Certificates To The GSEs

Between 2005 and 2007, the GSEs purchased over $14.2 billion in MBS certificates issued by Defendants in 40 Securitizations (the "Certificates").  Each Defendant played a critical role in creating and marketing the Certificates for sale to the GSEs.  Defendant DB Products sponsored 35 Securitizations (AC ¶ 50); Defendant ACE was the depositor for 34 Securitizations, (AC ¶ 55); Defendant MIT Securities was the depositor for one Securitization (AC ¶ 19); and Defendant DBS served as underwriter for all 40 Securitizations (AC ¶ 53). Defendants Deutsche Bank AG, Taunus, and DB Products controlled their subsidiaries ACE, MortgageIT (a loan originator), and DBS, throughout the relevant time period.  AC ¶¶ 57-58, 259.

Defendants marketed and sold the Certificates through multiple representations in offering materials later incorporated into a series of Prospectus Supplements ("ProSupps"), vouching for the credit quality of the underlying mortgage loans.  Among other things, Defendants provided detailed statistics comparing the amount of the individual mortgage loans to the value of the corresponding properties ("LTV ratios"), and reported the number of properties

occupied by the mortgage borrowers, both critical factors to the GSEs in evaluating whether to invest in the Securitizations.  AC ¶¶ 86, 92.  Defendants also represented that the mortgage loans collateralizing the Securitizations had been underwritten consistent with underwriting guidelines meant to ensure that borrowers would be able to repay those loans.  AC ¶¶ 74-83.

Based on an investigation overseen by FHFA, as conservator for the GSEs, it is apparent that Defendants' representations were systematically false.  A loan-level review of approximately 1,000 loans in each Securitization revealed that, for *every* Securitization, Defendants overstated the percentage of mortgage loans for owner-occupied properties.  AC ¶¶ 98, 103 & tbl.6.  Likewise, the Registration Statements and other offering materials for *every* Securitization understated LTV ratio of the mortgage loans.  AC ¶¶ 108-09 & tbl.7.  A forensic re-underwriting of 3,000 individual loan files across four Securitizations yielded similar results, indicating that the loans breached the applicable underwriting guidelines between 77 and 98 percent of the time.  AC ¶¶ 113-16.  The Complaint describes numerous examples, illustrating similar findings throughout the thousands of files re-underwritten, in which loan originators, contrary to Defendants' representations, failed to adhere to stated guidelines.  AC ¶¶ 126-34.

### B.   Defendants Knew, Or Were Reckless In Not Knowing, That Their Representations Were False

Defendants had substantial financial incentives to generate and sell massive volumes of MBS, contributing to a breakdown in quality control.  AC ¶¶ 49, 66.  Defendants also controlled each step in the Securitization chain (AC ¶ 57), "profit[ing] substantially" from this vertical integration (AC ¶ 175).  Defendants had unique access to information indicating defects in the loans they then selected as collateral for the Securitizations, including through their own reviews of loan files (unavailable to the GSEs as prospective investors), and Deutsche Bank's purchase of MortgageIT, an originator responsible for many of the defective loans. AC ¶¶ 169, 176, 178.

The Complaint also contains numerous allegations detailing a culture of fraud that infected Defendants' operations.  The Complaint alleges, for instance, that Defendants, specifically Deutsche Bank's vice president in charge of due diligence, Joseph Swartz, as well as Deutsche Bank Managing Director Michael Commaroto, had contemporaneous knowledge that the loans that DB Products sponsored repeatedly had failed to meet underwriting guidelines.  AC ¶¶ 166, 167, 172.  In 2006, a due diligence provider, Clayton, informed Commaroto of the extent to which it was detecting faulty loans and "that Deutsche Bank was securitizing loans without regard for their quality."  AC ¶ 172.  Defendants used this knowledge not to improve the quality of their Securitizations, but rather to "negotiate lower prices for the loans [they purchased from originators] and thus boost Deutsche Bank's own profits."  AC ¶ 174.

Defendants also acquired "detailed knowledge of the lender's operations" through their warehousing practices, by which they would extend massive lines of credit to originators, based on their "inside look into the true quality of the loans they originated."  AC ¶ 176.  Likewise, multiple government investigations have confirmed that Defendants misrepresented the same key data at issue here for at least nine of the Securitizations (AC ¶ 181), and "failed to implement basic quality control[] procedures" to ensure that loans—some likely included in at least two of the Securitizations—actually met the underwriting guidelines (AC ¶ 183).  Deutsche Bank insiders have since testified that by the middle of 2006 (*i.e.*, in the midst of Defendants' sale of the Certificates to the GSEs), Deutsche Bank knew that its subsidiaries were "generally horrible" in conforming to their representations.  AC ¶ 186.  And again, Defendants decided to use this knowledge, not to improve their internal operations, but to bet against the market by taking short positions that ultimately resulted in a $1.5 billion profit, the most money Deutsche Bank has made on a single trading position in its history.  AC ¶ 187.

### C.      The GSEs Reasonably Relied On Defendants' False Statements

As set forth in the Complaint, the GSEs have certain investment requirements for purchasing RMBS, including compliance with underwriting guidelines.  AC ¶ 193.  Deutsche Bank was aware of the GSEs' requirements and made its misrepresentations specifically to encourage the GSEs to purchase the Certificates.  AC ¶ 194.  Deutsche Bank provided the GSEs with term sheets, for instance, that contained critical data, later incorporated into the ProSupps, including credit ratings, LTV ratios, and owner occupancy statistics.  AC ¶ 199.  The GSEs relied on the accuracy of this data, as Defendants expected they would.  AC ¶ 200.

