# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

By E-Mail

November 15, 2013

Hon. Denise L. Cote,
    United States District Judge,
        Daniel Patrick Moynihan United States Courthouse,
            500 Pearl Street, Room 1610,
                New York, New York  10007-1312.

        Re:    *FHFA Actions*, No. 11-cv-5201, *et al.* (S.D.N.Y.) (DLC)

Dear Judge Cote:

        On behalf of all Defendants in the above-referenced Actions, I write to request the discovery specified at Exhibit A concerning the GSEs' loan-level reviews on bulk purchases of Alt-A and subprime mortgage loans underwritten to the guidelines of originators whose loans are at issue in these litigations.  The Court previously denied Defendants' requests for this discovery based on factual representations by FHFA's counsel that have proven inaccurate.  The discovery Defendants seek undermines the hindsight-based re-underwriting FHFA has performed for litigation purposes, and is relevant to a host of claims and defenses in these Actions.  The parties are at an impasse.

        The Court denied Defendants' prior requests for the GSEs' bulk purchase due diligence materials based on factual assertions by FHFA's counsel that the Court adopted in its oral rulings and Opinion and Order of June 28, 2013.  (*See* November 15, 2013 Declaration of Bradley A. Harsch ("Harsch Decl.") Sec. III.F.)  For example, FHFA's counsel claimed that the discovery sought by Defendants on the GSEs' bulk Alt-A and subprime purchases concerned loans "having different characteristics, made to different borrowers, and underwritten to different guidelines" (Dec. 14, 2012 Ltr. from R. Schirtzer to J. Cote), and that Freddie Mac identified loans in due diligence "for reasons entirely unrelated to compliance with underwriting guidelines." (Feb. 6, 2013 Ltr. from P. Selendy to J. Cote at 2.)  The Court stated in its Opinion of June 28, 2013 that "the GSEs principally bought whole loans under different standards and constraints than those that applied to PLS collateral." (June 28 Opinion at *22.)  The record demonstrates that, contrary to FHFA's prior representations, the GSEs purchased Alt-A and subprime loans in bulk that were underwritten in whole or in part to originators' guidelines—just like the loans backing the Private Label Securities ("PLS") at issue here. (Harsch Decl. Sec. III.A.)  The credit quality of the loans the GSEs purchased through their bulk programs substantially overlaps with the credit quality of the loans at issue in these cases, and many times the loans the GSEs purchased in bulk came from the same pools as loans that backed PLS the GSEs purchased. (*Id.* Sec. III.B.)  Also contrary to statements by FHFA's counsel, the GSEs did not merely compare loan files to loan tapes in due diligence, but instead re-underwrote loan files to determine whether the loans complied with originators' guidelines. (*Id.* Sec. III.C.)  Contrary to assertions by FHFA's counsel that its litigation re-underwriting is not comparable to the GSEs' contemporaneous due diligence because FHFA is "going beyond the loan files," the GSEs' due diligence also looked to sources outside loan files. (*Id.* Sec. III.D.)

        Now that FHFA has issued its first re-underwriting report, it is clear that discovery into the GSEs' loan-level reviews of Alt-A and subprime whole loans will directly refute FHFA's current litigation-driven re-underwriting. (*Id.* Sec. IV. ███████████



*(Id.* ¶¶ 74-76.)

*(Id.* at ¶ 77.)

*(Id.* at ¶ 78.)

*(Id.* ¶¶ 89-91.)

Evidence of the GSEs' bulk purchase loan-level reviews will rebut FHFA's core allegations. FHFA has described its contentions about defects as "the heart of the case" (Oct. 15, 2012 Hr'g Tr. at 64:2–3), and this Court has described the "core tasks" in the case as the "re-underwriting process," the "focus on materiality," and whether "plaintiff can prove misrepresentations." (Nov. 6, 2012 Hr'g Tr. at 63:2–6.) Under the Securities Act, the truth of a statement must be judged "by the facts as they existed at the time of the statement;" a "backward-looking assessment of the infirmities of mortgage-related securities . . . cannot help plaintiffs' case." *In re Royal Bank of Scot. Grp. PLC Sec. Litig.*, 2012 U.S. Dist. LEXIS 126220, at *26 (S.D.N.Y. Sept. 4, 2012); *see also GAF Corp.* v. *Heyman*, 724 F.2d 727, 742 (2d Cir. 1983). Freddie Mac's offering materials contain language nearly identical to that in the prospectus supplements in these cases despite Freddie Mac's waiving in many of the same supposed "material defects" on which FHFA proposes to prove its case. (Harsch Decl. at ¶¶ 38, 92.) A fully developed record on the GSEs' contemporaneous conduct with respect to similar potential "defects" will show that FHFA has inflated its claimed defect rates by identifying conditions that the GSEs themselves did not consider defects at all, or considered but determined were immaterial for many loans they reviewed. It will also show that the GSEs did not consider loans "defective" just because a vendor such as Clayton assigned them a grade of "3", or that there was anything misleading about "waiving in" those loans to a securitization pool. *(Id.* ¶ 93.)