Further, the GSEs' reliance on Defendants' representations and warranties was consistent with industry practice.  This practice reflects an asymmetry of information between MBS sponsors and investors.  AC ¶ 204.  Much of the information regarding the originators' compliance with underwriting guidelines, owner occupancy rates, LTV ratios, and data provided to credit ratings agencies was peculiarly within Defendants' knowledge.  AC ¶¶ 158, 200-01.  Among other things, as is standard in the industry, the GSEs—like all other potential investors and unlike Defendants—did not have access to the loan files before purchasing the Certificates.  AC ¶ 204.  It was therefore reasonable for the GSEs to rely on Defendants' representations, and, as alleged in the Complaint, "[b]ut for [those] misrepresentations and omissions, the GSEs would not have purchased or acquired the Certificates as they ultimately did."  AC ¶ 207.

Defendants' misrepresentations resulted in billions of dollars in damages to the GSEs.  AC ¶ 215.  From the day the GSEs purchased the Certificates, the true value of those Certificates was far lower than the price paid for them by the GSEs.  AC ¶ 208.

### D.      The Prior Proceedings

FHFA filed this action, with 16 other actions, on September 2, 2011.  *See FHFA v. UBS*

("*UBS*"), --- F. Supp. 2d ----, 2012 WL 1570856, at *1 (S.D.N.Y. May 4, 2012).[2]  The

Complaint, amended on June 13, 2012, alleges claims against Defendants under the Securities

Act of 1933 (the "Securities Act"), Virginia and District of Columbia Blue Sky laws, common-

law fraud and aiding and abetting fraud, and successor liability.  AC ¶ 1.  In its Decision and

Order dated May 4, this Court largely denied a motion to dismiss by UBS, which asserted

multiple "common" arguments addressed to the non-fraud claims asserted across all actions.

*UBS*, 2012 WL 1570856, at *11-21.  Pursuant to a schedule set by the Court (Dkt. No. 58),

Defendants brought the present motion to dismiss, focused on the fraud and successor liability

claims in this suit, but also re-argued for dismissal of the state Blue Sky claims.  For the reasons

that follow, Defendants' motion should be denied.

## <u>ARGUMENT</u>

On a motion to dismiss, a court must accept all factual allegations as true and determine

whether, under a reasonable reading, the plaintiff may be entitled to relief.  *Litwin v. Blackstone*

*Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011); *Ouaknine v. MacFarlane*, 897 F.2d 75, 78 (2d Cir.

1990).  The pleading standards applicable to a claim of fraud are governed by Fed. R. Civ. P.

9(b), which provides that "a party must state with particularity the circumstances constituting

fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be

alleged generally."  Under these standards, "[i]t is elementary that, on a motion to dismiss, a

complaint must read as a whole" and given a "generous reading."  *Yoder v. Orthomolecular*

*Nutrition Inst., Inc.*, 751 F.2d 555, 562 (2d Cir. 1985); *see In re Philip Servs. Corp. Sec. Litig.*,

---

[2]   The *UBS* action, No. 11 Civ. 5201 (DLC), was filed earlier, on July 27, 2011.

383 F. Supp. 2d 463, 479 (S.D.N.Y. 2004) (considering as a "whole" whether there was "an

adequate basis for believing that the defendants' statements were false") (citation and quotation

marks omitted).  The Complaint amply satisfies these standards.

## I.      THE COMPLAINT STATES A CLAIM FOR FRAUD

In compliance with New York law, FHFA has properly pled each of the five elements of

a common-law fraud claim: that "(1) defendant made a representation as to a material fact;

(2) such representation was false; (3) defendant[ ] intended to deceive plaintiff; (4) plaintiff

believed and justifiably relied upon the statement and was induced by it to engage in a certain

course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss."  *Ross v.*

*Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 488 (2007).  The Complaint includes all of the following:

- A detailed account of the Defendants' representations in the offering materials and ProSupps used to market the Securitizations, including representations key to investors' evaluation of the quality of the mortgage loans collateralizing those Securitizations (AC ¶ 74-97);

- A description, supported by statistics across all Securitizations and 31 specific examples of deficient loans in four Securitizations, of the overwhelming extent to which Defendants' representations were false (AC ¶ 98-134);

- Allegations describing Defendants' incentives to generate and market securitizations on a mass scale, and multiple indications, including witness accounts and repeated investigative findings, confirming that Defendants knew, but ignored, that the loans they selected for inclusion in the Securitizations were defective (AC ¶ 62-68, 166-192);

- Allegations that the GSEs could not access the same loan level information as Defendants, and thus reasonably relied on Defendants' misrepresentations (AC ¶ 193-208);

- Allegations that the GSEs suffered billions of dollars in damages as a direct consequence of Defendants' misrepresentations (AC ¶ 212-215).

Defendants' effort to characterize these extensive allegations as "vague" and "woefully

inadequate" (Mem. 3) is predictable boilerplate in a motion to dismiss, but contradicts the

allegations in the Complaint, which, at a minimum, raise factual disputes between the parties.

**A.    The Complaint Alleges That The GSEs Reasonably Relied On Defendants'
Misrepresentations**

Far from suggesting that their representations were true, Defendants open with the

argument that their representations were so obviously false that the GSEs, being "sophisticated"

entities, could not have reasonably relied on them.  Mem. 1, 4-10.  It is well-understood,

however, that "[t]he question of what constitutes reasonable reliance is always nettlesome

because it is so fact-intensive."  *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d

Cir. 1997).  Reasonable reliance is therefore "often a question of fact for the jury rather than a

question of law for the court . . . ."  *STMicroelectronics, N.V. v. Credit Suisse Securities (USA)*

*LLC*, 648 F.3d 68, 81 (2d Cir. 2011).  As set forth below, this case is no exception.