Evidence concerning the GSEs' bulk purchases also supports the Defendants' due diligence defense because the GSEs employed similar practices and procedures as those of Defendants *(id.* Sec. III.E.), thus undermining FHFA's claim that Defendants' due diligence was inadequate. The requested evidence also supports Defendants' loss causation defense. The limited discovery produced by FHFA on losses in the GSEs' subprime and Alt-A purchases shows that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *(Id.* ¶ 95.) The requested evidence further is relevant to Defendants' knowledge and inquiry notice defenses because, through their loan-level reviews of subprime and Alt-A bulk purchases in 2005–2007, the GSEs learned of precisely the same kinds of "defects" in loans from the relevant originators as FHFA today is alleging exist in the collateral backing the PLS at issue here. *(Id.* Sec. IV.C.)

Having attempted to limit its production to documents relating to PLS, FHFA's production relating to the GSEs' bulk purchases is small and haphazard *(id.* Sec. II.B.); additional discovery will further demonstrate that the GSEs' view of underwriting defects in 2005–2007 does not comport with FHFA's current litigation position. Any burden is outweighed by the central importance of this evidence, the more than $100 billion at stake in these Actions, and the massive resources of FHFA and the GSEs. *See* Fed. R. Civ. P. 26(b)(2)(C).

Hon. Denise L. Cote                                                                      -3-

Respectfully Submitted,

Richard H. Klapper

cc:      Counsel for All Parties

# Exhibit A

**EXHIBIT A—DEFENDANTS' TARGETED REQUESTS**

Defendants request that the Court (1) order FHFA to search for and produce the following documents concerning the GSEs' loan-level assessments of Alt-A and subprime loans underwritten at least in part to originators' guidelines; and (2) provide information sufficient to allow Defendants to assess whether additional targeted discovery is warranted. Defendants make these targeted requests without waiving their right to receive the more fulsome discovery to which they are entitled.

      1.      Centralized due diligence files and reports for the GSEs' Alt-A and subprime bulk purchases and securitizations, including for the following deals:

| Originator | Deal Identifier; Date(s) |
|---|---|
| **Freddie Mac** | |
| Washington Mutual | T063 (Feb. 16, 2005); T064 (May 18, 2005); T065 (Dec. 15, 2005); T068 (Feb. 22, 2006); T069 (March 23, 2006); T070 (May 19, 2006); T071 (June 20, 2006); T073 (Oct. 26, 2006) |
| Countrywide | T066 (Dec. 14, 2005); T067 (Feb. 24, 2006) |
| Wells Fargo | T074 (July 30, 2007); T077 (Oct. 26, 2007) |
| First Franklin | T079 (Dec. 18, 2007) |
| Bank of America | T080 (June 19, 2008); T082 (April 29, 2009) |
| Ameriquest | T072 (Sept. 27, 2006) |
| Argent, GS Mortgage Securities Corp., Indymac, Morgan Stanley, NovaStar | T075 (July 13, 2007) |
| MortgageIT, Inc. | T076 (Oct. 23, 2007) |
| Equifirst | T078 (Jan. 23, 2008) |
| Option One, Long Beach, WaMu | T081 (July 28, 2008) |
| **Fannie Mae** | |
| Bank of America | 18396 (Oct. 2007) |
| Chase | 16076 (Aug. 2006); 16374 (Nov. 2006); 17225 (April 2007); 17382 (May 2007); 17511 (June 2007); 17768 (June 2007); 17993 (July 2007); 18223 (Aug. 2007); 18319 (Oct. 2007) |
| Countrywide | 18414 (Sept. 2007); 18540 (Oct. 2007); 18792 (Dec. 2007); 18934 (Dec. 2007); 18991 (Jan. 2008) |
| First Franklin | 16143 (Sept. 2006); 16333 (Oct. 2006); 16502 (Oct. 2006); 16558 (Nov. 2006); 18093 (Aug. 2007); 18192 (Aug. 2007); 18292 (Sept. 2007); 18394 (Sept. 2007); 18535 (Oct. 2007); 18699 (Nov. 2007); 18797 (Dec. 2007) |
| Lehman Bros. | 18607 (Oct. 2007) |
| Nationstar | 18110 (Aug. 2007) |
| New Century | 14897 (Dec. 2005); 15611 (May 2006); 16013 (Aug. 2006) |

| Option One | 16094 (Sept. 2006); 17665 (May 2007); 18188 (Sept. 2007) |
|---|---|
| Wells Fargo | 18175 (Aug. 2007); 18234 (Aug. 2007); 18403 (Sept. 2007); 18901 (Dec. 2007); 19085 (Feb. 2008); 19326 (April 2008); 19357 (April 2008) |