1.    The GSEs Relied On Misrepresentations In The Offering Materials

Defendants start from the premise that "FHFA's claims are based on alleged

misstatements contained in [the] ProSupps" (Mem. 4), and argue that the GSEs could not have

relied on those misstatements because there is no allegation that they reviewed the ProSupps

before purchasing the Certificates.  But this mischaracterizes the Complaint allegations, and

ignores the reality of the disputed transactions.  The sufficiency of FHFA's fraud claim does not

depend on whether the GSEs relied on Defendants' misrepresentations in a particular document;

rather, the issue is whether the GSEs relied on Defendants' misrepresentations.  *See Gabriel*

*Capital, L.P. v. NatWest Fin., Inc.* ("*Gabriel II*") 177 F. Supp. 2d 169, 175 (S.D.N.Y. 2001)

(cited in Mem. 5) (holding that "a failure to read the Offering Memorandum cannot defeat

plaintiffs' claim of reliance [to] show misrepresentations or omissions *as a matter of law*").[3]

Moreover, a fraud claim in the MBS context can rest on a plaintiff's reliance on

---

[3]    Defendants also cite to a case (Mem. 5), decided on summary judgment, which held that the statements
at issue "were not sent to plaintiffs prior to their initial investment."  *Pension Comm. of Univ. of Montreal Pension
Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 629 (S.D.N.Y. 2009).  That is irrelevant to the current situation,
where Defendants sent the GSEs the same false information before and after deal closing.  AC ¶¶ 194, 199.

misrepresentations, not strictly in a registration statement or prosupp, but in a variety of offering materials commonly used to market MBS transactions.  *See Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1168 n.1, 1187 (C.D. Cal. 2011) (holding that plaintiffs adequately pled fraud, in the MBS context, based on their reliance on "Offering Materials," including "Registration Statements, Prospectuses and [ProSupps], Term Sheets, and other written materials pursuant to which the Certificates were offered").

The Complaint alleges that Defendants made identical misrepresentations in multiple documents they provided to the GSEs before the deals closed, and the GSEs relied on those misrepresentations in purchasing the Certificates.  AC ¶¶ 193-94, 199-200.  Defendants included their misrepresentations in "term sheets, free writing prospectuses, and [ProSupps], among other offering materials."  AC ¶ 194.[4]  These offering materials "contained *critical data* as to the Securitizations," including anticipated credit ratings, LTV ratios, and owner occupancy statistics. AC ¶ 199 (emphasis added).  Defendants tailored these critical data to the GSEs' standards, as Defendants "knew that the GSEs had specific requirements for investing in non-agency mortgage-backed securities, such as the GSE Certificates."  AC ¶ 194.  Moreover, the *identical misrepresentations* in the term sheets and free writing prospectuses were "subsequently incorporated into the ProSupps that were received by the GSEs upon the close of each Securitization."  AC ¶ 199.  The Complaint explains that it is "industry practice"—which is not contested by Defendants—for investors "to rely upon the representations and warranties of the sponsors, depositors and underwriters regarding the quality of the mortgage loans and the standards under which they originated."  AC ¶ 204.  Consistent with this practice, had the GSEs known Defendants' representations were false, "the GSEs would not have purchased or acquired

---

[4] Such offering materials are defined by the SEC as "any written communication … that constitutes an offer to sell or a solicitation of an offer to buy the securities relating to a registered offering that is used after the registration statement in respect of the offering is filed …."  17 C.F.R. § 230.405.

the Certificates as they ultimately did, because those representations and omissions were material to their decision to acquire the GSE Certificates."  AC ¶ 207.

The exhibits that Defendants attach to their Motion serve to confirm that the term sheets and free writing prospectuses that the GSEs received pre-purchase and relied upon contained the identical misrepresentations Defendants subsequently incorporated into the ProSupps.  For example, Defendants cite the term sheet for ACE 2005-AG1, dated October 12, 2005.  Defs. Ex. 3.  There, the "Description of the Group 1A Collateral" (Defs. Ex. 3 at 44) is materially identical to the LTV information contained in the ProSupp for this Securitization (AC tbl.5).  The same term sheet for the ACE 2005-AG1 Securitization makes materially the same misrepresentations as to owner-occupancy (Defs. Ex. 3 at 48) as reflected in the ProSupp (AC tbl.4).  As alleged in the Complaint, both of these representations were off by at least 10 percent.  AC tbls.6-7.

Likewise, the November 21, 2006 free writing prospectus (Ex. A at 46-47, 50, 67-68, 85 and 87-88) that was publicly filed prior to each of Fannie Mae's and Freddie Mac's purchase of Certificates in the ACE 2006-ASAP6 Securitization contained charts with LTV ratio and owner-occupancy statistics for the Group 1B and 1A loans (collateralizing the tranches Fannie Mae and Freddie Mac purchased, respectively).  These representations were materially identical to those in the ProSupp (AC tbls.4-5), and were again incorrect by at least 10 percent (AC tbls.6-7).  The free writing prospectus also contains materially similar descriptions of the "underwriting standards applicable to the Mortgage Loans" (Ex. A at 116) as later incorporated into the ProSupp, which were also false (*see* AC ¶ 112).  Thus, as alleged in the Complaint, the GSEs received and relied upon offering materials before purchasing the Certificates, which included the same misrepresentations Defendants later incorporated into the Registration Statements.