2. ████████████████████████████████████████████████████

3.   Documents related to GSE Alt-A and subprime bulk purchases, and Alt-A flow purchases, that were previously withheld from the email production of current FHFA custodians on the grounds that they were not "provided to or accessible to, PLS traders, their supervisors, or senior risk custodians."[1]

| Name | Title | Description |
|---|---|---|
| **Freddie Mac** | | |
| Ronald Feigles | Director, Alternative Markets Operations | Mr. Feigles' group was responsible for conducting due diligence for T-deals. |
| Raymond Romano | Executive Vice President, Credit Risk Oversight | Mr. Romano had a role in reviewing proposed terms of business for flow or bulk originators, and was also involved in post-contract reviews. In addition, transactions over certain dollar limits required Mr. Romano's review and approval.<br><br>Mr. Romano was at times kept informed of loan-level due diligence on subprime purchases, and of T-Deal underwriting issues. |

---

[1]   FHFA has previously produced documents that "pertained only to Single Family" only if those documents both (i) discussed Originators, **and** (ii) appeared in the files of a subset of [36] of its 81 custodians. Decl. of Richard Schirtzer in Support of Plaintiff's Sur-Reply, June 10, 2013, ¶¶ 4–7; 10. Otherwise, FHFA produced Single Family documents only if they happened to be part of the same families as otherwise-responsive PLS documents. *Id.* ¶ 10.

| | Fannie Mae | |
|---|---|---|
| Enrico Dallavecchia | Chief Risk Officer | As Chief Risk Officer, Mr. Dallavecchia was responsible for approving and overseeing Fannie Mae's Single Family subprime policy, including subprime bulk acquisitions and credit guarantees of subprime mortgage loans by the Single-Family Business of Fannie Mae. |
| Pam Johnson | Single Family Risk Officer | Ms. Johnson was responsible for day-to-day risk functions from 2002-2007, and part of Ms. Johnson's responsibilities included monitoring subprime bulk purchases from a credit risk standpoint. Ms. Johnson was at times consulted about individual subprime bulk purchases. |

4. Documents concerning the GSEs' bulk purchases of Alt-A and subprime loans, and flow purchases of Alt-A loans, from the files of the individuals responsible for or involved with performing or overseeing pre- and post-purchase reviews of these loans and assessing whether those loans conformed to underwriting guidelines.

| Name | Title | Description |
|---|---|---|
| | Freddie Mac | |
| Mike Belo | Director, Single Family Underwriting | Mr. Belo was involved with underwriting the T-Deals, including reviewing loans to determine whether they conformed with underwriting guidelines. |
| Pamela Padgett | National Underwriting and Quality Control Director | Ms. Padgett was one of the Freddie Mac employees who was responsible for overseeing and underwriting the T-Deals, including reviewing loans to determine whether they conformed with underwriting guidelines. |
| Robert Skinner | Director, Customer Credit Management | Mr. Skinner was responsible for bulk purchases, including ███ |

| Name | Title | Description |
|------|-------|-------------|
|  |  | ██████████████ ██ █ █ █ ██ |
| Rebecca Wagner | Underwriting QA Director | Ms. Wagner was one of the Freddie Mac employees who was responsible for underwriting the T-Deals, including reviewing loans to determine whether they conformed with underwriting guidelines. |
| **Fannie Mae** | | |
| Kevin Brungardt | Vice President, Subprime Business | Mr. Brungardt oversaw Fannie Mae's bulk subprime purchases. |
| Laurel Anne Davis | Vice President of the Investor Channel (part of the Single Family Mortgage Business) | Ms. Davis managed the purchase and securitization of bulk loans from Fannie Mae customers. |
| Hope Evans | Vice President, Underwriting & Quality Assurance | Ms. Evans managed single family underwriting and collateral quality, including the subprime due diligence process. |
| Joseph Grimes | VP for Subprime Account Management | Mr. Grimes worked for Fannie Mae's National Underwriting Center, and his roles included performing forensics on "bad loans," overseeing operations and assisting with the subprime initiative. |
| Leslie Peeler | Director, Subprime Portfolio Management | Ms. Peeler oversaw and managed Fannie Mae's subprime bulk purchases. |
| Robert Vignato | Sr. Underwriting Consultant | Mr. Vignato was a Director of Subprime Due Diligence at Fannie Mae's National Underwriting Center which performed loan level, pre-purchase review on Fannie Mae's subprime bulk purchases, and reviewed Alt-A loans purchased under the Alt-A Transformation. |

     5.     Documents sufficient to show the performance of the GSEs' bulk purchases of Alt-A or subprime loans.