Defendants also fail to account for the Complaint allegation that "[i]n particular, the GSEs relied upon the credit ratings that the credit rating agencies indicated they would bestow on the Certificates."  AC ¶ 200.  As this Court and others have recognized, credit ratings are "crucial" even to sophisticated purchasers.  *UBS*, 2012 WL 1570856, at *9 (S.D.N.Y. May 4, 2012); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 181 (S.D.N.Y. 2009) ("[T]he market at large, including sophisticated investors, have come to rely on the accuracy of credit ratings and the independence of rating agencies because of their [nationally recognized statistical rating organization] status and, at least in this case, the Rating Agencies' access to non-public information that even sophisticated investors cannot obtain.").  An examination of the term sheets Defendants offer in support of their motion shows that, as with LTV ratios and owner-occupancy statistics, Defendants made the same representations as to the credit ratings of the Securitizations as appeared in the final prosupps.  *Compare* Defs. Ex. 2 at 4 (listing the "Expected Rating[]" for tranche A-1 certificates of ACE 2007-HE4 as "AAA/Aaa"), *with* AC tbl.8 (same for final credit rating of tranche A-1A of ACE 2007-HE4); *compare* Defs. Ex. 3 at 4 (listing the "Expected Rating[]" for tranche A-1A certificates of ACE 2005-AG1 as "AAA/Aaa") *with* AC tbl.8 (same for final credit rating of tranche A-1A of ACE 2005-AG1).  These credit ratings, which the GSEs relied upon in deciding to purchase the Certificates, rest on the very misrepresentations by Defendants that are detailed throughout the Complaint. AC ¶ 158.

Finally, Defendants argue that their misrepresentations are "inactionable" because the offering materials contained statements warning that "we have not authorized anyone to provide you with different information."  Mem. 6 & n.6 (brackets omitted).  Courts have repeatedly rejected just such an argument.  *E.g.*, *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 94 F. Supp. 2d

491, 507 (S.D.N.Y. 2000) (concluding that because it was defendants who "were the ones

making the other representations" in pre-purchase representations, they "cannot use this

disclaimer to deny that they authorized their own representations"); *Wafra Leasing Corp. 1999-

A-1 v. Prime Capital Corp.*, 192 F. Supp. 2d 852, 866 (N.D. Ill. 2002) (same).  There is no

"different information" at issue in this case, just Defendants' consistent, repeated, and fraudulent

misrepresentations about the quality of the mortgage loans underlying the Securitizations.  AC

¶¶ 5, 199.[5]  In sum, FHFA has more than adequately alleged that the GSEs relied on the false

representations identified in the Complaint.

 2. The Complaint Raises A Factual Dispute As To Reasonable Reliance

 Defendants next contend that it is not "plausible" that the GSEs relied on Defendants'

misstatements, since the GSEs are "extraordinarily sophisticated investors" with significant

experience in the MBS market.  Mem. 7.  As the Court concluded in rejecting a "notice"

argument previously advanced on behalf of all Defendants, FHFA's claim is not that the GSEs

were deceived about poor underwriting practices by originators "*in general*"; rather, FHFA's

claim is that the GSEs were deceived about "the[se] *particular* Securitizations."  2012 WL

1570856, at *9 (emphasis in original).  Defendants point to nothing to suggest that the GSEs,

regardless of their sophistication generally, had any reason to know that Defendants'

misrepresentations concerning the quality of the collateral they selected for the Securitizations,

and supposedly tested through due diligence (AC ¶¶ 71–72), were systematically false.  *See*

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*, --- F. Supp. 2d ----, 2012 WL

2532172, at *8 (S.D.N.Y. June 29, 2012) (A plaintiff's sophistication does not "significantly

tend to show that sophisticated investors had any reason to doubt [a bank's] statements regarding

---

[5]  For the same reason, Defendants' reliance on *Good Hill Partners L.P. v. WM Asset Holdings Corp. CI 2007-WM2*, 583 F. Supp. 2d 517, 520 (S.D.N.Y. 2008) is unavailing, because the misrepresentations here did not change between pre- and post-purchase.

its underwriting practices for this particular offering … before they purchased the Certificates”). Thus, as the Court held in the “notice” context, the GSEs were entitled “to rely on defendants’ assertion[s]” in deciding to purchase the Certificates.  *UBS*, 2012 WL 1570856, at *10.

In addition, reasonable reliance is generally a fact question, including in actions involving sophisticated investors.  *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 649 (S.D.N.Y. 2012) (holding that whether an investor is “sophisticated and whether it should have uncovered the alleged fraud at the time of the investment using public information are questions of fact”).  Defendants are right that “the Court obviously should not be asked to make factual findings on a motion to dismiss” (Mem. 8), and yet they are asking the Court to do just that. Defendants cite statistics describing the extent of the GSEs’ involvement in the MBS market; they claim “good reason to believe” that the GSEs purchased the Certificates without relying on Defendants’ false statements; and they point to purported evidence that the GSEs implemented a strategy to purchase riskier products. Mem. 8.  Nothing Defendants point to, however, indicates that the GSEs were aware that Defendants’ representations were false.  While Defendants may find it “hard to swallow” that the GSEs relied upon Defendants’ false statements (Mem. 10), such rhetoric is better suited to closing argument than a motion to dismiss.

Defendants’ motion fails for the added reason that the Complaint describes misrepresentations of matters “peculiarly within defendant’s knowledge” such that the GSEs “ha[d] no independent means for ascertaining the truth.”  *Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 230-31 (S.D.N.Y. 2005) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir. 1997)); *see also Abu Dhabi*, 651 F. Supp. 2d at 181 (justifiable reliance alleged where “defendants had access to non-public information that even sophisticated investors cannot obtain”).  “Unlike [Defendants], the GSEs did not have access to the loan files

for the individual mortgages, and were not in a position to detect the underwriting failures that would have been readily apparent to [Defendants] in [their] capacit[ies] as sponsor, depositor and underwriter for the Securitizations."  AC ¶ 169.  Defendants seek to cast factual doubt on these allegations—they call it "inconceivable" that the GSEs did not apply "proprietary tools," including an automated valuation model ("AVM") analysis, to detect the loan deficiencies in advance of purchasing the Certificates.  Mem. 10.  But there is no indication that the GSEs could have run these tools based on the limited information available to them at the time.  *See Interpublic Grp. of Cos., Inc. v. Fratarcangelo*, 2002 WL 31682389, at *13 (S.D.N.Y. Nov. 26, 2002) ("[T]he reliance requirement was not designed to shield perpetrators of fraud by forcing investors to conduct exhaustive research every time they invest money.").  The Complaint is clear that the GSEs reviewed the data available to them (AC ¶ 200), and did so consistent with industry practice (AC ¶ 204).[6]

In sum, the GSEs, like all other investors in the Securitizations, did not have access to materials that would allow them to detect Defendants' misrepresentations through reasonable diligence before purchasing the Certificates, which is why the GSEs reasonably relied on Defendants' representations to accurately describe the quality of the collateral included in the Securitizations.  *See DDJ Mgt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 155 (2010) ("[W]here the plaintiff has gone to the trouble to insist on a written representation that certain facts are true, it will often be justified in accepting that representation rather than making its own inquiry.").

---

[6]  Defendants' present argument that the GSEs should have detected Deutsche Bank's fraud in 2005–2007 through the use of AVMs (Mem. 10) is inconsistent with the defendants' denigration of the worth of AVMs as inherently unreliable in the common-issue motion to dismiss (*FHFA v. UBS Americas*, 11 Civ. 5201 (DLC), Dkt. 52, at 41–42).  The Court should reject defendants' self-serving feint of alternatively embracing and criticizing AVMs.

**B.     The Complaint Adequately Alleges Scienter**

Defendants argue the Complaint fails to adequately plead scienter, by wrongly insisting on "a level of specificity in fraud pleadings that can only be achieved through discovery." *Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129, 137 (S.D.N.Y. 2001) (collecting cases).  A complaint sufficiently alleges scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006).  Such motives can be shown where defendants misrepresented information to gain "remuneration [that] was dependent upon the successful sale of the … Notes."  *Abu Dhabi*, 651 F. Supp. 2d at 179; *see also S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009) (noting that motive "could be shown by pointing to the concrete benefits" of the alleged fraud) (quotation marks omitted).  Likewise, a complaint pleads an "opportunity to commit fraud" where it alleges "the means used and the likely prospect of achieving concrete benefits by the means alleged," *id.* (quotation marks omitted), such as where a complaint pleads that "the defendants are well positioned to carry out the fraudulent transaction," *Abu Dhabi*, 651 F. Supp. 2d at 180 & n.162.

Defendants were well positioned to commit fraud and had clear motive to do so.  The Complaint includes numerous facts demonstrating that Defendants knew, or were reckless in not knowing, that their representations were false.  Among other things, the Complaint alleges that:

- Deutsche Bank generated massive profits from its sale and marketing of MBS Securitizations (AC ¶ 63), and Deutsche Bank entities participated at each stage of the Securitization process, thus providing Deutsche Bank control of the process and full access to information concerning loan collateral (AC ¶ 175);

- Defendants conducted a "pre-review" of the loan files for samples of hundreds of loans, which revealed to Defendants the rampant deficiencies in the origination of the very loans they selected for inclusion in the Securitizations (AC ¶¶ 167-169);

- Defendants learned from their outside diligence firms, including Clayton, that the loans had massive breach rates, and yet Defendants routinely waived those loans into the Securitizations—sometimes in excess of 50 percent (AC ¶¶ 170-174);

- Defendants participated in warehouse lending, where they extended lines of credit to loan originators and thereby controlled the origination practices of mortgage lenders relying on Deutsche Bank for financing, which also provided Defendants "detailed knowledge" of the originators' practices (AC ¶¶ 175-177);

- Multiple investigations have confirmed that Deutsche Bank knew the deficiencies of the mortgage loans it used to collateralize MBS, including specifically the mortgage loans that it included in several of the Securitizations (AC ¶¶ 181-185);

- Former Deutsche Bank personnel have called Defendants' securitization practices "horrible" and its securitizations "crap," have revealed that Deutsche Bank secured $1.5 billion by shorting the MBS market, and have described Defendants exerting pressure on ratings agencies to secure inflated investment grade ratings (AC ¶¶ 186-192).

These allegations, which describe Defendants' significant profit incentives, their knowledge of defects in the loans populating the securitizations (including specifically the Securitizations), and the bet they placed against the very securities they were marketing to customers, strongly support an inference of scienter.  *See Abu Dhabi*, 651 F. Supp. 2d at 179-80 (motive to commit fraud where fees would be reduced if ratings too low); *Dodona I*, 847 F. Supp. 2d at 643 (holding motive adequately alleged based on defendant's short position in CDOs); *Dandong v. Pinnacle Performance Ltd.*, 2011 WL 5170293, at *11 (S.D.N.Y. Oct. 31, 2011); *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 2012 WL 1450022 (N.Y. Sup. Ct. Apr. 23, 2012).

In addition to this litany of specific allegations, the scale and consistency of Defendants' misrepresentations provide further indication of Defendants conscious misstatements, or, at a minimum, recklessness.  *See In re WorldCom, Inc. Sec. Litig.*, 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003) (holding that "the enormous amounts at stake coupled with the detailed allegations regarding the nature and extent of [defendant's] fraudulent" activities weigh in favor of a strong inference of scienter); *see also Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) ("[T]he magnitude of the alleged fraud provides some

17

additional circumstantial evidence of scienter."); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 & n.174 (S.D.N.Y. 2007).  As detailed in the Complaint, Defendants *always* overstated the owner-occupancy rates in the Securitizations, usually by 10 percent or more.  AC ¶ 103 & tbl.6.  Likewise, Defendants *always* understated the LTV ratios, again usually by 10 percent or more.  AC ¶ 109 & tbl.7.  The Complaint further describes the forensic re-underwriting of thousands of loans from four of the Securitizations, which, based on a document-by-document analysis of the pertinent loan files, shows rates of non-compliance with the applicable underwriting guidelines between 77 and 98 percent.  AC ¶¶ 113-16.  These systematic misrepresentations were not coincidence; they were the result of the reckless and intentional conduct detailed throughout the Complaint.  *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1156, 1186 (C.D. Cal. 2008) (consistent misrepresentations of the Securitizations "create[s] a cogent and compelling inference" of scienter across entire company).[7]

Defendants respond to this extensive showing by isolating and attacking certain specific Complaint allegations.  For instance, Defendants argue that the so-called "Clayton Report" cannot support scienter because it was prepared after the GSEs purchased the Certificates.  Mem. 12-13.  This ignores testimony from Clayton's Vice President Vicki Beal, making clear that Deutsche Bank knew the results of Clayton's due diligence on a daily basis.  *See* Ex. B [FCIC

---

[7]  Defendants complain they are being treated as a "monolithic group."  Mem. 11.  Under the group pleading doctrine, however, plaintiffs "need not identify a specific statement made by [an entity defendant]; rather, they may satisfy Rule 9(b) by referring to an offering memorandum."  *In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 263 (S.D.N.Y. 2011); *see also Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986) ("[N]o specific connection between fraudulent representations in [an] Offering Memorandum and particular defendants is necessary where ... defendants are insiders or affiliates participating in the offer of the securities in question.").  This reflects a presumption that group-published offering materials are the collective work of the parties that offered the securities.  *Id.*  That presumption applies here.  The Complaint alleges that DB Products, DBS, ACE, and MIT Securities were each responsible for the misrepresentations in the term sheets and Registration Statements.  AC ¶¶ 50, 53, 55, 56, 336-38.  Further, to the extent Defendants complain that FHFA has not named specific individuals in its scienter allegations, the Second Circuit has held that "[i]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008) (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (Posner, J.)).

Beal Staff Interview] at 43:22-45:19.  Ms. Beal testified that Mr. Swartz, Deutsche Bank's Vice

President of Due Diligence, "would get a report *every day* on whatever loan reviews you were

doing for him."  *Id.* at 44:25-45:7 (emphasis added).[8]  Later, Clayton produced broader reports

that summarized their grading by quarter: starting from 2006 and going through 2007, Clayton

produced "trending reports" that were reviewed by another Deutsche Bank employee, Mr.

Commaroto.  AC ¶ 172.  FHFA alleges that "[i]n response to Clayton's findings, Deutsche Bank

did not improve its practices by excluding the faulty loans identified by Clayton, or by expanding

the number of loans that were subject to review.  Just the opposite."  AC ¶ 173.  Deutsche Bank

"affirmatively [sought] to profit from this knowledge" by using the high defect rates "to insist on

a lower price from the loan originators, leaving more room for its own profits while the defective

loans were hidden from investors" such as the GSEs.  AC ¶ 174.[9]

Defendants also seek to minimize the significance of Deutsche Banks' settlements with

federal and independent regulators.  As set forth in the Complaint, however, the Department of

Justice ("DOJ") accused Deutsche Bank and MortgageIT of "knowingly, wantonly, and

recklessly" permitting violations of underwriting guidelines.  AC ¶ 182.  The DOJ complaint

explains, in great detail, how these Defendants "failed to implement basic quality control"

procedures and how, during the relevant time period, Defendants' method for addressing reports

identifying "serious underwriting violations" was to "stuff[] the letters, unopened and unread, in

---

[8]   Deutsche Bank's reliance on *Landesbank Baden-Wurttemburg v. Goldman, Sachs & Co.*
("*Landesbank*"), 821 F. Supp. 2d 616, 622 (S.D.N.Y. 2011) (cited in Mem. 13), which discussed the single Clayton
Report that Defendants choose to address, is misplaced.  As later courts have concluded, *Landesbank*'s discussion of
the Clayton Report is distinguishable when a complaint contains, as it does here, additional allegations as to "how at
least some of [a defendant's] officers were on notice that the [securities] were 'junk,'" *Dodona*, 847 F. Supp. 2d at
643; *see* AC ¶ 186 (Deutsche Bank insider describing its RMBS offerings as "horrible," "crap," and "pigs").

[9]   Defendants similarly argue that Deutsche Banks' acquisition of MortgageIT is irrelevant because
"MortgageIT Inc. did not become a subsidiary of any Defendant until January 2007."  Mem. 15.  This ignores that
the Complaint alleges that as early as July 12, 2006, Defendants announced their acquisition of MortgageIT and had
been conducting due diligence on the transaction much earlier than that.  AC ¶¶ 179, 185.

a closet in MortgageIT's Manhattan headquarters."  AC ¶ 183.  Defendants' only response to this DOJ settlement is to argue that "there is no allegation that the FHA-insured loans at issue in the False Claims Act suit collateralized any relevant Offering" (Mem. 15), a factual assertion contradicted by the Complaint allegation that the DOJ settlement included loans that were "includ[ed in] the ACE 2006-ASAP1 and ACE 2006-ASAP2 Securitizations" (AC ¶ 182).[10]

In sum, Defendants' arguments depend on a misleading evaluation of selective components of the Complaint's scienter allegations.  Looked at "collectively," those allegations describe systematic misrepresentations that Defendants were either aware of or reckless in not knowing.  *Dodona*, 847 F. Supp. 2d at 643-44; *see also In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d at 479 (allegations must be evaluated "in the whole").

### C.    The Complaint Adequately Alleges Actionable Misrepresentations

Defendants next contend that the Complaint fails to allege actionable misrepresentations, claiming that the Complaint describes only "a few allegedly defective loans" based on a loan re-underwriting of four Securitizations.  In fact, the Complaint describes misrepresentations in thousands of individual loans, providing detailed statistics showing the extent to which Defendants misrepresented LTV ratios and owner-occupancy statistics across all Securitizations. AC tbls 6-7.  This false reporting, moreover, is a direct consequence of the underwriting failures illustrated by 31 specific examples from a page-by-page re-underwriting of nearly three thousand individual loans—a re-underwriting that revealed breach rates of between 77 and 98 percent for the four Securitizations.  AC ¶ 113-16.  Thus, Defendants' characterization is wrong:  the Complaint alleges, in great detail, "that there were pervasive and systematic breaches of [the relevant underwriting] guidelines with respect to the securitized loans."  AC ¶ 74.

---

[10]   The Complaint also discusses a settlement Deutsche Bank recently reached with FINRA, involving "nine of the Securitizations in this action" – a fact undercutting Defendants' characterization of this settlement as a "complete red herring."  AC ¶ 181 & n.16 (listing Securitizations); Mem. 16.

It is proper, moreover, for the Complaint to assert fraud based on the results of FHFA's analysis of thousands, but not all, of the underlying loans.  Courts recognize, including in the fraud context, that facts demonstrating a systemic problem are probative of whether particular loans from within that system were defective.  *Allstate*, 824 F. Supp. 2d at 1184 n.23 (construing New York's common-law fraud cause of action and concluding that underwriting allegations were "sufficiently pleaded as applying to Countrywide's entire operation and therefore to the specific Offerings purchased by Allstate").[11]  This is in keeping with the standard that, on a motion to dismiss, courts will not demand "a level of specificity in fraud pleadings that can only be achieved through discovery."  *Liberty Ridge*, 173 F. Supp. 2d at 137; *see also Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir. 1998) ("[W]e also cannot expect plaintiffs to plead 'fraud with complete insight' before discovery is complete.").  Defendants' approach, by contrast, would set an impossible standard whereby a plaintiff in a fraud action would be required to include specific allegations on a loan-by-loan basis, rather than relying on "only" 31 examples from a larger re-underwriting.  Mem. 19-20.  Plainly, FHFA was under no obligation to add 3,000 paragraphs to its Complaint describing each instance of breach in the re-underwritten samples.  And it is just as clear that FHFA, like any other investor, is not required in advance of discovery to identify each and every breaching loan in order to assert a common law fraud claim.  *See, e.g.*, *Colabella v. Am. Inst. of Certified Pub. Accountants*, 2011 WL 4532132, at *7 (E.D.N.Y. Sept. 28, 2011) (declining to decide an issue of fact where the case "is still in its

---

[11]   *See also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008) (same); *In re Wells Fargo Mortg.-Backed Certs. Litig.*, 712 F. Supp. 2d 958, 971-72 (N.D. Cal. 2010) (rejecting argument that allegations were not tied to the "specific Certificates," where it was alleged that the "challenged conduct infected the entire underwriting process"); *Employees' Ret. Sys. of the Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 152 (S.D.N.Y. 2011) (holding that plaintiff need not allege any particular loan was defective "so long as the complaint alleges widespread abandonment of underwriting guidelines").

nascent stages" and discovery "would significantly aid the court in rendering a decision"). The Complaint details a pervasive pattern of breach that supports the claim of fraud.[12]

### D.   The Complaint Adequately Alleges Causation

Defendants rely on another premature fact-based argument by claiming that the GSEs' losses, contrary to the allegations in the Complaint, resulted from a market decline, and not Defendants' misrepresentations. Mem. 21. This "don't blame me, blame the market" argument is routinely advanced by MBS defendants, and also routinely rejected. *In re Sadia S.A. Sec. Litig.*, 269 F.R.D. 298, 317 (S.D.N.Y. 2010) (rejecting this argument "[f]or the third time in as many months"); *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 618 (7th Cir. 2011) (the court cannot decide on the pleadings whether the "general economic downturn that impacted the financial services industry" was the sole cause of the plaintiffs' losses). It is well established that whether damages were caused by a defendant's actions or "by an intervening event … is a matter of proof at trial and not be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003); *see also Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 320-21 (S.D.N.Y. 2011) (acknowledging that the financial crisis may "complicate[] the causal inquiry" but noting that "[d]ifficult causal distinctions of this kind are not appropriately resolved on a motion to dismiss").

The Complaint alleges it was Defendants' misrepresentations that proximately caused the GSEs' losses. AC ¶ 214. Further, while Defendants seek to treat "market turmoil" as independent of the multi-billion dollar deficiencies in their MBS practices (Mem. 21), the Complaint also alleges that the "Defendants' misrepresentations and omissions, which

---

[12] As the Court explained during a recent conference, "[w]hatever review the plaintiffs did at the time they were preparing their complaint would not limit their ability to" identify additional breaching loans at trial. In fact, FHFA would be "entirely within [its] rights to do a completely new review of different loan files with completely different numbers and present that evidence at trial." Ex. C [7/19/12 Hearing Tr.] at 14:18–15:1.

proximately caused the GSEs' losses, also contributed to the Nation's housing crisis." AC ¶ 214. This allegation is in keeping with the findings of the FCIC, which Defendants themselves invoke (Mem. 22), that the market "disruption" "was the result of human action and inaction, not of Mother Nature or computer models gone haywire," Mem. 22 & Defs. Ex. 1, FCIC Report at xvii. Defendants cannot avoid liability by hiding behind a market decline that their own misconduct helped spur. *See King Cnty. v. Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 344 (S.D.N.Y. 2010) (rejecting argument that "plaintiffs failed to plead loss causation solely because the credit crisis occurred contemporaneously").

### E.    The Complaint Adequately Alleges Damages

Defendants claim that the Complaint fails to plead damages because there is no claim that any payments due under the Certificates have been missed, and because damages cannot be established through a decline in the value of an illiquid investment.  Mem. 20.  That is not the law.  "New York … follows the well-established common law rule that fraud damages represent the difference between the purchase price of the asset and its true value, plus interest, generally measured as of the date of sale."  *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007)(reversing district court's dismissal of appellant's counterclaim for fraud); *see also Allstate*, 824 F. Supp. 2d at 1188 (citing *Merrill Lynch* for proper standard to evaluate sufficiency of damages allegations for common law fraud claim).[13]  The Complaint squarely meets that standard with its allegation that "[f]rom the day the GSEs purchased the GSE Certificates, the GSEs suffered injury," because, due to Defendants' "misrepresentations, the true

---

[13]    The cases Defendants rely on address issues unrelated to the common law fraud cause of action asserted here. *See New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 166-67 (S.D.N.Y. 2011) (discussing Securities Act claims and holding that such "secondary market" warnings are "not determinative" of class certification issue); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 223 (S.D.N.Y. 2008) (discussing whether plaintiff alleged a material misrepresentation under the Exchange Act).

value of the GSE Certificates on the date of purchase was far lower than the price paid for them by the GSEs." AC ¶ 208; *see also* AC ¶¶ 11, 160, 215.[14]

## II.   BOTH THE VIRGINIA AND DC BLUE SKY LAWS APPLY IN THIS ACTION

Defendants seek dismissal of FHFA's state Blue Sky claims under Virginia and DC law through a choice of law analysis applicable in the tort context.  Mem. 22.  Defendants cite no authority for the proposition that such an analysis applies to state Blue Sky claims, however, and in fact concede that "some" authority holds the opposite.  *Id.* 23.  In fact, Courts and commentators are virtually unanimous that state Blue Sky laws from multiple jurisdictions can be asserted in combination or simultaneously.  *See, e.g.*, *Chrysler Capital Corp. v. Century Power Corp.*, 1992 WL 163006, at *2 (S.D.N.Y. June 24, 1992) ("[B]ecause application of multiple state securities laws to a single securities transaction does not present a conflict of laws issue, [defendant]'s argument that only New York law may apply to the transaction at issue is rejected."); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 2012 WL 1322884, at *2 (C.D. Cal. Apr. 16, 2012) ("The Court agrees with the majority view that a plaintiff may sue under the securities laws of several states at once so long as the requirements of each state's law are met."); *see also* 12 Joseph C. Long, *Blue Sky Law* § 4:1 n.5 ("Under the Uniform Act, it is clear that the laws of several states may attach to the same [securities] transaction.").  In one recent decision, directly on point, a court rejected the very argument Defendants make here seeking application of the Martin Act.  *Fed. Home Loan Bank of Seattle v. Banc of Am. Sec., LLC*, 2011 WL 2693115, at *1 (Wash. Sup. Ct. June 23, 2011).

The Complaint alleges that Defendants "targeted Fannie Mae in Washington, D.C. and Freddie Mac in Virginia," in particular by "sen[ding] offering materials, including the

---

[14]   Because FHFA's fraud claims are properly alleged, Defendants' sole challenge to the Complaint's aiding and abetting claims (Mem. 22 n.39) must also fail.

Prospectuses and [ProSupps], to Fannie Mae in Washington, D.C. and Freddie Mac in Virginia." AC ¶ 46; *see also* AC ¶¶ 277 (Freddie), 309 (Fannie).  Under the plain language of the relevant statutes, these claims are therefore properly brought under these laws.  *See* D.C. Code § 31-5608.01 (D.C. Blue Sky Act applies "to a person who sells, or offers to sell, when an offer to sell is made in the District or an offer to purchase is made and accepted in the District"); *Lintz v. Carey Manor Ltd.*, 613 F. Supp. 543, 550 (W.D. Va. 1985) (Va. Code § 13.1-522 "is intended to govern those who sell securities within the state even though incorporated elsewhere and never entering into the state").  Following the above overwhelming authority, these claims are properly asserted and not subject to choice of law analysis.

## III.   DB PRODUCTS IS LIABLE AS A SUCCESSOR OF MORTGAGEIT

The Complaint alleges that Defendant DB Products (referred to by Defendants as DBPS) is the successor to MortgageIT, as a result of the merger between MIT Holdings (MIT Securities Corp.'s ("MIT") parent corporation) and DB Products.  AC ¶¶ 19, 356.  In response, Defendants claim that MIT actually merged with a company called Titan Holdings (Mem. 24), but many of the Defendants' own press releases make clear that MIT merged with Deutsche Bank, not Titan, and was integrated directly into Deutsche Bank's MBS business.[15]  Defendants have thus raised, at best, a factual dispute that can be decided upon further discovery.

## CONCLUSION

For the reasons set forth above, FHFA respectfully requests that the Court deny in its entirety Defendants' Motion to Dismiss the Amended Complaint.

---

[15]   *See* Ex. D [Deutsche Bank Press Release, Deutsche Bank to Acquire MortgageIT Holdings, Inc. (July 12, 2006)] ("Upon closing, the operating company, MortgageIT, Inc., will become a part of Deutsche Bank's Residential Mortgage Backed Securities (RMBS) business."); Ex. E [Deutsche Bank Press Release, Deutsche Bank Completes Acquisition of MortgageIT Holdings (Jan. 3, 2007)] ("MortgageIT will become a part of Deutsche Bank's Residential Mortgage Backed Securities group.").

DATED:    New York, New York
          September 7, 2012

                                    QUINN EMANUEL URQUHART &
                                       SULLIVAN, LLP


                                    By:  /s/ Adam M. Abensohn
                                         Philippe Z. Selendy
                                         Kathleen M. Sullivan
                                         Adam M. Abensohn
                                         Jordan A. Goldstein

                                    51 Madison Avenue, 22nd Floor
                                    New York, New York  10010-1601
                                    (212) 849-7000

                                    *Attorneys for Plaintiff Federal Housing
                                    Finance Agency, as Conservator for Fannie
                                    Mae and Freddie Mac*